IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

MCALLEN DIVISION


| | | |
|---|---|---|
| HILDA GONZALEZ GARZA, ET AL | § | CASE NO. 7:18-CV-00046 |
| | § | MCALLEN, TEXAS |
| VERSUS | § | MONDAY, |
| | § | FEBRUARY 26, 2018 |
| STARR COUNTY, ET AL | § | 10:22 A.M. TO 1:53 P.M. |


TEMPORARY RESTRAINING ORDER


BEFORE THE HONORABLE RANDY CRANE
UNITED STATES DISTRICT JUDGE


APPEARANCES:

FOR THE PARTIES:                    SEE NEXT PAGE

COURTROOM ERO:                      RICK RODRIGUEZ


TRANSCRIPTION SERVICE BY:

JUDICIAL TRANSCRIBERS OF TEXAS, LLC
935 ELDRIDGE ROAD, #144
SUGAR LAND, TEXAS 77478
(281) 277-5325 (office) ◊ (281) 277-0946 (fax)
www.judicialtranscribers.com


Proceedings recorded by electronic sound recording,
transcript produced by transcription service.

<u>APPEARANCES</u>:

FOR THE PLAINTIFFS:              CELINA Y. MORENO, ESQ.
                                 ALEJANDRA AVILA, ESQ.
                                 NINA PERALES, ESQ.
                                 MALDEF
                                 110 BROADWAY, SUITE 300
                                 SAN ANTONIO, TEXAS 78205

                                 EFREN C. OLIVARES, ESQ.
                                 SOUTH TEXAS CIVIL RIGHTS
                                    PROJECT
                                 1017 W. HACKBERRY AVENUE
                                 ALAMO, TEXAS 78516


FOR THE DEFENDANTS:              EILEEN M. LEEDS, ESQ.
                                 GUERRA LEEDS SABO & HERNANDEZ
                                 1534 E. 6TH STREET, SUITE 200
                                 BROWNSVILLE, TEXAS 78520

                                 YSMAEL FONSECA, ESQ.
                                 GUERRA LEEDS SABO & HERNANDEZ
                                 10213 N. 10TH STREET
                                 McALLEN, TEXAS 78504

                                 JESUS M. ALVAREZ, ESQ.
                                 ATTORNEY AT LAW
                                 501 N. BRITTON AVENUE
                                 RIO GRANDE CITY, TEXAS 78582

INDEX

| WITNESSES: | Direct | Cross | Redirect | Recross | VOIR DIRE |
|---|---|---|---|---|---|
| HILDA GARZA | | | | | |
| By Ms. Avila | 16 | . | 59 | . | . |
| By Ms. Leeds | . | 44 | . | 62 | . |
| By Mr. Alvarez | . | . | . | 67 | . |
| OMAR ESCOBAR | | | | | |
| By Mr. Fonseca | 71 | . | 95 | . | . |
| By Ms. Perales | . | 90 | . | 99 | . |
| By Mr. Alvarez | . | . | . | 97 | . |

| EXHIBITS: | Marked | Offered | Admitted |
|---|---|---|---|
| GOVERNMENT'S | | | |
| Exhibits 1 through 16 | 13 | 13 | 13 |

4

1       <u>MCALLEN, TEXAS; MONDAY, FEBRUARY 26, 2018; 10:22 A.M.</u>

2       THE COURT:  All right.  Let me call for

3 announcements first, 18-CV-46, Hilda Gonzalez Garza, et al

4 versus the County of Starr, et al.  Let's start with the

5 Plaintiffs.  Who's here for the two named Plaintiffs?

6       MS. MORENO:  Good morning, Your Honor.  My name is

7 Celina Moreno with the Mexican American Legal Defense and

8 Educational Fund, or "MALDEF."  Here with me is Alejandra

9 Avila and Nina Perales, also with MALDEF.

10       MR. OLIVARES:  Good morning, Your Honor.  Efren

11 Olivares with the Texas Civil Rights Project for the

12 Plaintiffs.  And here with me is Matt Stevens, also for the

13 Plaintiffs.

14       THE COURT:  All right.  And for the Defendants --

15       MS. LEEDS:  Good morning, Your Honor.  Eileen Leeds

16 and Ysmael Fonseca representing the Plaintiffs.  At this

17 hearing Mr. Alvarez is here as a result of everything that

18 happened all at once, and, you know, we really haven't

19 communicated, but he is --

20       THE COURT:  All right.  And you're representing all

21 the --

22       MS. LEEDS:   -- representing himself to that extent.

23       THE COURT:  All right.  I think you said Plaintiffs

24 but you mis-spoke.  You represent all the Defendants.

25       MS. LEEDS:  Correct.

1          THE COURT:  And Mr. Alvarez represents Mr. Alvarez,

2     also maybe in addition to you, Ms. Leeds?

3          MR. ALVAREZ:  That's -- he's one of the County

4     Commissioners, Judge, and I mean everything happened at once,

5     Judge, that I don't even know where we fit.  So, we're here.

6          THE COURT:  All right.  And I did get your

7     continuance request --

8          MR. ALVAREZ:  Yeah.

9          THE COURT:  -- which also indicated as a basis that

10    you were hoping to try to work this out, and so I didn't know

11    if there were some discussions about resolving this or not

12    that you all wanted to visit with me about.  If not, then we

13    can move on here.

14         MR. ALVAREZ:  Yes, Judge.  And we did file a motion

15    for continuance on Saturday morning, Judge, and I'm glad the

16    Court got it and got to review it but -- because we hadn't had

17    any communication with MALDEF or the other Defendant -- that

18    is Defendants' case -- or Plaintiffs', I'm sorry.  But we did

19    talk a while ago, Judge, here in the courtroom, inside the

20    courtroom, it seems like they don't want to work this case

21    out, Judge.  So I mean --

22         THE COURT:  Okay.

23         MR. ALVAREZ:  -- and we tried to try to get a

24    continuance on this matter, Judge, but we were not able to get

25    them to a table to agree to it, Judge.

1           THE COURT:  All right.  So let's just move forward

2    here.  So read all of the filings by the Plaintiffs before we

3    broke for the weekend, and it wasn't until this morning when I

4    got to the office that I'd seen everything that came in over

5    the weekend, and even some things this morning.  So the amount

6    of time we've had to review the defensive information has been

7    very limited obviously.  We've had more time to look at and

8    try and analyze the information the Plaintiffs submitted.

9           The Defendants do raise some points that -- some

10   questions that the Court itself had just based on what had

11   been filed previously, and that is, you know, what really is

12   the ordinance, the regulation, the law that the county adopted

13   that, you know, we're fussing over here this morning, and I

14   wanted just to pull up both of these documents, Plaintiffs

15   contend one is controlling, the Defendants generally contend

16   the other is controlling.  And so let me just pull these up so

17   we can sort of go over what the Court's questions were.

18           I'm going to just guess this is Exhibit A.  All

19   right.  So here is -- wow, that's really bad.  Let's see if I

20   can get this to a reasonable magnification.  All right.  So

21   here we have the order that I -- that the Plaintiffs complain

22   about that calls itself an order setting policy for the

23   prohibition of electioneering, and it -- I think its intent

24   was to prohibit electioneering.  I mean that's what it says.

25           We couldn't -- the Court had difficulty trying to

1       figure out, well, where was the actual order because it -- the

2       order is really two paragraphs.  One it orders -- it claimed

3       that it's ordering -- it really doesn't -- it just described

4       some property, there's really no order that's in -- it just

5       sort of says that the County of Starr owned various pieces of

6       property, it goes on to describe them, the courthouse annex,

7       Justice of the Peace building, and various other buildings,

8       there are associated parking areas that serve to carry on

9       ordinary county business.  So that's not really an order.  We

10      would all agree with that, it doesn't order anything.

11              So the next paragraph I think comes closer and it

12      says that the County of Starr desires to regulate the time,

13      place and manner of electioneering, blah, blah, blah, blah,

14      blah, desires to regulate at these particular places and

15      there's some maps attached to this document.  But it

16      doesn't -- there -- it never -- then it says, I would think,

17      therefore it hereby ordered that electioneering is prohibited

18      or you cannot come on to these properties in an election year.

19              You know, I couldn't ever find where the prohibition

20      was, what they were really doing with this ordinance.  It

21      was -- either it was poorly written, I think everyone would

22      concede that it was very poorly written because I think the

23      intent was that it so regulate, but I couldn't see that it did

24      because it then criminalizes behavior that is the subject of

25      this order, but I couldn't find a rule anywhere in the order

1    that had been adopted.  I just had trouble with that.  I

2    wanted to hear some explanation, did I miss something.  But,

3    you know, it -- how is it the Plaintiffs read this that

4    there's an actual prohibition, because I saw two paragraphs

5    under the order, one describes some property, the other

6    describes desire of the County.

7            And again, this is usually sort of preamble

8    language, we desire to have a safer community, we desire to

9    restrict crime or -- and so here again the County desires to

10   regulate the manner of electioneering and I therefore expected

11   them then to do so in some kind of an order somewhere, but I

12   didn't -- I could never see the order.

13           Ms. Moreno, you want to elaborate or comment on that

14   or explain?

15           MS. MORENO:  Yes, thank you, Your Honor.  The order

16   bans electioneering "in or on property" --

17           THE COURT:  Where does it say that, where does it

18   say it's prohibited?  I mean unless -- I mean this is somewhat

19   a function of grammar.  The County of Starr -- where is the

20   verb in that sentence?

21           MS. MORENO:  The County of Starr --

22           THE COURT:  Okay.  That's the subject of the

23   sentence.

24           MS. MORENO:   -- desires to regulate --

25           THE COURT:  Desire, that's the verb.

1              MS. MORENO:   -- by prohibiting --

2              THE COURT:  That's the manner, that's a dependent

3       clause.

4              MS. MORENO:   -- by prohibiting --

5              THE COURT:  That's not a verb.  They're not

6       prohibiting.  Right?  That's by prohibiting, this is a

7       dependent clause that describes how they desire to do

8       something.

9              MS. MORENO:   -- by prohibiting during -- on

10      county --

11             THE COURT:  Will you --

12             MS. MORENO:   -- property --

13             THE COURT:   -- disagree with that or not?

14             MS. MORENO:  We -- I --

15             THE COURT:  It doesn't prohibit.  I mean language is

16      important, grammar is important.  I just didn't --

17             MS. MORENO:  Your Honor, we would agree with you

18      that the order is poorly written.

19             THE COURT:  Yes.

20             MS. MORENO:  But we offer our best interpretation

21      and we read the order as prohibiting on all county property

22      electioneering, and more importantly, Your Honor, we seek to

23      present evidence here today on how it's being enforced so --

24             THE COURT:  Okay.  Well, that's -- then actually we

25      get to that, but on its -- I don't see that this order

1    prohibits anything.  Now if the County is out there doing some

2    things that are unconstitutional, then we can move on to visit

3    about that.  But I'm having trouble with this order as not

4    really ordering anything is what I'm having trouble with.

5         Does anybody else want to weigh in?  Is my reading

6    of it contrary, just basic grammar?  Mr. Fonseca --

7         MR. FONSECA:  Yes, Judge.

8         THE COURT:   -- our Notre Dame graduate who can --

9    (Laughter.)

10        THE COURT:   -- illuminate, and also a grammarian, I

11   know by personal experience.  So, Mr. Fonseca, what -- is the

12   County's position is no, even though it's poorly written,

13   really the intent is to prohibit electioneering during any

14   voting period, we just didn't draft it very well, but this is

15   the way we're going to enforce it?

16        MR. FONSECA:  Your Honor, it was followed up by the

17   use policy and it subsumed this order for the desire of

18   regulating what was being done on the properties.

19        THE COURT:  Okay.

20        MR. FONSECA:  It really narrows down --

21        THE COURT:  What was the time period between this

22   order and the final order on the use of county property?

23        MR. FONSECA:  It was about a month ago.

24        THE COURT:  About a month.  Okay.  All right.  So

25   the County's position also is that this particular simply sets

1      forth sort of policy statement of what the county desires to

2      do and then a month later they actually implemented these

3      desires in the way that's set forth in the facility use order?

4              MR. FONSECA:  That is correct, Your Honor.  The

5      controlling policy for Starr County is the use policy, which

6      is Exhibit 3 to Plaintiff's application.  And it addresses

7      specifically different complaints that the Plaintiffs have as

8      to how the policy is actually enforced.

9              THE COURT:  About how the policy is being enforced?

10     Because -- I mean I just read an affidavit where somebody had

11     a car parked in the parking lot in a lawful manner, even under

12     the County's building and property use policy, that had a

13     bumper sticker and was required to cover that bumper sticker.

14     I mean that was in one for the affidavits I read.  Can you

15     explain why that would happen?  Because you would agree, it's

16     permitted by the building and property use policy, but it's

17     one of those things that's desired to be prohibited in this

18     county order that we have here on the document projector.

19             MR. FONSECA:  That is correct, Judge.  That is not

20     the Starr County policy.  If it was done, it was done

21     incorrectly.  We don't have -- I don't have -- I don't know

22     who it was other than the Plaintiff who was saying that.  All

23     I've seen is the affidavit, I haven't seen any other

24     complaints in the last month or so --

25             THE COURT:  Okay.

1          MR. FONSECA:   -- that the policy's actually been in

2     effect.  And that's part of what we're arguing today is that

3     this case is not ripe --

4          THE COURT:  All right.  So let's get to that.  But

5     so do you all want to put on some evidence about whether the

6     way the County policies, whether it's the building and

7     property use policy or whether it's a misinterpretation of

8     this order --

9          MS. MORENO:  Yes, Your Honor.  Regardless of --

10          THE COURT:   -- what's the date of this order, this

11     order of January 8, 2018, what's the practical effect of it,

12     or how it's been implemented?

13          MS. MORENO:  Yes.  Thank you, Your Honor.

14     Regardless of the fact that it is poorly written, we do --

15     Plaintiffs do understand that the County interprets this as an

16     order as stated multiple times in the order itself, but we

17     would like to put on some evidence about how the order's being

18     interpreted.

19          THE COURT:  All right.  Do you want to do that by

20     witness, by affidavit, by proffer, by witness?

21          MS. MORENO:  By witness, Your Honor.

22          THE COURT:  All right.  So, Ms. Avila, you want

23     to --

24          MS. AVILA:  Yes, Your Honor.  Before I call the

25     witness to the stand, we presented some exhibits to defense

1    counsel and we have not heard from them on objections, but we

2    (indiscernible) for the addition of the (indiscernible).

3              THE COURT:  For purposes of this hearing?  I mean I

4    assume they're all authentic?

5              MS. LEEDS:  Well, Your Honor, we really don't know.

6    We got the eight on Friday and then this morning I was given

7    an amended witness list, and do not really know even the

8    context of some of these names.  I mean for purposes of

9    today's hearing we don't really have a problem, for purposes

10   of some other hearing we might.

11             THE COURT:  Okay.  So you would just like to reserve

12   your objections to these documents, and I'll admit them for my

13   consideration at this time.  This is 1 through 16?

14             MS. AVILA:  One through sixteen, Your Honor.  One

15   through fifteen are paper copies and 16 is pin drive of the

16   video.

17             THE COURT:  All right.  So I'm going to admit 1

18   through 16, objections reserved for a later time, and again, I

19   also may have questions about some of them, and I'm going to

20   vouch for -- Ms. Avila, I assume you're going to vouch for

21   their authenticity, that these are the actual documents that

22   they purport to be?

23             MS. AVILA:  That's correct, Your Honor.

24        (Plaintiff's Exhibits 1 through 16 received into

25   evidence.)

1          THE COURT:  Okay.  Then you may proceed then.

2          MS. LEEDS:  Your Honor, may I just --

3          THE COURT:  Yes, ma'am.

4          MS. LEEDS:   -- clarify one thing?

5          THE COURT:  Sure.

6          MS. LEEDS:  Mr. Fonseca was talking about how the

7    order is subsumed by the use code --

8          THE COURT:  Right.

9          MS. LEEDS:   -- and the one issue of the parking

10   with -- or moving a car with a bumper sticker, that has

11   clearly been disavowed.  That occurred -- somebody jumped the

12   gun, as soon as the order came out and asked some people to

13   move, but that is specifically allowed --

14         THE COURT:  Right.  I saw that.

15         MS. LEEDS:   -- in the order and the use policy.

16         THE COURT:  So the County's position is that an

17   employee who didn't understand what the law was --

18         MS. LEEDS:  Yes.

19         THE COURT:   -- did something on one isolated

20   occasion.

21         MS. LEEDS:  Yes, that one day.

22         THE COURT:  And since --

23         MS. LEEDS:  And they were corrected.

24         THE COURT:  All right.  So we'll see about that I

25   guess.

1          All right.  So, Ms. Avila, who is your first
2    witness?
3          MS. AVILA:  Your Honor, Plaintiffs call Hilda
4    Gonzalez Garza.
5          THE COURT:  All right.  So, Ms. Gonzalez Garza, if
6    you would come step forward.  I do have her affidavit, I don't
7    really need -- are we just going to regurgitate her affidavit
8    or is there more to this?
9          MS. AVILA:  I am going to walk her through some of
10    the more recent and important --
11          THE COURT:  Okay.
12          MS. AVILA:   -- issues.
13          THE COURT:  Sure.  All right.  If you could step
14    forward I can have the oath administered to you before you
15    testify.
16          THE WITNESS:  Yes, Your Honor.
17          THE COURT:  If you'd raise your right hand, please.
18       (Witness sworn.)
19          THE COURT:  All right.  You can be seated over here
20    in the witness stand.
21          MS. AVILA:  Your Honor, can I ask that you turn on
22    the Elmo for the --
23          THE COURT:  Yes.  If I can get the right button
24    here.  Okay.  Got it.  Right?  That's the right one?  Okay.
25    All right.  So you can use the document projector now.

1           MS. AVILA:  Okay.

2           DIRECT EXAMINATION OF HILDA GONZALEZ GARZA

3    BY MS. AVILA:

4    Q    Good morning, Ms. Garza.

5    A    Good morning.

6    Q    Can you please state your name for the Record?

7    A    My names is Hilda Gonzalez Garza.

8    Q    In which county do you reside?

9    A    In Starr County.

10   Q    And what do you do for a living?

11   A    I'm an attorney.

12   Q    In this 2018 election cycle are you running for any type

13   of public office?

14   A    Yes, I am, I'm running for Precinct Chair for Precinct

15   Number 10 for the Democratic Party.

16   Q    Would that be in Starr County?

17   A    Yes, it is in Starr County.

18   Q    And would this be for the primary election or for the

19   general election?

20   A    The primary election.

21   Q    Now when is the early voting period for the March 2018

22   primaries?

23   A    It's from February 20 through March 2.

24   Q    So the early voting period begun the last Tuesday.  Is

25   that correct?

1    A    That's correct.

2    Q    Since that Tuesday have you engaged in any electioneering

3    on County property?

4    A    Yes, I did.

5    Q    And when was that?

6    A    That was on February 20, which was the first day, and on

7    Saturday, February 24.

8    Q    That would be this past Saturday.  Correct?

9    A    That's correct.

10   Q    Now let's talk first about February 20.  Where did you

11   attempt to electioneer that day?

12   A    At the Starr County courthouse.

13   Q    And when you arrived what did you see?

14   A    I saw my friend rushing to her vehicle to cover a bumper

15   sticker or she needed to move her vehicle.

16   Q    And what was your understanding of why she had to move

17   her vehicle?

18   A    She was told by the election director that she needed to

19   move the vehicle or cover the bumper sticker.

20           THE COURT:  Now how do you know that?  It seems like

21   we -- did you hear this conversation?

22           THE WITNESS:  She told me that, Your Honor.

23           THE COURT:  So this is hearsay.  Okay.  And so

24   that's all you know is what some lady told you, a friend of

25   yours told you had happened.

1           THE WITNESS:  While I was there at the parking lot,

2     yes, Your Honor.

3           THE COURT:  All right.  You didn't hear any of this

4     conversation yourself?

5           THE WITNESS:  Not with the director, no, sir.

6           THE COURT:  Okay.  So let's talk about what you have

7     personal knowledge of.  All right.

8           THE WITNESS:  Okay.

9           THE COURT:  Please continued.

10    BY MS. AVILA:

11    Q    Who else did you see that day?

12    A    I saw the Justice of the Peace.

13    Q    Now, Ms. Garza, can you please turn to Tab 11 on the

14    binder you have in front of you?

15          THE COURT:  Wait, I'm sorry, you sort of left -- you

16    saw the Justice of the Peace, what happened?  They gave her a

17    ticket or something and you went to -- I mean what's the

18    relevance of that?

19          THE WITNESS:  Your Honor, I was there in the middle

20    of the parking lot and the Justice of the Peace asked me for

21    some help.

22          THE COURT:  Okay.

23          THE WITNESS:  So that's when he had some legal sized

24    paper and some tape and he had -- I was helping him cover up

25    where he was announcing that he was running as a candidate.

1          THE COURT:  All right.  Okay.

2     BY MS. AVILA:

3     Q    Ms. Garza, can you turn to Tab 11 in the binder you have

4     in front of you.

5     A    Yes.

6     Q    Do you recognize this photograph?

7     A    Yes.

8     Q    And who are the people in this photo?

9     A    That's the Justice of the Peace and that's myself.

10          MS. AVILA:  Your Honor, I represent to you that

11    these are screenshots from the video that we provided as

12    Exhibit 16 in the flash drive.

13          THE COURT:  All right.  Thank you.

14    BY MS. AVILA:

15    Q    When was this photograph taken?

16    A    That was on February 20 after I had spoken to that first

17    employee and now to the Justice of the Peace.

18    Q    And when you say this first employee, who are you

19    referring to?

20    A    I'm referring to Ms. Gonzalez.

21    Q    Was that your friend that you just mentioned?

22    A    Yes, that was my classmate, a friend of mine.

23    Q    Where exactly were you standing here helping the Justice

24    of the Peace?

25    A    That's on the second portion, or the second part of the

HILDA GONZALEZ GARZA - DIRECT BY MS. AVILA

1    parking lot behind the courthouse.

2    Q    Do you know the Justice of the Peace personally?

3    A    Yes.

4    Q    Do you know whether the Justice of the Peace is an

5    employee at the courthouse?

6    A    Yes, his office is located there at the courthouse, and,

7    yes, he is an employee.

8    Q    And what is your understanding of why he was at the

9    courthouse that day?

10   A    He was more likely also working and campaigning.

11   Q    Okay.  And can you explain to the Court what exactly you

12   were doing in this photo?

13   A    I was -- he advised me that he needed to cover up the

14   portion that indicated that he was campaigning for the Justice

15   of the Peace Place Number 4 that he was seeking re-election

16   for.

17   Q    Ms. Garza, do you have any type of signage on your

18   vehicle?

19   A    Yes, I do.

20   Q    And what kind of signage do you have?

21   A    I have bumper stickers, political bumper stickers.

22   Q    What do you mean by political bumper stickers?

23   A    I have stickers supporting the Democratic Party and I

24   have stickers supporting two of the candidates that I'm

25   supporting in this March election.

HILDA GONZALEZ GARZA - DIRECT BY MS. AVILA

1    Q    So what did you do after you helped the Justice of the

2    Peace cover his sign?

3    A    I pretty much left the parking lot at that point.

4    Q    And why did you leave?

5    A    At that point there was a little bit of chaos and I

6    feared that I might be arrested.

7    Q    And what do you mean by a little bit of chaos?

8    A    Well, everybody was asked to cover up signage or bumper

9    stickers that involved campaign materials and my friend was

10   rushing to move her car out of the parking lot.

11   Q    When you saw your friend to go -- you mentioned that she

12   rushed to her car, where were you standing?

13   A    I was pretty much in the middle portion, if you look at

14   Plaintiff's Exhibit Number 11 I was walking a little bit

15   behind those vehicles when I saw my friend.

16   Q    Is this beyond the 100-foot perimeter?

17   A    Yes, it is.

18   Q    And what does your friend with the bumper stickers do for

19   a living?

20   A    She works at the courthouse.

21   Q    Is that where she parks regularly?

22   A    Yes.

23   Q    Now you mentioned that you were there only for a couple

24   of minutes.  How long did you intend originally to stay at the

25   courthouse?  I intended to stay a little bit longer there to

1    campaign.

2    Q    And if you had stayed, what kinds of activities would you

3    have --

4    A    I would have distributed sample ballots, I also would

5    have reminded some of the voters also to vote on the back

6    portion of the ballot that talked about the 12 propositions

7    that the Democratic Party was supporting.  I also would have

8    passed out some bumper stickers and I also had in my

9    possession the Constitution of the United States both in

10   English and Spanish.

11   Q    And where would you have engaged in these activities?

12   A    I would have done that in the back of the parking lot.

13   Q    Is that beyond the 100-foot perimeter?

14   A    Yes.

15   Q    Now let's talk about the more recent events on February

16   24.  You mentioned that you attempted to electioneer as well

17   on Saturday.  Where exactly did you attempt to electioneer?

18   A    I was on the sidewalk --

19           THE COURT:  Could we finish up with -- let's finish

20   up with the courthouse first.  Are we going to move on to

21   another property or are we --

22           THE WITNESS:  No, it's the same property.

23           THE COURT:  It's the courthouse.  Okay.

24           THE WITNESS:  Yes, I was at -- on Saturday the only

25   polling location was the courthouse.  So I was on the sidewalk

1    and I had one of the T-shirts of one of the candidates.

2    BY MS. AVILA:

3    Q    Okay.  When you arrived did you speak to anyone?

4    A    Yes, I had spoken to that same candidate that I had a T-

5    shirt on.

6    Q    And where were you standing when you were speaking to

7    this candidate?

8    A    We were standing outside of the parking lot at one of the

9    campsites.

10              THE COURT:  Do you have a map?

11              MS. AVILA:  Yes, Your Honor.

12              THE COURT:  If not, I can pull one up.  So you're

13   beyond the 100 feet of the entrance of the courthouse,

14   beyond --

15              THE WITNESS:  It would have been the back portion of

16   the courthouse, Your Honor.

17              THE COURT:  But to comply with the 100 foot rule do

18   you measure that from the front door or the back door, the

19   polling place?  I assume just the door --

20              THE WITNESS:  They typically measure it from the

21   back door, Your Honor.

22              THE COURT:  All right.  So were you outside the 100

23   feet or --

24              THE WITNESS:  I was outside the 100 feet, Your

25   Honor.  It is -- if you can see the parking lot --

HILDA GONZALEZ GARZA - DIRECT BY MS. AVILA

1          THE COURT:  I can.

2          THE WITNESS:  -- it has two divisions.  You can see

3     the middle one -- there's like a middle --

4          THE COURT:  Sure.

5          THE WITNESS:  -- island.

6          THE COURT:  Right.  I see that.

7          THE WITNESS:  Okay.  I would have been behind that

8     little island towards the back.

9          THE COURT:  I'm familiar with a lot of polling

10    places that paint the -- someone with the city or someone will

11    come in and paint a red line on the ground or otherwise

12    designate the area.  Is that -- is there anything --

13         THE WITNESS:  Your Honor --

14         THE COURT:  -- any marker line like that at the

15    courthouse?

16         THE WITNESS:  Actually, Your Honor, that morning at

17    nine o'clock I had to call the election director and advise

18    them that the presiding judge had not placed the cone --

19         THE COURT:  Okay.

20         THE WITNESS:  -- to indicate the 100 foot marker.

21    And when I spoke to the election director's office, they told

22    me that they would advise the presiding judge of that.  So

23    this is the only site that I know of that does not do that

24    semi circle.  The other locations that I've been to, they do

25    mark it with some paint and then they put like a cone or --

HILDA GONZALEZ GARZA - DIRECT BY MS. AVILA

1           THE COURT:  Some signage also.

2           THE WITNESS:  -- a subject -- a signage in the

3      middle that indicates that that's the boundary so to speak.

4           THE COURT:  All right.

5           MS. AVILA:  Your Honor, can I approach the witness

6      to giver her a clicker?

7           THE COURT:  Sure.  I see that the middle

8      intersecting --

9           THE WITNESS:  The only -- right there, Your Honor,

10     is the signage that they put in the middle, and I was

11     electioneering around this area, this back portion.

12          THE COURT:  All right.  You may continue, Ms. Avila.

13     BY MS. AVILA:

14     Q    So you mentioned that you met your friend who was

15     campaigning.  What did you understand she was doing at the

16     courthouse that day?

17     A    She was just working.  I did ask her if she had taken the

18     day off to politick for her brother, but she indicated that

19     she was working that day.

20     Q    And you mentioned that you were also --

21          THE COURT:  And this is the Saturday of just a week

22     ago --

23          THE WITNESS:  No, that --

24          THE COURT:  I'm sorry.

25          THE WITNESS:  -- my friend, Your Honor, that was on

1    the first day of early voting and her vehicle was around this

2    area back here.

3                THE COURT:  Okay.

4                THE WITNESS:  And that's when I was entering from

5    over here on one of the side parking slots going into the

6    parking area.

7                THE COURT:  Okay.

8    BY MS. AVILA:

9    Q    So going back to the event on February 24, you mentioned

10   that you met with your friend who was a candidate.

11   A    Yes.

12   Q    What did you understand she was doing there?

13   A    She was also politicking or trying to electioneer outside

14   the 100 feet, but she was told to leave the parking lot.

15   Q    And do you know who told her this?

16   A    My understanding is there was two deputies and they told

17   her to leave the parking lot because she was wearing one of

18   her campaign shirts

19               THE COURT:  Okay.  So you say my understanding, so

20   this is just what she told you?

21               THE WITNESS:  Yes, Your Honor.

22               THE COURT:  All right.

23   BY MS. AVILA:

24   Q    Now you mentioned that you were also wearing a T-shirt.

25   A    Yes, I was.

1   Q    And what kind of T-shirt were you wearing?

2   A    I was wearing a T-shirt endorsing the candidate that's

3   running for the 229th Judicial District.

4   Q    Okay.  And how long were you at the property that day?

5   A    Well, I was -- I say for a couple of hours, I guess --

6   I'm sorry, around this area which was the campsite, but I did

7   approach the corner right here of the sidewalk.

8   Q    So inside the perimeter of the actual county property how

9   long were you there on February 24?

10  A    Maybe about 10 or 15 minutes.

11  Q    Okay.

12          THE COURT:  And now you're talking about the

13  sidewalk portion?

14          THE WITNESS:  Yes, Your Honor, I was --

15          THE COURT:  Okay.  That you're pointing to which

16  is --

17          THE WITNESS:  Right there, Your Honor, around that

18  area.

19          THE COURT:  All right.

20          THE WITNESS:  I was speaking to another candidate at

21  that area and she had her granddaughter and she placed her

22  granddaughter there to play in the grass area.

23          THE COURT:  Okay.  And this is the -- would be the

24  northwest corner of the lot upon which the courthouse sits?

25          THE WITNESS:  Yes, Your Honor.

1          THE COURT:  All right.  Just for the record.

2     BY MS. AVILA:

3     Q    And is this beyond the 100 foot marker --

4     A    Yes, it is.

5     Q     -- she was standing?

6     A    Yes, it is.

7     Q    Now you mentioned that you only were there for about 10

8     minutes.  Is that how long you intended to stay at the

9     courthouse?

10    A    Not at that particular location, no.

11    Q    Why did you decide to leave?

12    A    That's when I was approached by two of the deputies and I

13    was told to leave.  They had pointed to my T-shirt, so I

14    needed to leave.

15    Q    So what is your understanding of why they asked you to

16    leave the property?

17    A    Because I had the slogan, the campaign slogan that I was

18    supporting one of the candidates.

19         THE COURT:  You say deputies.  These were Starr

20    County Sheriffs deputies?

21         THE WITNESS:  Yes, Your Honor, they were Starr

22    County Sheriffs deputies.  They were dressed in uniform.

23         THE COURT:  And did you get their names, or are you

24    familiar with who they were?

25         THE WITNESS:  They're normally the staff that works

1        there in the courthouse, Your Honor.  I don't know --

2                    THE COURT:  Okay.

3                    THE WITNESS:   -- the gentleman's name, but he's a

4        red head so --

5                    THE COURT:  Okay.  But these are people are

6        positioned just on a daily basis to be at the courthouse

7        providing security?

8                    THE WITNESS:  Yes, Your Honor.

9                    THE COURT:  Okay.  And so -- and that was again this

10       past Saturday, just a couple of days ago that this incident

11       happened.

12                    THE WITNESS:  Yes, Your Honor.

13                    THE COURT:  All right.

14       BY MS. AVILA:

15       Q    Ms. Garza, for approximately how many years have you

16       engaged in electioneering in Starr County?

17       A    At least six years.

18       Q    And base don this experience can you explain to the Court

19       where the typical -- where do people typically electioneer on

20       county property?

21       A    Typically electioneering, Your Honor, would be the tents

22       and the barbeques and tables, signage would be on the back

23       portion of the parking lot, this back portion.

24       Q    And what is your understanding of why electioneering

25       takes place at the back of the courthouse?

1    A    Because that's beyond the 100 feet.

2    Q    Where do voters come in through to vote at the polling

3    place?

4    A    They come in through the back and they also come in

5    through the front.

6    Q    So if a voted wanted to come in through the front, they

7    could do that, and then walk out through the back door.

8    A    Yes, they could.

9              THE COURT:  All right.

10   BY MS. AVILA:

11   Q    Is there additional parking for voters aside from the

12   100 -- beyond the 100-foot perimeter where you just described

13   the tents and the barbeques pits are.

14   A    Yes, there is, there's parking over here, there's parking

15   in the front, and there's parking in the side, and the side

16   over here as well.

17             THE COURT:  Is any of that county property,

18   especially the stuff to the right of the courthouse in this

19   diagram, that big -- what looks like a big parking lot is

20   that --

21             THE WITNESS:  That is property, Your Honor, that

22   goes normally for the Casey Hall, but employees do use that

23   parking area and other individuals.

24             THE COURT:  So it's county-owned property that

25   they --

1              THE WITNESS:  I don't believe that -- I really don't

2     know the status of that property, Your Honor.

3              THE COURT:  Okay.

4              THE WITNESS:  I do know that we -- as an employee

5     and as a person that frequents the courthouse I have on

6     occasion parked there without any incident.

7              THE COURT:  Is it paved, I can't really tell?

8              THE WITNESS:  Yes, it is, Your Honor.  That part is

9     paved.

10             THE COURT:  Okay.  You pointed to the area where

11    there's electioneering, you said campsites, barbeques, tents,

12    and that is in an area that is for parking as well, and

13    actually is striped for parking as well.  You would agree with

14    that?

15             THE WITNESS:  Yes, Your Honor.

16             THE COURT:  I just want the record to be clear that

17    it's marked parking spaces where you're indicating that the

18    tents and the barbeque pits were placed in the past for

19    electioneering.

20             THE WITNESS:  Yes, Your Honor.

21             THE COURT:  All right.  You may proceed, Ms. Avila.

22    BY MS. AVILA:

23    Q    So if -- just to clarify, if a voter wanted to walk into

24    the poll, they could do that without going through the tents

25    and the electioneering that occurs in the back of the

1    courthouse?

2    A    Yes.  Typically in this particular site voters, Your

3    Honor, that do not want to engage with candidates go in

4    through the front.  And they vote because the back portion

5    over here, there's a room, that's Commissioners Court, that's

6    normally where the voting booths are placed.

7                THE COURT:  Okay.

8                THE WITNESS:  And so those voters can go through the

9    front and then if they decide that they want to engage the

10   candidates or pick up a plate of food or just chit chat, then

11   they can go through the back.  Or if they decide that they do

12   not want to engage with the candidates in any way, shape or

13   form, they just come straight out, they just vote and come out

14   the front door as well.

15               THE COURT:  Is that true even on a Saturday that the

16   front door is opened?

17               THE WITNESS:  Your Honor, I did not check the front

18   door, I know that in the past it has been closed, the front

19   door and they've only had the back portion open on Saturdays.

20               THE COURT:  Okay.  But obviously on a normal week

21   day the front door is open for the normal business of the

22   courthouse.

23               THE WITNESS:  Yes, Your Honor.

24               THE COURT:  Okay.

25   BY MS. AVILA:

1    Q    And on normal weekday do voters have to go through the

2    barbeque pits and the tents that you just described in order

3    to go vote?

4              THE COURT:  She said no.  You can -- next question.

5    BY MS. AVILA:

6    Q    I just want to go back to the event on February 20 for a

7    couple of clarifying questions, Ms. Garza.

8    A    Yes.

9    Q    Where does the Justice of the Peace work?

10   A    He works at the courthouse.

11   Q    And where does he park for work?

12   A    He normally parks back here.

13   Q    So that would be beyond the 100-foot perimeter?

14   A    Yes, that's correct.

15             THE COURT:  I couldn't tell but in that picture

16   where you're covering up his sign on the side of his truck,

17   where was his truck actually parked on that day?

18             THE WITNESS:  Your Honor, it would have been close

19   to -- there's a median right here for --

20             THE COURT:  Okay.  Sure, I see that in the --

21             THE WITNESS:  Okay.  And it would have been a little

22   bit around this area back here.

23             THE COURT:  Okay.  Got it.

24             THE WITNESS:  It would have been maybe the

25   parking slot -- the first or the second one close to that

1    median.

2    BY MS. AVILA:

3    Q    So in the back of the courthouse, and I'm sorry, we drew

4    a line there, I don't suppose -- I don't know if we'll take

5    that.

6              THE COURT:  I think I can undo that for you.  There

7    we go.

8    BY MS. AVILA:

9    Q    In the back of the courthouse where do voters typically

10   park?

11   A    Voters will park here in this area, typically -- and this

12   was before the ban -- they would come in and vote here and

13   they would also park over here, park in the front, and that's

14   basically where they'd park.

15   Q    Okay.  And what about the tents and the barbeque pits,

16   where did they --

17   A    The tents would be on the back portion, the second part

18   of the parking lot.  That's typically where they would be at.

19   Right now they're not -- there are -- none of them are back

20   there.

21   Q    Ms. Garza, can you turn to Exhibit 1 in the binder you

22   have in front of you.  This is marked as Plaintiff's Exhibit

23   Number 1.

24   A    Yes.

25   Q    Do you recognize this document?

HILDA GONZALEZ GARZA - DIRECT BY MS. AVILA

1    A    Yes.

2    Q    And what is it?

3    A    It's an order prohibiting electioneering.

4    Q    Were you present at the meeting when this order was

5    adopted?

6    A    Yes, I was.

7    Q    In what capacity?

8    A    I was a concerned citizen.

9    Q    Can you please turn to Page 12 of the order?

10   A    Yes.

11   Q    All right.  And what is this looking like?

12   A    This is a map -- or a picture of the Starr County Annex.

13   Q    Now as a candidate running for election in the primaries,

14   are you familiar with the different polling locations around

15   Starr County?

16   A    Yes, I am.

17   Q    Is this property here a polling location?

18   A    No, it's not.

19   Q    Is it a polling location for early voting?

20   A    No, it's not.

21   Q    Is it a polling location for the general election?

22   A    No.

23   Q    Now can you turn to Page 14 of that same document?

24   A    Yes.

25   Q    And can you tell us what this is?

1    A    This is La Victoria Community Center, it's also the site

2    of the park, this is a polling location for election day.

3    Q    Is it a polling location for early voting?

4    A    No, it's not.

5    Q    Do you -- are you familiar with the various distances

6    from the doors of the buildings to the edges of the county

7    properties?

8    A    Yes.

9    Q    And what is your understanding?

10   A    On this particular polling location the distance from the

11   entrance, which would be the polling location's right, the

12   door would be there, and there's only one entrance that I know

13   of, and the entrance to the property would be here.  That's

14   approximately about 468 feet.

15   Q    And what is this understanding based on?

16   A    The fact that I measured it.

17   Q    All right.  Did you measure any other properties --

18   A    Yes, I did.

19   Q    Which ones did you measure?

20   A    I measured also the courthouse.

21   Q    Okay.  So let me just find it on the -- and when did you

22   find out about the distance from the door of the building to

23   the edge of the property?

24   A    The door of the building would be somewhere around here,

25   going all the way to the edge would have been approximately

1    153 feet.

2    Q    Did you measure any other properties, let's say --

3    A    Yes, I did.  I also measured La Rosita.

4    Q    And what was the distance from the door of that polling

5    location to the edge of the county property?

6    A    That was 155 feet.

7    Q    Were those the only properties that you measured?

8    A    No, I also measured the one in Encineso (phonetic).

9    Q    And what was the distance from the door to the edge of

10   the county property in that location?

11   A    That one was from the door to the -- pretty much in front

12   of the gate, and that was approximately 232 feet.

13            THE COURT:  So is the county courthouse the only

14   early voting location?

15            THE WITNESS:  Excuse me, Your Honor?

16            THE COURT:  Is the county courthouse the only early

17   voting location?

18            THE WITNESS:  No, Your Honor, those four locations

19   are our early voting locations.

20            THE COURT:  La Victoria, La Placenta --

21            THE WITNESS:  La Rosita, Your Honor, the courthouse,

22   Encineso (phonetic) --

23            THE COURT:  Right.

24            THE WITNESS:  -- and, gee, I'm trying to remember

25   the --

1          MS. AVILA:  Your Honor, it's -- if I may, it's on

2     your binder under Tab 3.

3          THE COURT:  All right.

4          MS. AVILA:  It's Plaintiffs' Exhibit Number 3.  I

5     think this is --

6          THE WITNESS:  And the Roma Community Center, Your

7     Honor.

8          THE COURT:  That's --

9          THE WITNESS:  But that's not county property, that's

10     city property.

11          THE COURT:  Okay.

12     BY MS. AVILA:

13     Q    Now I want to go back to the bumper stickers on your car.

14     What type of county property do you conduct your regular

15     business as an attorney?

16     A    What vehicle or --

17     Q    To what county properties do you go on your regular

18     business as an attorney?

19     A    Okay.  Well, I go to the courthouse, I go to the

20     sheriff's office, I'll go to the annex, I'll go also to some

21     of the Commissioners' offices, and on occasion I'll go the

22     probation office.

23     Q    And what vehicle do you drive to all of these locations

24     that you just --

25     A    The vehicle that I'm driving at this point in time that

1    has the bumper stickers.

2    Q    Do you take off or cover your bumper stickers when you

3    visit any of these properties?

4    A    No, I do not.

5    Q    How do you feel about visiting all of these properties as

6    an attorney?

7    A    Well, there's a little bit of apprehension to go into

8    some of these locations because you can be arrested.

9              MS. AVILA:  Can I have a minute, Your Honor?

10             THE COURT:  You may.

11         (Pause in proceedings.)

12   BY MS. AVILA:

13   Q    Ms. Garza, based on your experience with electioneering

14   what have you observed about how the county enforced the 100

15   perimeter around the polling sites?

16   A    At the courthouse they sometimes do not abide by the

17   regulations.

18   Q    And what do you mean by that?

19   A    Back in March of 2016 at that point in time the tents had

20   already been set up and some signage or political signs had

21   already been set up with in the 100-foot perimeter.

22   Q    Now did you personally electioneer on March of 2016?

23   A    Yes, I did.

24   Q    And did you electioneer within the 100-foot perimeter?

25   A    I did not electioneer within the 100 feet, and I try not

HILDA GONZALEZ GARZA - DIRECT BY MS. AVILA

1    to electioneer within the 100 feet.

2    Q    Now did you observe any type of voter intimidation within

3    the 100-foot perimeter in the March 2016 primaries?

4    A    What happened was that basically we -- the candidates and

5    I guess the people that were electioneering, the rule had not

6    been followed.  We were supposed to be beyond the 100-foot,

7    but because the tents had been set up before the presiding

8    judge or the election director could mark the area, it was

9    determined at that point in time that we were not going to

10   abide by the 100-foot marker.

11   Q    So what were you asked to do in relation to the 100-foot

12   perimeter?

13   A    Just to kind of stay away from that area, but it was less

14   than 100 feet at that point in time.

15   Q    And to go back to my question, did you observe any type

16   of voter intimidation within the 100-foot perimeter?

17   A    Not intimidation, but the fact that we were already

18   encroaching into the 100 feet there was candidates that were

19   roaming around that area, so I would say that there was

20   some -- I didn't observe any intimidation myself, but I

21   just -- what I'm saying is that by simply encroaching that was

22   a violation.

23   Q    And what about outside the 100-foot perimeter, did you

24   observe any type of voter intimidation?

25   A    No, not voter intimidation.

1    Q    Did you ever witness any damage to voting machines?

2    A    At the March 26 primary we had some issues with voting

3    machines, we had about three voting machines that broke down.

4    So that one I was a candidate so the candidates were brought

5    in to the voting site and were told that those machines had

6    broken down so they were sealed off and taped up, and -- until

7    new machines came in.  So that was an issue.

8    Q    Did the damage have anything to do with electioneering?

9    A    No, I don't think it had anything to do with

10   electioneering.

11   Q    Are you aware of any altercations that have occurred at

12   the county courthouse?

13   A    I had heard that there was an altercation back in 2016 in

14   the bathroom with some supporters arguing.

15   Q    And this was within the 100-foot perimeter?

16   A    Yes.

17   Q    Have you -- did you personally observe those

18   altercations?

19   A    No, I did not personally see those altercations, no.

20   Q    How did you come to know about those?

21   A    From individuals that were there at the campsite.

22   Q    And have you personally observed any voter harassment

23   within the 100-foot perimeter?

24   A    Not voter harassment, no.

25   Q    Ms. Garza, can you turn to Exhibit 5 in your binder,

1    please?

2    A    Yes.

3    Q    Do you recognize this document?

4    A    Yes, I do.

5    Q    And what is it?

6    A    This is an email that I sent to Ms. Christina Atkins

7    who's the legal director of the Elections Division with the

8    Secretary of State, with the Texas Secretary of State.

9    Q    And when did you send this email?

10   A    I sent this email after Commissioner's Court on Monday,

11   February 12.

12   Q    And why did you contact Ms. Atkins?

13   A    I contacted Ms. Atkins because of the fact that the

14   resolution had passed, and also a building use policy

15   provision that was passed on that particular day.

16   Q    And generally can you tell us what did you communicate

17   with Ms. Atkins?

18   A    My concern was whether the resolution and the building

19   policy conflicted with the Texas Election Code 61.003.

20   Q    And what did Ms. Atkins respond to you?

21   A    She did advise that she felt that there was a conflict.

22   Q    Do you know whether the Secretary of State has stated any

23   of these positions anywhere else?

24   A    Yes, they publicly stated these I believe in *The Monitor*

25   and also on a news story that was -- ran or that was posted in

1    the KRGB News.

2    Q    Now what do you know about Defendants' response to the

3    Secretary of State's position on polling -- position on the

4    legality of the ban?

5    A    My understanding that the Defendants' response is that

6    they believe that they will continue to have this ban until

7    there's a lawsuit that is filed.

8    Q    And what is this understanding based on?

9    A    It's based on a Facebook post that was posted by

10   Mr. Escobar on February 16.   That would be Plaintiffs'

11   Exhibit Number 7.

12   Q    Thank you.  Can you please turn to Exhibit 15?

13   A    Yes.  This is the --

14   Q    Do you recognize this document?

15   A    Yes, I do.

16   Q    And what is it?

17   A    This is a news story from KRGB.

18   Q    Now I want to draw your attention to the last paragraph

19   on this first page.

20   A    Yes.

21   Q    What do you understand from this is the Defendants'

22   intention to enforce the ban?

23   A    Well, that they intended to enforce it and that if

24   anybody chose to challenge it, they would have to file a

25   lawsuit.

1    Q    And just one last question, Ms. Garza.  Do you believe

2    electioneering on county property is important?

3    A    Yes, it is.

4    Q    And why is that?

5    A    Well, because that's when the voters are there in the

6    parking lot and if you're electioneering, you have sample

7    ballots, you have some ballots that are pre-filled and others

8    that are not.  If there's a voter that approaches you and asks

9    you who you're supporting, you can indicate who you are

10   supporting, and state your position at that point in time.

11   And I also provide like I said bumper stickers and any

12   information that the voter might need, including if they are

13   not registered to vote or they'll even ask where do they need

14   to vote if for whatever reason they decided they don't want to

15   vote that day or they want to vote at a different location.

16            MS. AVILA:  Thank you, Your Honor.  I pass the

17   witness.

18            THE COURT:  Any questions, Ms. Leeds or Mr. Fonseca?

19            MS. LEEDS:  Yes, Your Honor.

20            THE COURT:  Or Mr. Alvarez.

21            CROSS-EXAMINATION OF HILDA GONZALEZ GARZA

22   BY MS. LEEDS:

23   Q    Ms. Garza, you were at the meeting -- do you prefer

24   Gonzalez or Garza, I never know.

25   A    Garza.

1    Q    Okay.

2    A    Garza is fine.  My husband would prefer Garza, I can say

3    that.

4    Q    You were at the meeting at which the use of property

5    policy was passed.  Correct?

6    A    That's correct.

7    Q    And did you understand why that use of property policy --

8              MS. LEEDS:  May I approach, Your Honor?

9              THE COURT:  You may.

10   BY MS. LEEDS:

11   Q    -- actually did away with the ban that you are

12   complaining about to the extent that it conflicted with the

13   policy?

14             MS. AVILA:  Objection, Your Honor, it calls for a

15   legal conclusion.

16             THE COURT:  Well, what her understanding is, I mean

17   she is a candidate, a supporting candidate so her

18   understanding might be relevant.  I'll allow the question.

19             THE WITNESS:  May I see the document, Ms. Leeds?

20   BY MS. LEEDS:

21   Q    Sure.  Just a moment.  It's Number 14 of the order.

22             MR. OLIVARES:  It's Plaintiffs' Exhibit 2.

23             THE COURT:  Yeah, god, I'm just trying to find a

24   date on it --

25             MR. OLIVARES:  Okay.

HILDA GONZALEZ GARZA - CROSS BY MS. LEEDS

1          THE COURT:   -- so remind myself of the date this
2     policy was enacted because I don't see a date on it anywhere.
3          THE WITNESS:  Your Honor, it was enacted on February
4     12 at that particular meeting.
5          THE COURT:  February 12 was --
6          THE WITNESS:  Of 2018, Your Honor.
7          THE COURT:  Okay.
8          THE WITNESS:  Which would have been the Monday
9     before the Tuesday election.
10    BY MS. LEEDS:
11    Q    Can you see it okay?
12    A    Yes, I can.
13    Q    Okay.  Would you read that, please?
14    A    Yes, it has Cumulative all policies of the County of
15    Starr, Texas adopted or unadopted in conflict with the
16    provisions of this policy are hereby repealed and all of the
17    provisions not in conflict with provisions of this policy
18    shall remain in full force and effect.
19    Q    What is your understanding as a lawyer what that means?
20         MS. AVILA:  Your Honor, objection, calls for a legal
21    conclusion.  She's not here to testify as an attorney.
22         THE COURT:  Well, it just -- what's your
23    understanding, I mean it speaks for itself, and really I don't
24    know that her understanding is relevant, but as a lawyer I
25    don't think it's relevant, but I'll allow it as just a

1    candidate or someone electioneers what is your understanding?

2              THE WITNESS:  Okay.  Am I still being asked that

3    question, Your Honor, because she --

4              THE COURT:  Just as a layperson.

5              THE WITNESS:   -- changed the page.

6              THE COURT:  Yeah, if you could go back so she can

7    see it --

8              MS. LEEDS:  Yes.

9              THE COURT:   -- Ms. Leeds?

10   BY MS. LEEDS:

11   Q    It's Exhibit 4.3 of your complaint.

12   A    Okay.  Well --

13   Q    Or application.

14   A     -- actually, Ms. Leeds, that statement's a little

15   confusing, because then if you move your document a little bit

16   further on down, please --

17   Q    Down or up?

18   A    Oh, there you go.  There's Provision Number 12, that says

19   that the Starr County electioneering policy as adopted on

20   January 5 by the Starr County Commissioners Court is hereby

21   incorporated into the Starr County building and property use

22   policy for all purposes.

23   Q    Correct.  And with Number 14 what does that do?

24   A    It indicates that all policies the County of Starr

25   adopted or unadopted in conflict provisions of this policy are

HILDA GONZALEZ GARZA - CROSS BY MS. LEEDS

1    hereby repealed.   And all of the provisions not in conflict

2    with the provisions of this policy shall remain in full force

3    and effect.

4    Q    So the policy rules.

5    A    Yes.

6    Q    Okay.  Now if you go to Number 11 of the use of property

7    policy, what does that deal with?

8    A    That deals with parking zones.

9    Q    Okay.  And it defines what can be parked in a parking

10   zone, does it not?

11   A    Yes, it does.

12   Q    In fact, on the next page in just to get quickly through

13   the bumper sticker issues, would you read Number 6?

14   A    It indicates vehicles may display political signs

15   attached to the vehicles in accordance with the Texas Election

16   Code.

17   Q    So bumper stickers are allowed pursuant to the policy.

18   A    On this particular page I believe it is allowed.

19   However, if you go to -- I believe on Page 7 it talks about no

20   political signs or advertisements will be displayed on

21   historically restored areas.

22   Q    Yes.

23   A    Okay.

24   Q    And what are historically restored areas?

25   A    That would -- I'm assuming it would be in the courthouse,

1   ma'am, but I'm not sure.

2   Q    You're not sure.  You don't know that that is the

3   building of the courthouse?

4   A    That would be the building --

5   Q    Okay.

6   A     -- but it also has parking zones, so that adds to the

7   confusion.

8   Q    Ms. Garza, are you saying you don't understand that we

9   think the parking zone is part of the historical building?

10  A    I believe they have them marked, Ms. Leeds, so that's

11  what I'm looking at.

12  Q    Okay.

13          THE COURT:  I'm understanding we're

14  misunderstanding, but that's her understanding.

15          MS. LEEDS:  Okay.

16          THE WITNESS:  Yes.

17  BY MS. LEEDS:

18  Q    Now if you go back to Number 11 of the order, it says

19  that certain things are allowed in the parking zone but

20  certain kinds of things are not allowed in the parking area.

21  Correct?

22  A    That's correct.

23  Q    It says, Trailers, barbeque pits, chairs, tents,

24  recreational vehicles and the like.

25  A    Yes, ma'am.

1    Q    Would you agree with me that those things are not

2    vehicles?

3              THE COURT:  Well, a recreation vehicle --

4              THE WITNESS:  I'm sorry, but recreational vehicles

5    are vehicles.

6    BY MS. LEEDS:

7    Q    A recreation vehicle I would agree, but it's rather

8    large, or a trailer.  But a barbeque pit, chairs and tents are

9    not vehicles.  Correct?

10   A    Correct.

11   Q    Okay.  You also are well acquainted with the order of

12   which you complained that allows you to apply for a permit for

13   use.

14   A    What page is that, Ms. Leeds?

15   Q    Well, maybe that's the order.

16             THE COURT:  No, it's not the order.

17             MS. LEEDS:  The policy I mean.

18             THE COURT:  It's the policy that you were just

19   looking at?

20             MS. LEEDS:  Yes.

21   BY MS. LEEDS:

22   Q    The use or property policy under Number 8 --

23   A    Okay.

24   Q     -- establishes regulations for use of space.

25   A    Okay.

1    Q    Are you acquainted with this section of the policy?

2    A    Let me look at it, Ms. Leeds.  Regulations for use of

3    space.  Yes, ma'am, I'm looking at it.

4    Q    Okay.  Does that give you the option of applying for a

5    permit to do certain things?

6              THE COURT:  I think you're meaning Number 4.  You're

7    in the wrong area of the policy.  I don't know if that's -- I

8    think this is what you're trying to get at, where people can

9    apply to use --

10             MS. LEEDS:  Yes, I'm sorry, Your Honor.

11   BY MS. LEEDS:

12   Q    Number 4 and 5, which is the application process.

13   A    Okay.

14   Q    In common areas that are not parking zones the county has

15   provided a system by which you can apply for a permit for

16   proper use.  Correct?

17   A    I believe so, Ms. Leeds.

18   Q    Have you tried to apply for a permit?

19   A    No, ma'am, but I did inquire on the 16th if there was

20   some permits available and I was informed that they did not

21   have a document or form so that you could apply for a permit.

22   So I did not do so.

23   Q    Have you attempted after that point in time?

24   A    No, ma'am, I have to.

25   Q    Okay.  So had not been denied the resolution that is

1    contained within the policy.  Correct?

2    A    I'm sorry?

3    Q    You had not been denied the ability to resolve the

4    conflict you had with the policy until you actually asked for

5    a permit and were denied that.

6    A    So you're saying that I needed to have a permit for

7    having a T-shirt on that has some political signage on it?

8    Q    No, I'm talking about --

9           THE COURT:  Can you be more specific in your --

10   yeah, your question's really vague, Ms. Leeds.  I'm having a

11   hard time.  Do you mean if she were to apply to have a tent in

12   the parking lot or if she was -- if she were to apply to stand

13   on the northwest corner of the building where two deputies

14   encountered her on Saturday?  I mean can you be a little more

15   specific?

16   BY MS. LEEDS:

17   Q    Yes, have you tried to apply, besides the 16th, have you

18   tried to apply for the use of any common area of Starr County?

19   A    No, ma'am.

20   Q    Okay.  Is it your understanding that having a T-shirt on

21   is different from using a bumper sticker?

22   A    It's still political speech, so by having a T-shirt on

23   it's still electioneering and so is having a bumper sticker.

24   Q    I'm glad you said that.  Would you turn to the statute,

25   61.003.

1    A    Yes.

2              THE COURT:  Does any of my materials --

3              MS. LEEDS:  It should be -- it's --

4              THE COURT:  Yeah, I have it.  Sorry.  Exhibit 5.

5    BY MS. LEEDS:

6    Q    And, Ms. Garza, would you read what the definition of

7    electioneering is, please?

8    A    I've gone through that temp -- hold on, Ms. Leeds, I'm

9    trying to find it.  Here we go.

10   Q    It's 44 --

11   A    It was on Plaintiffs' Exhibit Number 5, so I'm looking

12   for that one.

13   Q    Okay.

14   A    Yes, ma'am.

15   Q    What is electioneering?

16   A    Includes -- excuse me, electioneering includes posting,

17   use or distribution of political signs or literature.

18   Q    Okay.  That doesn't include putting up a tent or a

19   barbeque pit, does it?

20             MS. AVILA:  Objection, Your Honor, again, it calls

21   for a legal conclusion.

22             THE COURT:  Can you answer it?

23             THE WITNESS:  Your Honor, I know that there were

24   some signs, some tents have Vote For also on them, so it could

25   be electioneering material because candidates have their tents

1    that have, you know, 229th or the name of the candidate so.

2           THE COURT:  Sure.  But without -- if a tent, just a

3    plain vanilla --

4           THE WITNESS:  If it would have been a plain

5    vanilla --

6           THE COURT:   -- canopy with nothing on it, would

7    that be prohibited.

8    BY MS. LEEDS:

9    Q    In a parking lot.

10          THE COURT:  Or under this statute would that be

11    considered electioneering.  Let's say whatever the local

12    elementary school PTA had tents in the parking lot, would that

13    be electioneering.  Or the Girl Scouts were selling cookies

14    and had a tent, would that be electioneering.

15          THE WITNESS:  I guess if they didn't have any

16    political signs, Your Honor, it wouldn't be.

17          THE COURT:  All right.  I mean --

18          MS. LEEDS:  Well --

19          THE COURT:   -- let's move along, we've --

20    BY MS. LEEDS:

21    Q    Yeah, the question was is a tent included in the

22    definition?

23          THE COURT:  Not necessarily, but could be.

24          MS. LEEDS:  Okay.

25          THE COURT:  If the tent had signage painted on the

1   side of the tent, it would be electioneering, if it doesn't,

2   it's blank, devoid of any signage endorsing a candidate or

3   party, then it would not be.

4   BY MS. LEEDS:

5   Q    Would a tent conform with the use policy under what is

6   permitted in the parking zones?

7          MS. AVILA:  Objection, Your Honor, it's vague.  I'm

8   not sure what she's referring to.

9          MS. LEEDS:  I'm referring to Number 11,

10  Subsection 4.

11      (Pause in proceedings.)

12         THE WITNESS:  It looks like you're restricting

13  trailers and tents from the parking zones.

14  BY MS. LEEDS:

15  Q    Right, because they're not vehicles.  Right?

16  A    Yes, ma'am.

17  Q    You would agree with me?

18  A    Yes.

19  Q    You are also familiar with the Secretary of State's

20  Advisory 27 -- 2017-14, are you not?

21  A    I haven't looked at it lately, Ms. Leeds.

22  Q    Have you looked at the exhibits on your exhibit list?

23  A    Let me see if I have this one.

24      (Pause in proceedings.)

25  BY MS. LEEDS:

1    Q    Plaintiffs' 9.

2    A    I'm sorry.  Okay.

3    Q    And on the second page there is a subsection regulating

4    electioneering outside the 100-foot marker.

5    A    Okay.

6    Q    All right.  Now the Secretary of State has indicated that

7    reasonable regulations as to time, place and manner of

8    electioneering may be had and those include keeping sidewalks

9    and driveways clear for pedestrians and traffic.  Correct?

10   A    That's correct.

11   Q    Okay.  And that's outside the 100 feet.

12   A    Yes.

13   Q    When you talked to the individuals you spoke to at the

14   Secretary of State did you provide them with the use of

15   property policy?

16   A    No, ma'am, because they had -- it had not been given to

17   me at that time.

18   Q    Okay.  So you do not know if the language that the policy

19   has in it actually solves the problems you have with the 100-

20   foot line because it's a proper -- well, would you agree that

21   a county can regulate the use of its property?

22   A    Reasonably regulate, yes, ma'am.

23   Q    Okay.  Do you think it's proper for a county to make its

24   parking zones for parking only?

25   A    Are you asking me to speculate at this time?

1    Q    I'm asking if you think it's reasonable for a county to

2    designate its parking zones for parking --

3    A    Yes.

4    Q    -- only.

5    A    Sure.

6    Q    Okay.  So it's not unreasonable that they exclude things

7    that are not vehicles for parking for business purposes on

8    their -- in their parking zones.

9    A    That's correct.

10   Q    If you're --

11           MS. LEEDS:  Your Honor, can you give me a minute?

12           THE COURT:  Uh-huh.

13        (Pause in proceedings.)

14           MS. LEEDS:  Your Honor, we'll pass the witness.

15           THE COURT:  Ms. Avila, is there anything else you'd

16   like to ask of your --

17           MS. AVILA:  (Indiscernible), Your Honor.

18           THE COURT:  You may.

19           THE COURT:  So, Ms. Garza, I want to ask you a few

20   more questions about the incident this weekend.

21           THE WITNESS:  Yes, Your Honor.

22           THE COURT:  So you park there along the street, I

23   think you said on the west side of the courthouse and walked

24   on to the courthouse property to the sidewalk on the front of

25   the grassy area upon where the courthouse sits, and you were

1    encountered by two courthouse deputies.  When they approached

2    you, you mentioned they pointing out your shirt, I mean what

3    specifically did they say to you?

4              THE WITNESS:  That I was on county property.

5              THE COURT:  Okay.  Well, that's -- did you -- I

6    assume you agreed with them, that's true.

7              THE WITNESS:  Yes, I did.

8              THE COURT:  What else?  Did they say anything --

9              THE WITNESS:  Well, they -- like I said, they

10   pointed at my shirt and so I assumed I needed to leave that

11   area because I had the electioneering shirt.

12             THE COURT:  Did they tell you to leave, did they ask

13   you to leave?

14             THE WITNESS:  They asked me to leave, Your Honor.

15             THE COURT:  Okay.  Well, that's what I'm -- so what

16   did they say to you?  You said they pointed at your shirt and

17   you -- a moment ago you said you assumed because of your shirt

18   they wanted -- I mean what did they say to you if you wouldn't

19   mind, to the best of your memory?

20             THE WITNESS:  Your Honor, to the best of my memory

21   they said that it was county property and that I had to leave.

22             THE COURT:  Okay.  Did they explain to you why it is

23   that you had to leave the county property or --

24             THE WITNESS:  They simply pointed at my shirt and

25   that was the reason -- the other person I was talking to, Your

1     Honor, didn't have to leave, I'm the one that had to leave.

2             THE COURT:  So they pointed at your shirt, which had

3     a political --

4             THE WITNESS:  Right.

5             THE COURT:   -- statements on it, and they said, You

6     need to leave, this is county property?

7             THE WITNESS:  Yes, Your Honor.

8             THE COURT:  And then -- and you left.

9             THE WITNESS:  Yes, Your Honor, I did.

10            THE COURT:  No further discussion about the issue?

11            THE WITNESS:  Your Honor, I didn't want to be rude

12    to the officers or anything like that, so I left and I assumed

13    it was because of the shirt that I was there, that they were

14    pointing at and because it had, you know, a political message.

15            THE COURT:  All right.  Ms. Avila, you may resume.

16            REDIRECT EXAMINATION OF HILDA GONZALEZ GARZA

17    BY MS. AVILA:

18    Q    Ms. Garza, with respect to the permitting process under

19    the building policy, what do you understand to be the fee, if

20    any, to apply for a permit?

21    A    My understanding, it's $25 and $50 if I --

22    Q    If you may, may you turn to Plaintiff's Exhibit Number 2?

23    A    Yes.

24    Q    This is on page 7 of the policy.

25    A    Yes.

1    Q    Is that the $25 and the $50 --

2    A    Yes.

3    Q    -- deposit?

4    A    And I have to pay -- not only do I have to apply for the

5    permit, but I also have to pay $25 and like leave a deposit of

6    $50.  And the other thing that I understood was that because

7    it's less than 30 days, it can only be approved by the County

8    Judge.

9         THE COURT:  This says, after hours fees, or $25 per

10   hour, deposits are 50 bucks.  You interpret that to mean

11   during ordinary business hours?

12        THE WITNESS:  From 8:00 to 5:00.  It would be after

13   5:00, Your Honor.  I'm assuming that's what it means.

14        THE COURT:  And that there would be no fee for use

15   of these places before?  I mean, I guess we could --

16        THE WITNESS:  There's still a permit fee, Your

17   Honor, that --

18        THE COURT:  I mean, this sort of seems like a rental

19   fee.  I know I've --

20        THE WITNESS:  That's the part that I don't

21   understand, Your Honor.  It just says that I --

22        THE COURT:  I'm more familiar with --

23        THE WITNESS:  It has there the Starr County

24   Courthouse on it, assuming I need to -- even if I'm going to

25   be there at the courthouse I need to pay a deposit of $50.

1          THE COURT:  All right.

2          THE WITNESS:  But I still wouldn't be able to

3     distribute any material, Judge.  Because if you look at page

4     4, under 8, Regulations, and you go to provision (e),

5     depositing or posting handbills, flyers, pamphlets, signs,

6     posters.  I can't do that anyway, even if I apply for a

7     permit.

8          THE COURT:  That's pretty  much every community has

9     a -- because they're concerned about later.  You can't post

10    signs on placards, handbills.  I mean, that's pretty generic.

11    I think it's been Constitutionally upheld.

12         THE WITNESS:  But it also says, parking, Your Honor.

13    It says, lawns, driveways, parking, exterior of buildings, on

14    the stairs.

15         THE COURT:  Well, you couldn't post them on the

16    parking spots.  I mean, it doesn't say you can't post them on

17    -- they can't be on your car.  All right.  I mean, I

18    understand your concern with that.  Let's move on.

19    BY MS. AVILA:

20    Q    Ms. Garza, can you please turn to Exhibit Number 1 --

21    A    Yes, Your Honor.  Yes, ma'am.

22    Q    -- this is on page 8.  Do you think it's reasonable for

23    Starr County to make parking available for voters in the rear

24    parking lot and allow electioneering outside the 100 foot

25    marker?

1    A    Yes.

2    Q    Now, I just want to clarify.  After the deputies told you

3    to leave, on February 24th, and they pointed to your shirt,

4    what did you think would happen to you if you stayed?

5              MS. LEEDS:  Objection, speculation.

6              THE COURT:  Well, it's -- by it's nature, yes.  Go

7    ahead.

8              THE WITNESS:  And, Your Honor, I guess I could be

9    arrested at that point in time.  I didn't want to test the

10   waters on that, so.

11             THE COURT:  So you feared either a fine or

12   harassment?

13             THE WITNESS:  Right, so.

14             MS. AVILA:  Thank you, Your Honor.  No more

15   questions.

16             THE COURT:  All right.  Any final Redirect?

17                  RECROSS-EXAMINATION OF HILDA GARZA

18   BY MS. LEEDS:

19   Q    Ms. Garza, the use of policy, the use of property policy,

20   does have a fee requirement after hours, correct?

21   A    Yes, ma'am.

22   Q    You just read that.

23   A    Yes, ma'am.

24   Q    But are you also aware that that can be waived?  Section

25   C, waiver modification requirements.

1    A    If we go to --

2    Q    If --

3    A    What page is -- that would be the first page?

4    Q    First page, front page.

5    A    Yes, ma'am.  It says that the Commissioner Court retains

6    the right to waive.

7    Q    All right.  So it's not necessarily that you would have

8    to pay.  This is a use policy for all Starr County property,

9    correct?

10   A    Ms. Leeds, that's correct.  But even according to this

11   policy, before I even get a permit for it to go to

12   Commissioner's Court it has to be done 30 days before.

13   Q    Well, that is so that they have enough time to actually

14   review it, correct?

15   A    That would be correct.

16            MS. AVILA:  Objection, Your Honor.  Argumentative,

17            THE COURT:  I'm sorry.  What was the question?

18            MS. LEEDS:  Well, the witness added that not only

19   can it be waived, but she also has to apply for it 30 days

20   before and --

21            THE COURT:  All right.  There's a provision in there

22   that the County Judge can make a decision --

23            MS. LEEDS:  Right.

24            THE COURT:  -- if it's something quicker.  All

25   right.

1   BY MS. LEEDS:

2   Q    And so, you have not availed yourself of that provision

3   either, have you?

4   A    Which provision is that?

5   Q    An attempt to get a waiver of any fees with the

6   application of a permit that would go to the --

7            THE COURT:  She's never applied for a permit.

8            THE WITNESS:  I've never applied.

9            THE COURT:  Let's move along.

10           (Pause in proceedings.)

11           MS. MORENO:  Your Honor, we're ready for oral

12   argument.

13           THE COURT:  I don't think -- Ms. Leeds, are you

14   finished?

15           MS. LEEDS:  No, Your Honor.  I didn't rest.

16           THE COURT:  Yeah.  You still have a few questions.

17           MS. MORENO:  My apologies.

18           THE COURT:  So you have no more witnesses, then?

19           MS. MORENO:  No, we don't.

20           THE COURT:  All right.

21   BY MS. LEEDS:

22   Q    So Ms. Garza, you were asked earlier about have you

23   witnessed any harassment or have you witnessed any

24   intimidation.

25   A    That's correct.

1   Q    But you have been quoted as having known about harassment
2   in the past, have you not?
3   A    Have I been quoted?
4   Q    Yeah.  Back when you were with the School Board and you
5   were trying to obtain more voting sites?
6   A    Okay.
7   Q    There was an article in the *Brownsville Herald* that said
8   that one of the reasons you were trying to obtain more voting
9   sites was because of harassment at the voting.  Do you recall
10  saying that?
11  A    May I see the document, please?
12  Q    Sure.
13       (Pause in proceedings.)
14  A    I'm sorry, Ms. Leeds.  I don't see in quotes where I say,
15  harassment.  Can you show me that on the document?
16  Q    Yes.  It's not in quotes.  It wasn't an actual quote.
17  But that was one of the reasons you gave for wanting to have
18  more voting sites.  Is it not?
19            MS. AVILA:  Objection, Your Honor.  Vague.  What
20  time period are we talking about here?  For the Record, could
21  she say what it is.
22  BY MS. LEEDS:
23  Q    I'm just trying to make the point that harassment has
24  been an issue in the past and that's one of the reasons that
25  this whole thing has come up, is it not?

1          MS. AVILA:  Is that -- Your Honor, vague.  Is there

2     a question?

3          THE COURT:  Do you have a question, Ms. Leeds, or do

4     you want to rephrase?

5     BY MS. LEEDS:

6     Q    Is harassment not been an issue in the past, making it

7     one of the reasons?

8     A    Ms. Leeds, the comment that I made related back to what

9     happened on March 16th -- or, I'm sorry, during the March 2016

10    election, which were the issues that were had at that primary,

11    where we were electioneering not even beyond the 100 foot

12    marker that we have encroached in.  So that's when I had

13    indicated in that article all the problems that were at that

14    particular site for that particular election.

15    Q    And it's happened in other places that you know of, don't

16    you?

17    A    Happened?  What has happened, Ms. Leeds?

18    Q    That crowding has made it difficult for voters to get in

19    and vote?  People setting up their barbeques and tents and

20    being difficult for voters to get in to vote?

21    A    The issue, Ms. Leeds, is that typically at the courthouse

22    they refuse to mark the 100 foot electionary marker.

23          MS. LEEDS:  Okay.  I'll pass the witness.

24          MR. ALVAREZ:  Judge, may I ask a few questions, just

25    about one point?

1            THE COURT:  All right.  You may.

2         (Off the Record discussion concerning microphones.)

3            RECROSS-EXAMINATION OF HILDA GONZALEZ GARZA

4    BY MR. ALVAREZ:

5    Q    This is La Rosita (phonetic) voting place that's going on

6    right now; is that correct?

7    A    That's correct, Mr. Alvarez.

8    Q    All right.  And in this voting plays we have certain

9    particular county businesses that are going on, is that

10   correct?

11   A    Yes.

12   Q    And one of them is the Commissioner's Fish, and one is

13   located right here in the building, right?

14   A    That's correct.

15   Q    And also the library, the public library is located in

16   this building where the voting is going on, is that correct?

17   A    That's correct.

18            THE COURT:  Can you point?  Just for the Record

19   you're pointing to the largest of the structures, which is

20   square in nature.

21            MR. ALVAREZ:  Right, Judge, that's correct.

22   BY MR. ALVAREZ:

23   Q    And then next to that same building, and what I'm

24   pointing at is the Justice of the Peace, Phase I.  Is that

25   correct?

1    A    There's --

2               THE COURT:  In that same building?

3               MR. ALVAREZ:  Same building, Judge.

4               THE WITNESS:  There's a pre -- I don't remember

5    there.  I know that across they have another -- where

6    Mr. Jesse Availlare (phonetic) has it.

7    BY MR. ALVAREZ:

8    Q    Well, they used to have it on this side but now they

9    moved it right in here.

10   A    Yes.

11   Q    Justice of the Peace is what moved, was there.

12   A    Okay.

13   Q    Were you given all that?

14   A    I have not been to that particular precinct or Justice of

15   the Peace, Mr. Alvarez.

16   Q    I thought you mentioned a while ago that you measured

17   this area.

18   A    I did measure, Mr. Alvarez, and I do remember that there

19   was some signage, and I measured from the entrance where they

20   had voting site.

21   Q    Okay.

22   A    And I went all the way to -- tried to go straight to the

23   edge of the highway.

24   Q    In this same area there is a fire department that is

25   located right here in this area?

1    A    That is correct, yes.

2    Q    All right.  And next to this fire department there's an

3    elderly -- I'm sorry -- a child care facility that is operated

4    by the Migrant Council.  Do you know that?

5    A    That one I didn't get to look at, Mr. Alvarez.

6    Q    Did you look at -- there's also, in this same location,

7    they use the same parking lot here, that is also being used by

8    the food pantry.  You know that, right?

9    A    Yes.

10   Q    All right.  And here, in this area, this is the only

11   parking space that belongs to the County, is that correct?

12   And I'm looking at the surrounding area.

13   A    That's correct.

14   Q    And all these areas where the cars are parked, they're

15   the ones doing business and there's only like 15 parking space

16   there.  Is that correct?

17   A    Maybe a little bit more.  But not that much more.

18   Q    Kind of common, the car will only go -- I counted 15

19   parking space there.  But, I mean, so be it, the Court can

20   look at it.

21        And those 15 parking space are the one that you are

22   suggesting people can put tents up, barbeque pits on, and so

23   forth.  Is that correct?

24   A    I think they normally put them a little bit on the side,

25   Mr. Alvarez.  I've seen them do that too.

HILDA GONZALEZ GARZA - RECROSS BY MR. ALVAREZ

1   Q    Well, this particular site, where the voting is going on,

2   is very limited in space.  Would you agree to that?

3   A    Yes, that is correct.

4   Q    All right.  And if we allow all 49 candidates or 37

5   candidates -- I don't know how many there are, there was a lot

6   -- can we put election areas and tents and barbeque pits,

7   everything else.  The people that have business in the County

8   property does not have any place to park, is that correct?

9   A    Yes.  If you fill it up all with tents, yes.

10  Q    And then the County will not have, at least a proper

11  parking for the people that have business within the County,

12  is that right?

13  A    That's correct.

14  Q    And would you think that is feasible for the taxpayers of

15  Starr County, not to have their parking, at least when they're

16  doing business in the day?

17  A    With regards to tents?  No.

18       MR. ALVAREZ:  I withdraw the question, Judge.  I

19  have no further questions.

20       THE COURT:  All right.  And, let's see, Ms. Moreno,

21  you said there are no additional witnesses on behalf of the

22  Plaintiffs?

23       MS. MORENO:  That's correct, Your Honor.

24       THE COURT:  All right.  Did the Defense have any

25  witnesses they would like to call?

1              MR. FONSECA:  One witness, Your Honor.

2              THE COURT:  All right.  Ms. Garza, you may be

3      seated.

4          (Witness excused at 11:48 a.m.)

5              MS. GARZA:  Yes, Your Honor.

6              MR. FONSECA:  We call District Attorney Omar

7      Escobar, Your Honor.

8              THE COURT:  All right.

9          (Witness sworn, 11:49 a.m.)

10             THE COURT:  All right.  Please be seated.

11             MR. FONSECA:  Is there a binder there?

12             THE WITNESS:  No, there's no binder.

13             THE COURT:  Where was the binder that the witness

14     was using?

15             MS. AVILA:  Your Honor, Plaintiffs are happy to make

16     their witness binder available to Defense Counsel.

17             THE COURT:  Well, all right.  Given how happy you

18     are, we'll allow them to use it.

19             All right.  Whenever you're ready, Mr. Fonseca.

20                 DIRECT EXAMINATION OF OMAR ESCOBAR

21     BY MR. FONSECA:

22     Q    Mr. Escobar, what is your position with the County?

23     A    I'm the 229 Judicial District Attorney

24             THE COURT:  And your full name, please, for the

25     Record?

1          THE WITNESS:  Omar Escobar.

2     BY MR. FONSECA:

3     Q    And Mr. Escobar, you played an important part in this use

4     policy, correct?

5     A    Well, I would say so, yes.

6     Q    How were you involved in coming up with this -- with the

7     use policy?

8     A    I helped draft this particular policy.

9     Q    I'm sorry?

10    A    I helped draft this particular policy.

11    Q    And why did you draft this policy?

12    A    Well, in looking at some of the issues that were sort of

13    coming up, because we had already gone through -- the County

14    had already adopted that previous policy, the Court has

15    indicated that has been in artfully drawn.

16         So in viewing some of the issues that were coming up,

17    some of the other issues that we started thinking about was

18    that we didn't have policy dealing with property and how the

19    public can use property.  There was nothing.

20         And so I do remember the date, but I remember calling

21    Canales, who is a County Attorney, and asking, what would

22    prevent me from parking a trailer full of cattle in our County

23    parking lot.  Tell me what prevents me from doing so.  And

24    there was sort of a pause and said, well, nothing, nothing

25    does.

1        And so, the reality was that the County simply had no

2    governing policy regarding the use of property.  So commenced

3    to try to look for go-by's that we could use to be able to

4    draft as far as a policy that could be considered by the

5    Commissioner's Court in regulating not just buildings, but

6    property that the County owns.

7    Q    Now, have there been any issues with food being prepared

8    or being served at locations -- at these County properties?

9    A    Food being prepared.  Okay.  I'm assuming you're

10   referring to a particular incident that you and I just spoke

11   about.

12   Q    Yes.  Yes, Mr. Escobar.  Chicken was involved.

13   A    So let's get to the chicken issue, I suppose that's what

14   you want to get to.  So what you're asking is, have there been

15   incidents.

16        There was one incident, and this is part of where we get

17   to some of these electioneering issues is that -- you have to

18   understand I have to see the map so that I can explain to the

19   Court.  But you have to understand that there are several

20   locations that are used for County wide polling locations.

21   And so --

22   Q    The courthouse map will be helpful?

23   A    Well, yes.  So, to give the Court context, I can use a

24   pointer.  I'm so used to getting up and pointing.

25        So in the ordinary elections that we have, for example

1    the primaries.  What ends up happening because there is no

2    County policy, property policy.  What ends up happening is

3    that sometimes about a week in advance people start parking

4    their vehicles overnight to ad hoc designate where they're

5    going to put their tents, some of which are large tents.

6         So what ends up happening is that pretty much this entire

7    area ends up being commandeered, this entire area here.

8         THE COURT:  And basically you're pointing to the

9    back half of the parking lot that's striped, designated for

10   parking spaces.

11        THE WITNESS:  Yes.  All of that area ends up being

12   commandeered.  How do I know?  Because I have personal

13   knowledge.

14        And so this entire area during courthouse hours,

15   talking about we've got grand jury proceedings, we've got jury

16   trials, we've got regular.  Remember, what's housed at the

17   County Courthouse is, you've got County Court law, you've got

18   two District Courts, you've got a District Clerk, you've got

19   the County Clerk's office, you have the District Attorney's

20   office, you have the County Attorney's office, and you have

21   some other, like crime victims' unit.  So there's always a lot

22   of traffic from day-to-day into the courthouse.

23        So what ends up happening, like I said, is that you

24   have this entire area that I pointed to, basically

25   commandeered.  Just taken over.  And it's no longer available.

1   And sometimes you have, you know, you have defendants that

2   come from the jail from the north, because the Court doesn't

3   have a context.  So the jail would be up here and they come

4   around and drop off defendants here and then they come in.

5   This is all happening during regular polling hours.

6           And so having said that, so we started kind of

7   looking at and thinking about how the County can regulate the

8   use of County space.  And so that's what sort of giving rise

9   to looking at now a more comprehensive County use policy.

10          So there was one election, I'm going to say in -- if

11  memory serves, in May of 2016.  And in that mayoral race there

12  was an argument over a barbeque pit between the parties.  And

13  so what ends up, the end result of that argument was that

14  there was some chickens being cooked on one of these large

15  barbeque pits.  These are not the small, these are the big

16  pits, these are for professional -- you know, well, not

17  professionals but these are the heavy duty ones.

18          THE COURT:  Sure.  They're on wheels like trailers,

19  basically.

20          THE WITNESS:  Yeah.  They're trailers.  So what ends

21  up happening is that because over the argument over whose two

22  opposing camps, they took -- there was some chicken.  It was a

23  very -- so it became a notorious incident.  So one of the

24  candidates actually took the chicken and flung it onto the

25  parking lot, in that area that we're talking about over here

1    in the back.  And so somewhere in that area there, they flung

2    it so there was chicken on our County property and County lot.

3            So, you know, there's been disputes before, but

4    that's one of them where they were like -- they threw this

5    half coked or baked chicken onto our County property.

6    BY MR. FONSECA:

7    Q    Does this constitute safety hazard?

8            MS. AVILA:  Objection, Your Honor.  Just to the long

9    line of leading questions.

10           THE COURT:  I mean, it speaks for itself, raw

11   chicken on a parking lot.

12           THE WITNESS:  Probably not a good thing, no.

13   BY MR. FONSECA:

14   Q    While we're looking at his map, you've just listened to

15   the witness talking about the surrounding areas.  I mean,

16   everything's around the courthouse and the parking lot, County

17   property?

18   A    Well, no.  The only County property is actually the

19   square with the red line around that, that's the square.

20   Everything else is city property or privately owned.  You

21   know, in fact, you know, Mr. Alvarez's office is right here,

22   and then you have another office right here, another attorney

23   office here, another attorney office over here.  So -- and

24   then this is going to be City property and that's going to be

25   City property.

1    Q    This particular parking lot --

2    A    And that belongs to the KC, to the KC Hall.  It's used on

3    occasion -- well, it's used by juvenile County employees.  So

4    that's that area that's used there, so it's a small area that

5    they usually use.

6         From time-to-time if we have overflow, for example, on

7    jury trials where we might have people coming in, when you

8    have a voir dire panel coming in, sometimes you might have

9    this area park -- where they start parking there.  But this is

10   private property, that's not public property.

11   Q    Is the parking lot on the north side of the courthouse

12   sufficient for the needs of the courthouse?

13   A    In my opinion during -- during election year periods?

14   Q    Yes.

15   A    No.  I there's no way.  Half of this entire -- from here

16   to here is usually commandeered by everyone that's running,

17   whether it's one or two sides, however, it's going to be

18   commandeered.  It's like it's taken over, it's no longer

19   available.

20   Q    Are there any permit fees under the policy --

21   A    To my understanding there are no application fees, but

22   there are -- if the application is rented there are permit

23   fees for the use of what is going to be, like, for the City or

24   whatever it might be, representing the cause to the taxpayers

25   of using those particular buildings.  And we're talking about

1    buildings or property.

2        So as far as I know there's no application fees and there

3    could be permitting fees for those -- especially those used

4    after hours.  And even those can be waived depending on the

5    use that has been requested.  So if it's some kind of public

6    use those can also be considered to be waived.

7        So in other words, Commissioner's Court retains the

8    authority to waive those fees.

9    Q    These $50 deposits --

10   A    Right.

11   Q    -- referred to on page 7 of the policy, what are those

12   for?

13   A    Correct.  Those would also represent deposits that, for

14   example, it could be for clean up and for the things that

15   might be used that are ordinarily associated with the use of

16   public buildings.  So that's just -- it's a fee that was

17   imposed or that was adopted by the Commissioner's Court that's

18   subject to change or it can be subject to waiving.

19   Q    Let me move on to Plaintiff's Exhibit Number 11.

20   A    Yes.

21   Q    Do you recognize the two individuals in that picture?

22   A    I do.

23   Q    Who are they?

24   A    One of them is Ms. Hilda Garza and the other person is

25   Martin Martinez, Jr., Justice of the Peace.

1    Q    You heard testimony on the covering up of this political

2    sign here.  What happened after they finished covering it up?

3    A    Okay.  So a lot of attention has been drawn to this

4    incident.  So what actually happened was that on Tuesday,

5    which would have been the first day of early voting, the

6    presiding judge -- my understanding, the presiding judge --

7    and the Court will excuse me if I get into hearsay.  I don't

8    know if there's going to be -- so a lot of this is going to be

9    based on hearsay and then I can talk about what my personal

10   conversations with Mr. Martinez.  So --

11   Q    Let's talk about your personal conversations with

12   Mr. Martinez.

13   A    Right.  So Mr. Martinez, so I think it would have been on

14   Wednesday that I heard -- I had understood that -- and I don't

15   recall from whom, that -- it may have been from the security,

16   I'm not sure -- that Mr. Martinez was ordered to sort of put

17   that paper over his his truck because it was electioneering.

18        And actually, I think I saw it myself from my office from

19   the third floor, so I was able to see it.  And I began

20   thinking, well, why is he covering up his sign.  So I did

21   speak to the Elections Administrator, John Rodriguez, and I

22   indicated to him our property use policy very clearly states

23   that outside of the 100 feet they can have stickers, they can

24   have, you know, some kind of signs, political signs.  It says

25   it.

1        So his response was, it was the presiding Judge's call,

2    that she took it upon herself to -- at that polling location,

3    we're talking about the courthouse polling location.  The

4    presiding Judge in that location made the call to say that

5    they needed to take down the stickers or the signs or remove

6    whatever need to be done.  At which point I think -- and

7    actually I think Mr. Canales got involved in that, and we both

8    gave our opinion that it was allowed under the County use

9    policy.  So the presiding Judge had no authority outside the

10   100 feet electioneering zone and could not have ordered

11   anybody to get out of our parking zone for that purpose.

12       So I think that eventually -- so then I spoke to

13   Mr. Martinez -- and I would have been on the first floor, and

14   I apologize to the Court, it would have been Wednesday or

15   Thursday, I don't remember when it was.  And I specifically

16   told him, you can have your sign and you don't need to cover

17   it up if you're outside the 100 feet.

18       So he, in fact, did that.  In fact, his vehicle has

19   remained on the Starr County property as far as I knew, in

20   fact all weekend, because I saw it over the weekend, with

21   fully -- you know, in other words, uncovered.  So this issue

22   was resolved.  Very clearly we're not going to enforce that.

23   In other words, the policy is you can have stickers.

24   Q    And what about he bumper stickers that had been ordered

25   covered up that the witness testified about?

1    A    I'm not aware of this because we made -- the County

2    Attorney and myself made it explicitly clear that persons can

3    have -- pursuant to just reading the policy it's clear, you

4    can have bumper stickers.  I mean, there should be no debate

5    about it.

6    Q    Have you talked about this with the Elections

7    Administrator?

8    A    With the Elections Administrator, who then talked to

9    them, who then speaks with the presiding Judge.  The presiding

10   judge had no -- so there was confusing the first day.  I said,

11   the presiding judge has no authority outside the 100 feet, so.

12              MR. FONSECA:  Your Honor, we included as part of our

13   response, Exhibit A, which are Google maps, which -- like this

14   one, that show the red line around the property just to -- a

15   little bit more clearer than all the other exhibits that have

16   been provided.

17              But I also added a white line to each one of these

18   using the Google map measuring -- measurement tool to show

19   what 100 feet looks like.  And every one of these exhibits has

20   that.  I just want to use it for demonstrative purposes.

21              THE COURT:  All right.  You may.  I didn't catch the

22   white line.  I saw that the red line was much more visible.

23   Because in some of the Plaintiffs' I couldn't tell, especially

24   the ones in rural areas.  It's tough to see the red line.

25              MR. FONSECA:  All right.  And I have provided a copy

1    to Plaintiff's counsel prior to --

2            THE COURT:  All right.  So you now have a white

3    line.

4            MR. FONSECA:  And it's right here, Judge.

5            THE COURT:  Okay.

6    BY MR. FONSECA:

7    Q    I mistakenly put it on the wrong door, it should be up

8    here, the 100 foot line goes up to about there.  Is that

9    correct, Mr. Escobar?

10   A    I can tell you where the 100 feet is, more or less.

11   Q    Where is the 100 --

12   A    So the 100 feet is going to be somewhere -- it's going to

13   be somewhere -- that the cone is usually somewhere here.  If

14   you measure it from the actual door it's going to go right

15   past this median, it's going to be right there.

16        But that's where Ms. Gaza's sort of brought up an

17   argument in the past, that tents were set up.  But, you know,

18   they were right here, like right at the edge of the 100 foot

19   marker, and so technically would have been inside the

20   electioneering zone, the 100 foot prohibition of

21   electioneering zone that Texas has, 63 Texas Election Code.

22        So here's a door and 100 feet is right around that area.

23   And from this other door, from this door the 100 foot is

24   somewhere around this area here, right there, so.

25   Q    So the parking lot and then just maybe the corners of the

1      courthouse property is -- the common areas are just these

2      round corners, correct?

3      A      Okay.  So under the policy?  Under the policy anything

4      that is not a parking zone is a common area.  Anything that is

5      not a parking zone is considered a common area.  There's only

6      really two classifications of property that you have.

7      Q      So these grassy areas are common areas?

8      A      Yeah.  Anything that is not a parking zone, that has not

9      been designated as a parking zone is a common area.

10     Q      Okay.  And these can be used for electioneering as long

11     as they're outside the 100 foot marker?

12     A      Sure.  Assuming that you requested an application.  In

13     other words, for whatever -- because the County policy speaks

14     to any property use, whether during the election period or

15     outside of election periods, for whatever use you  may be

16     thinking about using, whether -- it can be -- if you think

17     you're going to be selling stuff, or it can be whatever

18     purpose that one can conceive of, as far as the use of the

19     public property.

20          You request an application, then you have permits that

21     are going to be issued depending on the location that you're

22     requesting and what the public use is.

23     Q      Are there County parks that you rent out pavilions at or

24     anything like that?

25     A      Okay.  Well, here's the problem, and that's one of the

1    problems we were addressing.  One of the commissioners has a

2    pavilion in which -- and actually, let's go to -- do you have

3    --

4    Q    Is that La Victoria?

5    A    Let's show the Court La Victoria.  So let's look at --

6    Okay.  All right.  So, no.  Encineso (phonetic).  I'll show

7    the Court what this is.

8              Encineso (phonetic).  Okay, yeah.  So your polling

9    location is right here.  This is your polling location right

10   here.

11             THE COURT:  And that's a election day only or early

12   voting?

13             THE WITNESS:  Early voting.

14             THE COURT:  Okay.  Early voting, encineso

15   (phonetic), okay.

16             THE WITNESS:  Okay.  Encineso (phonetic).  So -- and

17   then you have this entire area designated as parking zone,

18   parking area.  So for example, here you're going to have an

19   adult -- I think it's like an adult center here, adult day

20   care center.

21             THE COURT:  And that's the first building on the

22   right when you come into the parking lot?

23             THE WITNESS:  That's correct.  That's correct,

24   Judge.  I'm sorry.  And then you're going to have the JP

25   office here, the Justice of the Peace office, and then you're

1      going to have the Commissioners' office right here.  This here

2      is a pavilion.

3              So to our understanding the County Commissioner of

4      that precinct was renting that building out, but not renting

5      it out.  And so that becomes somewhat of an issue.  For the

6      years that he has been Commissioner, we know of persons that

7      have used this, this location, but we've never seen any money

8      deposited, ever, in the County, that has ever been brought.

9              So one of the things that this property's policy

10     indicates is, that if you're going to rent out taxpayer

11     property or you're going to allow the public to use, you're

12     going to need to account for it.  And it doesn't belong to any

13     particular commissioner, it belongs to the County as a whole.

14             So this property use policy also addresses the

15     situation where pavilions are rented out, leased out, loaned

16     out, to the public and it standardizes that particular

17     process.  If you're going to rent out a pavilion for an event,

18     you better get an application on file and then get a permit

19     approved.  Okay.  So that's one of the things that this

20     particular policy does.

21     BY MR. FONSECA:

22     Q    Are there liability concerns?

23     A    Well, of course.  I mean, that's one of the things that

24     you're going to be looking at.  If there's an accident or

25     something would happen, of course we want waiver of liability

1    forms, at least some, you know, documents or -- you know, that

2    we might need for the County to sort of limit its exposure.

3    But as we know the County can limit its exposure as much as it

4    wants, but there's always going to be certain liability when

5    you have a public using, you know, the public property.

6    Q    So looking at this particular property, we have the north

7    and the northeast area --

8    A    Yeah.  But the --

9    Q    -- to be used as long as it's outside the 100 foot

10    buffered zone?

11    A    Right.  Because the County property doesn't -- and here,

12    like all of this area's County property.  I mean, there's a

13    baseball field, there's a field that travels even further

14    north than this.  And like I said, anything that is not a

15    designated parking zone is a common area.

16    Q    And just to show the Court the 100 foot mark on

17    La Rosita.

18    A    And Mr. Alvarez was asking a question but was also

19    testifying at the same time.  This is the fire engine right

20    here.  So there's usually a fire engine right here.

21    THE COURT:  Well, I see two parked out in front, it

22    looks like.  That looks like those are red trucks.  I assume

23    those are fire related.

24    THE WITNESS:  Yeah.  Right.  They're usually going

25    to be in this area right here, and then you have operations

1    back here, the County.  You know, you're going to have

2    backhoes and heavy equipment back here and you're going to

3    have all kind -- you know, this traffic in and out here.  And

4    so, this is 83.  You're traveling at highway speeds right here

5    and you sort of turn off into this area.

6          And so what happens is that during election periods

7    you're going to have -- right around this area here people set

8    up all their tents.  Like they set up tents and barbeque pits

9    and whatever.  So you're left with this little -- Mr. Alvarez

10   made a point.  There's just this little area, little zone.

11   There's a little bit of area on this side where people have to

12   come in and sort of battle for a place to park to go into the

13   polling place.

14         THE COURT:  And then they have to walk though the

15   area where the tents are, generally, if they're going to go

16   straight to the front door, apart from the regaining parking

17   spots.

18         THE WITNESS:  Correct, Judge.  So if you try to go

19   here and it's not blocked, in this area.  If you're lucky

20   you're going to come around this area and sort of park in

21   front, and then try to avoid these people right here, right in

22   this area that are kind of eyeballing you and maybe telling

23   you -- shouting at you.  This is from personal knowledge.

24   They're going to be looking at you and sort of -- if you can't

25   go here you better look for somewhere else here, and you have

1    to walk past this area, walk past these other areas to get to

2    the polling location.

3    BY MR. FONSECA:

4    Q    Would this be the only area that, as a citizen, you could

5    park in to avoid these tents in order to conduct business in

6    Precinct 1, the library and the child care center?

7    A    Well, from personal experience you're going to have cars

8    lined up.  Because it's not just the candidates, it's their

9    supporters also.  So they're going to park out -- and workers,

10   they're going to take up this entire area here.  So, like I

11   said, the only real place to park during election period is

12   really up front.  You're going to have hope that this isn't

13   filled up.  And most people, when they see this mess will come

14   back another day.

15   Q    Here we have La Victoria, correct?

16   A    Yes.  All right.  So --

17   Q    Where the elections take place?

18   A    Right.  This is also a pavilion.  This is also used for -

19   - can be used for community events and can also be used by

20   private persons, evidently for weddings and stuff like that,

21   you know.  And this is where -- or other kind of events,

22   social events.  This is where the polling location is actually

23   at during election day, on election day this is the area.  But

24   this is an operating community center, so there's an JP office

25   here and there's a County warehouse here.

1          And I think this is the JP office here and there's some -

2   - like an operations here.  So there's areas that are used for

3   parking, is going to be used for parking here.  And then this

4   area over here is also used for parking.

5          But the County property is actually much larger.  It

6   actually covers this entire area in this zone back here.  The

7   outside red area right here is just an outer zone, but it

8   doesn't represent all the County's property there.  This is

9   like a park here, area, and there's a park over here, so.

10  Q    Those are just the lines that were drawn in -- that were

11  drawn over.

12  A    Right.  In the original work, yes, in the original.

13  Q    And finally, the courthouse annex.  Why is this

14  particular location important for the County?

15  A    Well see, this is the counting station.  So all the

16  counting that happens on election day, when you bring in all

17  the machines, all the M-100s, and you do the counting, all the

18  mail-in, everything.  All the mail-in, everything, is kept

19  here in this location.

20         Now right now it's not a polling location.  It is just a

21  central counting station.  But nothing prevents the County

22  from later designating this as a polling location.  It can be

23  used at a later time.

24  Q    And the green areas on the west side of the property, are

25  those available?  I'm sorry --

1    A    These are two?

2    Q    Yes.

3    A    So these areas presumably are, because I don't know

4    title, I'm not exactly sure of the title of this particular.

5    But this I think, these areas right here, are probably

6    available for electioneering.  These areas here.  But on that

7    I don't know so I have to qualify that.  I don't know the

8    title.  Because this could also belong to the Highway

9    Department, right there, so I don't know.  But these are

10    improved areas, so my understanding is that they can be used.

11         MR. FONSECA:  Those are all my questions, I'll pass

12    the witness.

13         THE COURT:  All right.  Any cross examination?  It's

14    Ms. Perales?

15         MS. PERALES:  Yes, Your Honor.

16         THE COURT:  All right.  You may proceed.

17              CROSS-EXAMINATION OF OMAR ESCOBAR

18    BY MS. PERALES:

19    Q    Good morning, Mr. Escobar.

20    A    Good morning.

21    Q    I think maybe it's good afternoon at this point.  I only

22    have a couple of questions for you.  If you wouldn't mind

23    turning with me to Exhibit 7 in the binder.

24    A    Yes.  Yes.

25    Q    I'm going to use a little technology to get there.  Do

1    you recognize this document as a copy of a Facebook post for

2    the 229th Judicial District Attorney?

3    A    That's correct, yes.

4    Q    Thank you.  If you wouldn't mind turning to tab 13,

5    please.  Do you recognize this document as a correct copy of a

6    Facebook post by Omar Escobar, Jr., titled, Starr County

7    Election Update, on February 23rd?

8    A    Correct.  It looks like it, yes.

9    Q    And that's your Facebook post, correct?

10   A    Yes, that's correct.

11   Q    And did you author both of the Facebook posts that we

12   talked about?

13   A    Yes, I did.

14   Q    If you wouldn't mind -- well, in just one moment I'm

15   going to put up one of the maps that you have looked at with

16   the County Courthouse.  This is a map attached to Plaintiff's

17   Exhibit 1.

18   A    Right.

19   Q    Now, if we're looking at the County Courthouse, I'm just

20   going to ask you a couple of questions about this.

21   A    Right.

22   Q    It's correct that under the County's property use policy

23   there is no permitting process for the parking areas.  There

24   are parking areas and there are common use areas, is that

25   correct?

1    A    That's correct.

2    Q    And you need a permit to use a common use area, correct?

3    A    Correct.

4    Q    And there is no use of parking areas.  Those are reserved

5    solely for parking, is that correct?

6    A    That's correct.  That's for parking.

7    Q    And so, for example, to use an example that the Court has

8    mentioned.  If we're looking just at this back parking lot,

9    which you see at the top of the picture, and seven different

10   Girl Scout Troops sent up tents to sell Girl Scout Cookies in

11   that back part of the parking lot, that would be prohibited,

12   isn't that correct?

13   A    You mean during courthouse operations?

14   Q    Yes.

15   A    That would be prohibited.  That would be prohibited, yes.

16   Q    And they couldn't get a permit to do that either because

17   it's a parking area, correct?

18   A    Right.  Because the governing body has the authority to

19   list it as a parking area.

20   Q    Of course.  Putting aside the question of authority, I

21   just wanted to draw out the distinction between parking areas

22   where the Girl Scout tents would not be permissible and

23   there's no permitting process.  But, for example, if there was

24   a park, a common area somewhere in Starr County, the Girl

25   Scouts might be able to apply for a permit to use that.  Is

1    that right?

2    A    Correct.  To the extent if it's a common area, sure.

3    Q    Thank you.  And so, if we change the example from the

4    Girl Scout tents to candidate tents, barbeque pits, ice chests

5    and chairs.  If those are set up in the back parking lot there

6    as well, that's also a prohibited use, correct?

7    A    That's correct.  Parking lot is for parking.

8    Q    Yes, yes.

9    A    I don't know if we can go any further than the parking

10   lot is for parking.  Any other examples that you give me, my

11   answer is going to be the same.

12   Q    And then the same question.  There is no permitting

13   process to be able to set up those candidate campaigning

14   electioneering tents in that back part of the parking lot

15   because it's parking, correct?

16   A    It's for parking.  Yes.  And, by the way, we haven't

17   testified to this.  But there's ingress and egress of

18   vehicles.  They come in this way and they've got this way.  So

19   it's constant, just constant traffic back and forth.

20   Q    And then, finally, one more example.  If an individual

21   wants to election year, wearing a candidate tee-shirt, handing

22   out what we call palm cards or other campaign material, in the

23   back half of the parking lot, that would be a prohibited use,

24   correct?

25   A    Right.  It's prohibited both within the 100 feet, which

1    currently exists, and then would also be not a permissible use
2    of our parking lot.  So you have to apply for an area that is
3    not a parking lot.  So you can apply for any other area and
4    just would need to be considered by the Commissioner's Court.
5    Pretty sure not just one person would end up applying.  You'd
6    have to end up with a whole bunch of permits and kind of
7    figure out.  But that would be for the deliberative body to do
8    at that point.
9    Q    Thank you.  Thank you, Mr. Escobar.  And there's also no
10   permitting process for an individual who wants to, election
11   year, with tee-shirt and hand out materials, there is no
12   permitting process for that individual to engage in those
13   electioneering activities in the back half of the parking lot,
14   correct, because it's a parking lot?
15   A    Because it's a parking area, that's correct.
16   Q    Okay, thank you.  What is the penalty for violating the
17   County's electioneering policy?
18   A    As far as going on to these locations without a permit?
19   Q    No.  The penalty for violating the electioneering policy.
20   A    Right.  In the extreme case, after we consider it, if
21   you're on a location or public property without permission,
22   it's possibly trespass, depending on, you know, the
23   circumstances.  It could possibly -- of course the County
24   Attorney -- that would be in the County Attorney's purview.
25   But it possibly could be a trespass.  It's like going on to

1     any property without permission.  At some point if you're not

2     using it in accordance with the policies that have been

3     directed, it is trespass because you're on there without

4     permission.

5     Q    And the fine for this penalty, which is expressed in the

6     electioneering order slash resolution and incorporated in the

7     building use policies, $2,000 and up to six months in jail, is

8     that correct?

9     A    Up to.  I think it's up to that amount.  So depending on

10    if a jury would find you guilty, I suppose, or whoever the

11    trier of fact may be.  It's the normal penalties for trespass.

12              MS. PERALES:  Thank you.  I pass the witness.

13              THE COURT:  Any Redirect?

14              MR. FONSECA:  One follow up question, Your Honor.

15              REDIRECT EXAMINATION OF OMAR ESCOBAR

16    BY MR. FONSECA:

17    Q    Why is it important for the County to keep people from

18    passing out pamphlets or bills or anything in a parking lot?

19    A    Well, one of the things I believe that can happen is --

20    number one, the Court alluded to it, is that, you know, there

21    is authority at the very least to regulate the kind of sort

22    trash that you have in those areas or zones.

23         But not only that, when we're talking about parking

24    areas, pedestrians and vehicles don't mix very well.  And it

25    is important for the County to be able to stress, or in other

1    words to regulate who can actually be on those parking areas,

2    or in those parking areas.

3        So otherwise the situation that you would have is that,

4    for example, if we'd say, well you can't electioneer -- or you

5    can electioneer all you want in parking zones.  Then you have

6    mass of people in our parking areas and I know what's going to

7    happen because I've seen it.  As soon as a voter gets to the

8    parking area they will be mobbed by each side trying to get

9    the vote, it will happen.  And so you're going to have people

10   just crawling over the parking area trying to get the vote of

11   that particular person, before they even get down from the

12   vehicle, and that's precisely what will happen.

13       So, you know, one of the things is, you can't have people

14   just walking all over the place when you've got traffic,

15   especially when you're got ordinary, routine government

16   operations going on.  And I think the deliberative body, the

17   County, can in fact regulate what zones are available for what

18   uses and whatnot.  And these are, I would venture to say,

19   important regulations as far as the safety -- not just for the

20   persons that are on the parking lot, but also to make sure

21   that voters do have a right to vote, to protect the integrity

22   of the election process.

23               MR. FONSECA:  Thank you, I'll pass.

24               MR. ALVAREZ:  May I have --

25               THE COURT:  Sure, you may.

RECROSS-EXAMINATION OF OMAR ESCOBAR

BY MR. ALVAREZ:

Q    The elections started -- earlier the elections started November the 20th or when did it start?

A    The 20th, I believe.  Well, it would have been Tuesday, so it would have been this last Tuesday, so whatever that day was.

Q    It would have been the 20th.

Q    From the 20th, 21st, 22nd, 23rtd and 24th, and this Saturday, the 25th, did anybody complain to you that they are being harmed in any way because they're not using the parking lot of the County?  Is that still the --

A    No.  And you referenced -- no.  And so I just referenced it in one of the maps.  So a lot of the electioneering is going on just outside of the County parking lot, so you have a mass of people, but they're outside of our parking areas, or for the most part anyway.

And so they're around the area but just not inside the parking lot, so I couldn't imagine what injury there is.  I'm going to say there's maybe 20 foot -- 10  feet -- actually some people are right outside our parking lot as cars are trying to drive in, in some instances.  But they're right outside the zone.

But as far as complaining about not being able to reach the voter, no, I have not.

1    Q    People can still campaign and give their literature out
2    and put a tee-shit outside the parking area --
3    A    Well, in fact, Mr. Alvarez, you were doing campaigning
4    and you were able to also campaign outside of the area.
5    Q    Sure.
6    A    And so, I didn't hear any complaints from you or anybody
7    else as far as not being able to adequately reach the voter.
8    In fact, you have an office -- what is it, about 20 feet from
9    the outer zone of the courthouse, so you have been able to
10   campaign, so I don't know -- and there has not been any member
11   of the public that has approached me or called me or told me,
12   complaining about not being able to electioneer.  In fact,
13   quite the opposite.  I think most of the residents, the County
14   resides ask, what took you all so long.
15   Q    And we only have a few days to go, this Tuesday,
16   Wednesday, Thursday, and Friday of this week, and then Tuesday
17   of next week, and the election is over, is that correct?
18   A    Correct.
19   Q    At least the democratic primaries and the republican
20   primaries, right?
21   A    Correct.
22        MR. ALVAREZ:  All right.  Pass the witness, Your
23   Honor.  I have no further questions.
24        MS. PERALES:  Your Honor, I just have one quick
25   follow-up question.

RECROSS-EXAMINATION OF OMAR ESCOBAR

BY MS. PERALES:

Q    Mr. Escobar, when you were asked just a moment ago what the penalty would be --

A    right.

Q    -- you were testifying out of what's written in the order, right?

A    The original order.

Q    The original order.  And you --

A    Or policy or whatever.  Right, okay.

Q    The original order says:  Any person violating a rule adopted under this order.  Have nay rules been adopted under this order?

A    Under that order?

Q    Yes.

A    Not that I know of.

Q    So the questions that Plaintiff was just asking you about, the penalties, really don't apply to the policy itself, do they?

A    Right.  You have to understand -- and the Court honed on it very quickly.  The original order does have its issues, obviously.  It's the property use policy that really should be at issue here.  I don't see -- and I would have to agree with the Court, attempting to enforce that first order is going to be difficult.  It's the subsequent property use policy that,

1    as law enforcement, we would be trying to enforce and that

2    would be under the penal code.  In other words it would have

3    to be trespass under that test.  So, I mean, as law

4    enforcement officers I couldn't imagine trying to really

5    enforce that first order.  Just couldn't do it.  It's the

6    property use policy that we are focused with.

7                    MS. PERALES:  Thank you.

8                    THE COURT:  One of things the Defendants brought

9    out, I'm just going to -- they brought it up but they didn't

10   ask you specifically about it, was your Facebook post.

11   Towards the end of it basically you say:  Starr County's

12   property use and electioneering policy continues to be in

13   effect and electioneering is not permitted in County parking

14   lots.

15                   I'm just kind of curious to get your thoughts on

16   what you meant by that, because you testified at one point

17   that you got business at the courthouse you can park in the

18   parking lot, you can have a sign on the side of your pickup

19   truck that says Martinez for JP, which is considered

20   electioneering because you're advertising for a candidate.

21   And you also mentioned bumper stickers and other things

22   affixed to vehicles can be in the parking lot, assuming

23   they're affixed to a car that's parked there.

24                   So what did you mean by electioneering is not

25   permitted when at the same time you're saying, well, it is

1      permitted under certain circumstances?

2              THE WITNESS:  Sure, I understand what the Court is

3      asking.  The post is to public.  And so, in my mind, we're not

4      talking to attorneys, we're talking to lay people.  And so the

5      first thing that will come to mind -- and we're referencing

6      the last post, correct, according to this?

7              THE COURT:  Yes.

8              THE WITNESS:  So what ends up happening is, in my

9      mind, when people hear federal lawsuit, the sky is falling.

10     Uh-oh.  All the rules are out and now we're going to go back

11     to the old system.  And so my intent was to -- for the public

12     to understand that we were not going to have people flooding

13     the parking lots because that's what they don't want.  They

14     want to go in to vote and get out.  And in other words, they

15     don't want to be pressured, harassed, eyeballed, or approached

16     in any way, manner or form.

17             So my intent was to let them know that the Court had

18     not issued any restraining order.  That they could peacefully

19     go and park, go in and get out, which is the most commentary I

20     get as an individual now.  Because if they can go and get out

21     without having to be approached by anybody.

22             So that was the notion.  Did it mean that we were

23     prohibiting everybody from having stickers and otherwise

24     political signs on their vehicles, no.  Electioneering in our

25     mind, at least to the public is when somebody's approaching

1    you to ask for a particular vote.  So that's what I was trying

2    to get at.

3                THE COURT:  All right.  I just wanted you to clarify

4    that.

5                All right.  Anything else from anybody?

6                You may be seated, Mr. Escobar.)

7          (Witness excused, 12:31 p.m.)

8                MR. ESCOBAR:  Thank you.

9                THE COURT:  Any other witnesses from the Defense?

10               MS. PERALES:  No, Your Honor.

11               THE COURT:  Or any other kind of evidence?  No.  I

12   mean, I have all the documents in front of me.

13               All right.  Ms. Moreno, you wanted to have some

14   argument?

15               MS. MORENO:  Yes, Your Honor.

16               THE COURT:  Why don't we take like a five minute

17   break and then I'll come back in and you can give me whatever

18   arguments you want and we'll try to make some decisions here

19   quickly.

20               All right.  We'll be in recess for just about five

21   minutes.

22               COURT OFFICER:  All rise.

23          (Recess taken from 12:31 p.m. to 1:53 p.m.)

24               COURTROOM CLERK:  All rise.

25               THE COURT:   All right.  Good afternoon.  Please be

1    seated.  All right.  So, Ms. Moreno, you are -- where is she?

2    Oh, there you are.  You've changed seats yet again.  You

3    expressed a desire to present some arguments regarding your

4    position so I'll allow you to do so.

5               MS. MORENO:  Thank you, Your Honor.

6               THE COURT:  If you want to do it from the Elmo or

7    whatever you would like.

8               MS. MORENO:  Good afternoon, Your Honor.  Celina

9    Moreno, Plaintiffs.  I'll be addressing the free speech

10   argument and my colleague, Mr. Efren Olivares, will address

11   the Texas Election Code and *ultra vires* arguments as well as

12   the remaining elements of the preliminary injunction standard.

13              THE COURT:  Okay.  Let me -- perhaps I can short

14   circuit some of this without needing arguments and because of

15   what I perceive also as somewhat of a concession.

16              The Court finds that the January 8th, 2018 order of

17   Commissioner's Court setting policy would be constitutionally

18   vague to be enforced.  It is a document that expresses only

19   the desires of the county and it contains no language actually

20   adopting any order or rule.  It is expressive only of their

21   desires and so I find that it is of no force and effects in

22   terms of something that could be enforced against an

23   individual.  So let's not focus on that.  I declare it

24   unconstitutionally vague.

25              If it was something that was ever intended to be

1    enforced I don't know.  So let's move to the county use policy

2    which I think is really the operative law or regulation that's

3    at issue here.

4            MS. MORENO:  Thank you, Your Honor.  So I will

5    address why the electionary policy is unconstitutional.

6            THE COURT:  I grant -- I mean, I agreed with you it

7    is.

8            MS. MORENO:  Including the building, that portion of

9    the building-use policy that incorporates?

10           THE COURT:  I find that paragraph that incorporates

11   it by reference to be surplusage and of no force and effect

12   because it cannot enforce the original order which I declare

13   constitutionally vague.  So that particular paragraph is just

14   surplusage and is of no enforcement force or effect.

15           MS. MORENO:  Then what we are left with, Your Honor,

16   is the practice of the county which is that it is, in fact,

17   being enforced.  It's been publicized, the policy -- the

18   electionary --

19           THE COURT:  Sure.

20           MS. MORENO:  -- event has been publicized; it's up

21   on the website.  I would ask the Court to take judicial notice

22   that the -- here on the Starr County website under useful

23   links, the order that you just declared unconstitutional

24   vague is up on the website.  And under No. 2 for useful links

25   it's been posted and --

1         THE COURT:  I mean, I don't have a problem with it

2    being posted.  It's simply a statement of the desires of the

3    County.  I think they're welcome to post them --

4         MS. MORENO:  And, Your Honor --

5         THE COURT:  -- what their desires are.

6         MS. MORENO:  And so what we're left with is the fact

7    that -- in fact the order is -- the policy is continuing to be

8    enforced as recently as this Saturday.  And it's being

9    enforced in a way that is not narrowly tailored.

10        You have Ms. Garza, a lone individual, standing on

11   the sidewalk with a T-shirt practicing passive speech on a

12   public -- in public fora.  And so under the standard required

13   specifically we see that this is a content-based restriction

14   and it is being enforced.

15        THE COURT:  How so?  You know, the policy again is

16   not at issue.  How do you find that the building and property

17   use policy is not content neutral?

18        MS. MORENO:  Well, the building and property policy

19   specifically mentions electioneering and the language within

20   Section 12.  And that policy incorporated by two --

21        THE COURT:  All right.  So I've declared that as a

22   surplusage.  So how would you -- what other aspects would you

23   feel are not content neutral?

24        MS. MORENO:  Again, I think we're left here --

25        THE COURT:  Well, let me ask you this, Ms. Moreno.

1      So Ms. Garza, the incident Saturday -- again I'm trying to

2      figure out what happened there -- I think the testimony on the

3      incident earlier, on February 20th, was just a -- this

4      electioneering judge or whomever was making a decision that

5      didn't comport with the law and the County distances itself

6      from that.  That's not our policy and that person has been

7      reprimanded, corrected so that doesn't happen again, that they

8      weren't enforcing something; that somebody apparently

9      misunderstood what the law was or what the county regulation

10     was.

11           Now with respect to the incident on Saturday, my

12     understanding from Ms. Garza is that she did not have a permit

13     to be where she was.  That where she was was not in a parking

14     lot but was in the common area and that the County has a

15     policy that permits you to be there if you've gotten a permit

16     to do so and she hadn't gotten a permit.

17           MS. MORENO:  Correct.

18           THE COURT:  What else?

19           MS. MORENO:  And on Saturday, you know, it was

20     Ms. Garza who was wearing a political T-shirt and not the

21     grandmother that she was talking to and was asked to leave by

22     the Sheriff Deputies.

23           And under the First Amendment if you're standing on

24     a common area, you know, very clearly sidewalks have been well

25     established as public property and it's public fora.  And so I

1    would -- we submit that requiring a permit is not, in a

2    content-based way, that is not narrowly tailored.  And so you

3    are -- what happens is that you are -- you're seeing

4    enforcement where political speech that is much broader than

5    what is allowed is being prohibited.

6          And so you are -- so, Your Honor, requiring a permit

7    is not permitted unless it is narrowly tailored.  And we

8    submit that when you incorporate activities like Ms. Garza on

9    Saturday being threatened -- told to leave, right, or facing

10   risk of arrest, that is not narrowly tailored as required by

11   the First Amendment.

12         THE COURT:  Is the law not narrowly tailored or do

13   you think its application by these Sheriff's Deputies was --

14   they were just applying in an unconstitutional way?  Or do you

15   think that what they were doing really doesn't even comport

16   with the law and they were -- maybe misunderstood what the

17   regulation was and that that's a problem?  I mean, what are

18   you -- give me your thoughts on this.

19         MS. MORENO:  I would say both, Your Honor.  But even

20   content neutral policy must still under the First Amendment be

21   narrowly tailored.  And we submit that this electioneering

22   policy is certainly not.

23         THE COURT:  And how would you suggest that it be

24   more narrowly tailored?

25         MS. MORENO:  Well, what --

1          THE COURT:  Is content neutral just requiring that

2     this applies to all county property requiring a permit to be

3     able to use the common areas of that property.  Is that your

4     issue or is your issue with the complete band on the use of

5     parking lots for anything other than parking?

6          MS. MORENO:  Well, electioneering is being treated

7     differently than other activities because the County has

8     enforced the electioneering ban against people who, for

9     example, are not using the property at all, just standing

10     there on the sidewalk as Ms. Garza was as recently as on

11     Saturday, just standing around.

12          THE COURT:  Now, this Press Closet (phonetic) does

13     it -- it has a walkway that leads up to the front door.  That

14     walkway starts at the side street and runs along the back of

15     the courthouse greens, green area, dividing the parking lot

16     from the courthouse green area.  That walkway, you know, leads

17     right to the front door of the courthouse.  It's my

18     understanding that Ms. Garza was on that walkway, correct?  Or

19     did I misunderstand where she was?

20          MS. MORENO:  I believe she was standing on the

21     northwest corner.

22          THE COURT:  Right, of that walkway that leads to the

23     front door of the courthouse.

24          MS. MORENO:  Correct.

25          THE COURT:  So if you were not going to walk across

1      the grass or you were not going to walk through the vehicular

2      parking area, the only way to get to the front door would be

3      on this walkway from the west side of the building, agreed?

4                  MS. MORENO:  Correct.

5                  THE COURT:  So is this the same kind of sidewalk

6      that was in the Supreme Court case that permitted people to --

7      permitted the Supreme Court basically to ban anyone from

8      political speech on their property except for the sidewalk

9      along the street?

10                 MS. MORENO:  I would just reiterate that the -- that

11     Ms. Garza's friend was not asked to leave where Ms. Garza, in

12     fact, was asked to leave.  And that was precisely because she

13     was wearing a political T-shirt.

14                 THE COURT:  All right.  So perhaps the law then

15     isn't being enforced in a neutral way is what you are

16     suggesting?

17                 MS. MORENO:  I think the ban is being enforced as

18     written, Your Honor, and we are deducing that from the way

19     Ms. Garza was treated by the Sheriff's Deputies on Saturday.

20                 THE COURT:  Okay.  So what you call a ban I think

21     you're referring to as this policy; is that --

22                 MS. MORENO:  Yes, that's correct.  And, you know,

23     electioneering, even if it's permitted by the property's

24     policy, it cannot be contingent on obtaining a permit when

25     you're talking about content-based regulations.

1          THE COURT:  All right.  Now the northwest corner

2     where Ms. Garza was standing, do you know if that was more

3     than 100 feet from the corner of the building?

4          MS. MORENO:  It was outside of the 100 foot marker,

5     yes.

6          THE COURT:  All right.  I don't know if we had any

7     testimony on that because it was -- by the photograph it would

8     be close.

9          MS. MORENO:  I believe Ms. Garza did testify, Your

10    Honor, that she was standing outside the 100 foot marker.

11         THE COURT:  All right.  Maybe I recall that.  I can

12    review my notes.  All right.

13         So the argument is that this policy statement that

14    recited the desires of the County is being enforced as though

15    it were not simply some sort of desirous -- desires of the

16    County but as though these desires were a policy of the

17    County?

18         MS. MORENO:  Correct.  And I think that's why in the

19    order it specifically says that "the County thereby orders"

20    and then again later "further orders" and then again "further

21    orders" and was not rescinded.  But the County could have

22    rescinded on February 12th, that policy, but instead chose to

23    incorporate it.

24         And because is it a more specific policy to the --

25    when compared with the property use policy, the Rules of

1    Statutory Construction, Your Honor, do require that it be read

2    and both be given meaning.  And that the more specific policy

3    override the more general property use policy.

4        And so as a result, you know, we believe the ban is

5    overly broad because it is encompassing activity not only like

6    Ms. Garza experienced on Saturday but also it talks about

7    places that have nothing to do with the voting.  It

8    incorporates Starr County annex; it incorporates parks, public

9    parks; it incorporates, you know, other county buildings that

10   are public foras and the surrounding areas whether it be

11   sidewalks or seats around the county property.

12       THE COURT:  So does the policy prohibit a candidate

13   from getting a permit and renting out a pavilion at one of

14   these parks to have a fund raiser, a pechanga (phonetic)?  Is

15   that prohibited or can a candidate, under the use policy,

16   apply for a permit to use one of these pavilions?

17       MS. MORENO:  Yes.  Under that policy, even First

18   Amendment protected political speech, in order to do that you

19   would have to spend $50 and put a deposit down in order to be

20   able to use public fora, which under the First Amendment

21   jurisprudence is very clear that the content-based restriction

22   that is in public fora cannot be -- it is protected and it

23   cannot be restricted unless that it's narrowly tailored and

24   serving a compelling government interest.

25       And we just have -- I think it's very clear, Your

1    Honor, that there is no narrow tailoring here.  As you heard

2    and as you mentioned, this -- the policy relates to even

3    passive speech.  If people are wearing T-shirts, people having

4    bumper stickers, even as you heard county employees having

5    bumper stickers on their car, not seeking to hand out fliers,

6    just simply going to work at their office.

7         And in addition, you know, to be -- the reason,

8    another reason the electioneering ban is not narrowly

9    tailored, Your Honor, is that again it applies to all county

10   property.  And, you know, that's including polling places,

11   non-polling places, and a wide range of public fora.

12        And the illustrative examples that were attached to

13   the initial electioneering policy are just that, illustrative.

14   The order states that these are properties that are included

15   as county properties but certainly not limited to the breadth

16   of the county property.

17        And so this electioneering ban is over broad.  As I

18   mentioned it covers passive speech.  It bans speech on all

19   property and even with respect to polling places.  The ban

20   covers areas that don't affect -- that are arbitrary and

21   inconsistent.  So Ms. Garza --

22        THE COURT:  I know you want to keep focusing on the

23   ban but please don't focus on the ban.  It's

24   unconstitutionally vague; it's of no force; it's

25   unenforceable.  I've declared it that way.

1          If somebody is being treated in a manner that's not

2     consistent with the other laws of this state and of the

3     county, the municipality, then that person has probably a

4     Fourth Amendment claim against the law enforcement officer

5     that is attempting to prohibit them from doing something

6     that's otherwise legal or arresting them if they're doing

7     something that's not otherwise illegal under the County's

8     policies.

9          A couple of quick questions.  You've complained that

10    there is a cost to get the permit.  But Ms. Garza never

11    applied for one, was not aware of a cost.  And the County

12    Attorney, Ms. Escobar, District Attorney, testified that

13    there's no fee for the permit.

14         And in the written documents that you supplied to

15    the Court was an after-hours fee of $25 with a $50 deposit,

16    not a lot of explictness to that.  I don't know if you only

17    use it one hour if you get back the other 25.  I don't know

18    how that works.  But that's sort of implicit if it's only --

19    you're only being charged $25 an hour.

20         And the County testified that's just to cover sort

21    of the reasonable cost of electricity, county employee maybe

22    having to go and unlock the facility or lock it up when you're

23    done.  Yeah, there we go.  It's Attachment A, what was pointed

24    out to the Court earlier.

25         And so can you show me where it has a $25 permit fee

1      again for use of, say, during normal business hours?

2             MS. MORENO:  Your Honor, we would argue that the

3      entire process of having to -- that you have to go through in

4      order to simply practice protected political speech is what

5      itself is unconstitutional.

6             THE COURT:  All right.  But you would agree that

7      there's no specific discrimination against political speech;

8      this is applied to any kind of speech or any kind of activity

9      that somebody may want to do on the county property.

10            MS. MORENO:  Correct.  But I would point to the

11     practice that we've seen so far of the County where you have

12     -- you have it being enforced differently when we're talking

13     about political speech versus non-political speech.

14            And the ban -- the practice, the County practice

15     currently is over broad because it only goes to political

16     speech, not to artistic speech or the Girl Scouts or to, you

17     know, religious speech.  It's very specific to political

18     speech.

19            And so it is, in that sense, under inclusive by not

20     regulating -- the practice is under inclusive because it

21     doesn't regulate all that speech.  It was only Ms. Garza that

22     was told to leave.

23            THE COURT:  Okay.  Now do you think there's an issue

24     of rightness, the fact that the two deputies pointed to her

25     shirt, asked her to leave; that she wasn't detained; she

1    wasn't charged with an offense.  Do we have any constitutional

2    injury or is there -- I mean, do we have a significant enough

3    injury where the Court can even rule on this?

4              MS. MORENO:  Your Honor, the case law is clear that

5    you don't have to wait in order to be arrested.  And so in

6    *Reese versus McCann* (phonetic), a Fifth Circuit case, the

7    Court speaks clearly the plaintiff was not required to submit

8    to arrest but has to face a realistic danger of arrest.

9              And I think that the two Sheriff Deputies asking

10   Ms. Garza to leave after she was wearing a political speech

11   qualifies as that.

12             THE COURT:  All right.  I mean, my impression she

13   assumed or deduced that but the deputies never explained to

14   her why they were asking her to leave.  You would concede

15   that?

16             MS. MORENO:  Well, I would say just like it was

17   passive speech, right?  They pointed to her shirt.  And, you

18   know, I think that in that sense she got the very clear

19   message that she was going to risk arrest if she did not

20   leave.

21             THE COURT:  And I guess one of my concerns is, is it

22   possible that the Sheriff's Deputies misunderstood where the

23   100 foot line was and that's why she was treated differently

24   than the person who didn't have a campaign shirt?  I mean, you

25   would have to concede this is within 20 feet maybe of the

1    actual line, at worst, and possibly even less than that -- a

2    few feet outside that 100 foot line?  I mean, do you know

3    whether it's just confusion on the deputies' parts where the

4    line was?  I was told there was no actual red marker on the

5    street.  There was only one single cone sort of at the apex of

6    the 100 foot arc.

7            MS. MORENO:  I would be speculating but what I'm not

8    speculating to is what we know has been stated by the District

9    Attorney, what is posted on the website and what seems to be a

10   very clear indication that this practice that we saw on

11   Saturday is going to continue to be the policy of the County.

12           THE COURT:  Okay.  All right.  Anything else?  I

13   don't mean to keep interrupting you with these questions but

14   -- so is there anything further you would like to add?

15           MS. MORENO:  Mr. Olivares is going to talk about our

16   election code and *ultra vires* claims.

17           THE COURT:  All right.  I mean, I would concede that

18   if that -- what you're calling the ban were actually something

19   enforceable that it would be *ultra vires*.  So if that's what

20   you're going to argue, I'm going to agree with you that it

21   would be, if it were something that were enforceable.

22           MR. OLIVARES:  Good afternoon, Your Honor.  Yes, the

23   thrust of my argument was going to be with respect to the

24   January 8 ban which is not declared unconstitutional.  It's

25   the enforcement of that ban that worries us.  We want to make

1 sure that the enforcement of either Section 12 of the building

2 use policy or the January 8 ban, that that also enjoins Starr

3 County and it agents and police --

4    THE COURT:  Well, it's, according to the --

5    MR. OLIVARES:  -- are enjoined from enforcing it.

6    THE COURT:  It is not an enforceable -- it is not an

7 order; it's not a constitutional order.  It is their desire.

8 I can't restrain them from having this desire.  I mean, it is

9 not -- it prohibits nothing, that January 8th order.  I don't

10 know how more clearly I can state that.

11    It is -- it doesn't contain anything that could be

12 enforced against someone.  It has no enforcement value.  It is

13 simply a statement of some properties the County owns and

14 their desire to regulate the use of them.  And it does nothing

15 more than that.  Everything -- I mean, anything beyond that is

16 surplusage.  I do -- as a consequence of that, whatever that

17 paragraph is that referenced it in the county use policy --

18    MR. OLIVARES:  12.

19    THE COURT:  -- I think it's paragraph 12, is just

20 surplusage because it incorporates a statement of the County's

21 desires, is all it does.  It doesn't create anything that's

22 enforceable.

23    So however I agree with you 100 percent.  Had they

24 then in the January 8th order in fact went on to prohibit

25 something -- you know, therefore it is therefore prohibited,

1        you know, (a), (b), (c), (d), that they -- what they were

2        desiring to do, if they had actually attempted to do that it

3        would've been *ultra* vires because you can't have a greater

4        fine for committing an offense that the state has already set

5        a lesser fine for, it would be ultra vires.

6                MR. OLIVARES:  Got it, Your Honor.  What we have

7        left then is this permitting provision.

8                THE COURT:  Okay.

9                MR. OLIVARES:  One way in which it is not content

10       neutral is that it is being enforced with respect to political

11       speech but not with respect to other uses of the common areas.

12               For example, as we heard this morning, Ms. Garza's

13       friend, who had a baby and the bay was playing on the grass,

14       she was not asked to leave and she did not have a permit.  But

15       nonetheless, the permitting requirement was applied with

16       respect to her political speech.

17               There are cases that set out the standard for what

18       kind of private restraining permits may be required.  One

19       important aspect of those cases is that the authority issuing

20       those permits must not have unfettered discretion of what

21       permits to grant and what permits to deny.

22               I point to attaching a fee of the building use

23       policy that requires -- this permit I'll concede, Your Honor,

24       is also unclear.  It's not clear if the after-hours fee

25       applies, the $25 after-hours fee.  And then the second clause

1    of that sentence, the $50 deposit, it is unclear if that

2    applies only to after hours or to all permits.  That "comma

3    and" is unclear.

4           But additionally, page 9 of that same exhibit, they

5    talked about a deposit.  The Commissioner's Court may require

6    a deposit between zero and up to $1,000 from an individual and

7    they may impose additional restrictions.  And there's no

8    guidance as to what those are.

9           And there are cases, *Murdock versus Pennsylvania*, at

10   319 U.S. 105 (1943), that's a Supreme Court case, and a Fifth

11   Circuit case, *Horton versus City of Houston*, 179 F.3d 188

12   (1999).  They describe how these permits related to protected

13   political speech cannot be expected to provide provisions of

14   permits in order to exercise protected political speech cannot

15   stand if the issuing authority or body, as is the case here,

16   has unfettered discretion on how to grant them and how much to

17   charge for them.

18           THE COURT:  Okay.

19           MR. OLIVARES:  And the rest of my presentation

20   related to the irreparable harm that generally goes back and

21   the enforcement of it have been causing and continues to cause

22   but I understand the Court has already ruled on that so I will

23   not --

24           THE COURT:  Okay.

25           MR. OLIVARES:  -- produce on that.

1          The issue at the end of the day, Your Honor, is that

2     people who are engaging in other type of speech that is not

3     political speech are not required to obtain a permit and have

4     not been required.

5          THE COURT:  This is the one example of the grandma

6     who was playing with the child there at the corner of the

7     courthouse.

8          MR. OLIVARES:  That's the one example we heard this

9     morning and the broader point is that commercial speech and

10    other type of speech may be regulated with a permit but not

11    political speech.

12         THE COURT:  Okay.  Well, is this regulating speech

13    though?  Is this intended to regulate speech?  I mean, let me

14    ask you this.  Can the County charge anyone, for whatever

15    purpose, a fee for using a pavilion?  Whether it's the Girl

16    Scouts, a political group, somebody wants to have a private

17    wedding or birthday party there, is there -- is it your

18    position that the County could not charge a fee to anyone that

19    wanted to have a political event at one of its common areas?

20         MR. OLIVARES:  That is not my position.

21         THE COURT:  Okay.  So under what circumstances could

22    the County charge for the use of its common areas?

23         MR. OLIVARES:  Commercial speech, for example.  The

24    fund raisers that we were describing, other types of events.

25    But the way --

1          THE COURT:  No, but you just said you could also

2     charge political functions.  You could charge a fee for

3     political functions.

4          MR. OLIVARES:  The case law focuses on parades.

5     We're talking about a single individual standing on the

6     sidewalk with copies of the constitution wearing a T-shirt

7     outside of the 100 foot marker.  And that's not a use of the

8     property the way say having a tent and a barbeque, et cetera.

9     Just standing around on the sidewalk, that's -- wearing a

10    political campaign T-shirt, for example, that requires a

11    permit the way that other type of speech so far has not.

12         THE COURT:  In its application.  But the policy

13    itself is neutral.  It doesn't prohibit -- it doesn't only

14    require people to get a permit who are engaged in political

15    speech.  I mean, it also requires a permit for those who need

16    -- who are going to make commercial speech, in your example,

17    right?  I mean, the policy on its face, it doesn't

18    discriminate.

19         MR. OLIVARES:  Correct, Your Honor, the policy on

20    its face but the way it's been applied.

21         THE COURT:  Okay.  So that's -- so do you concede

22    then that it is -- on its face it's facially neutral, the

23    county use policy?

24         MR. OLIVARES:  The requirement for permits?

25         THE COURT:  The requirement for permits.  That was

1     your biggest complaint.  I mean, your biggest complaint, I

2     believe -- again, this is the aspect that you're dealing with,

3     not what your colleague dealt with -- is the permitting that's

4     -- No. 1, that you can't have unfettered discretion in

5     deciding upon an amount to be charged.  So that's one problem

6     that you have.

7             And the second is that the permitting process,

8     although on its face perhaps is neutral, it's being applied

9     to, whatever, silence political speech, right?

10            MR. OLIVARES:  Correct.

11            THE COURT:  Those are your two arguments, okay.

12    Anything else you want to add on top of that?

13            MR. OLIVARES:  No, Your Honor.

14            THE COURT:  All right.  Thank you.  Anybody want to

15    respond?  Mr. Fonseca?

16            MR. FONSECA:  I want to start, Judge, with the issue

17    of rightness and whether -- and the harm for this application

18    for temporary restraining order.  Plaintiff --

19            THE COURT:  Well, that's -- I think that's your

20    biggest argument.  Can I get some concessions from you first.

21    Would you concede that this January 8th order suffers from

22    vagueness and it's not actually something that could actually

23    be enforced against anybody.

24            MR. FONSECA:  That's correct, Your Honor.  And

25    that's why they ended up having this full policy dealing with

1   what they were actually trying to do, which as testimony would

2   -- as we heard testimony, was to make sure parking lots are

3   used as parking lots, liability issues and what not.

4            THE COURT:  Okay.  So now let's -- we can move

5   along.  Your rightness arguments --

6            MR. FONSECA:  Whether or not there was this

7   realistic danger of being under arrest.  The deputies asked

8   her to leave.  They didn't arrest her.  They didn't threaten

9   her with arrest.  We don't know whether or not she was

10  actually about to go into the 100 foot buffer zone.  That

11  could've been the basis.  We just don't have enough evidence

12  here to support that.

13           The grandma with the child, we don't know what

14  happened after the fact.  Did the deputies, after they

15  approached the Plaintiff and asked her to leave, did they

16  approach grandma and her grand kid to also get out of the

17  greens of the courthouse.  There's just not enough evidence

18  her to show the harm or the irreparable harm that Plaintiff is

19  alleging.

20           Looking a little bit -- just to respond to the last

21  two arguments that were made by counsel --

22           THE COURT:  On the permitting issues?

23           MR. FONSECA:  -- on the permitting issues.  Page 9,

24  which was referenced, the deposit, which is referenced on page

25  9, zero to 1,000 -- up to $1,000, I would just like the Court

to know that it's in relation to the preservation of
historical property.  It's Attachment B to the policy.

There was a greater interest for the County to make
sure that this historical building is preserved.  So the fact
that there is a bigger deposit required is -- it goes with
that.  And it's talking about the actual courthouse itself.
It's not ask -- it's not a deposit for the use of the grounds,
the greens.

It would not be -- I would say it would not be --
you wouldn't need a $1,000 deposit to stand outside of the
courthouse.  But the courthouse itself does have -- there is a
compelling interest for the County to protect this historical
building.

Now, at Attachment A, and you have historic county
facilities, these deposits, it doesn't say that the use of
common areas, you're going to be charged this for the common
areas.  The $50 deposit may be required for cleanup as
Mr. Scolott (phonetic) testified.  But there is no fee for
seeking that permit or seeking a waiver of these particular
fees, these after-hours fees and deposits.

I don't believe that these fees or these deposits
are constitutionally burdensome on any particular campaign, or
candidate, or church, or the Girl Scouts.  It's enough to
preserve property for the County, whether it's cleanup or any
damage that a Girl Scout may do on a shrub.  I don't know.

1         So I believe those are the two main permitting

2     issues.  There's just not been any evidence of the difference

3     in enforcement, whether you can -- you're allowed to wear a T-

4     shirt; that's not electioneering.  I don't see where you could

5     go and enforce that.

6         When you're actually engaging -- and this is going

7     back this particular instance that the Plaintiff talked about.

8     She was engaging with others in the election.  She wasn't just

9     walking around with a T-shirt.  She was actually engaging with

10    someone on trying to get a vote so --

11        THE COURT:  Which incident are you talking about,

12    the first one, the January -- the February 20th or the one

13    this weekend?

14        MR. FONSECA:  The one this weekend, Judge.

15        THE COURT:  Okay.

16        MR. FONSECA:  The one on the 20th I think the County

17    did enough to correct the mistake by this presiding -- this

18    polls presiding judge and remedied that.  Other than that

19    there is no evidence that the enforcement of this policy has

20    been -- there's been disparate treatment between people.

21        There hasn't been any evidence of others that have

22    applied for permits and been denied or that have been

23    accepted, been given permits.  And that goes to the rightness

24    issue.  There's just simply been no application at this point

25    pursuant to the policy for the use that the candidates are

1    seeking.

2           And the main issue -- and it comes down to this

3    county courthouse parking lot that's been the practice of

4    tacos for votes and setting up their barbeque pits.  And the

5    County has, under intermediate scrutiny, has a compelling

6    interest in making sure that citizens are able to walk from

7    their vehicle to the polling place without being harassed.

8    They have the compelling interest in protecting property.

9    They have a compelling interest in securing the safety.  What

10   if there is a child running in the parking lot and runs into

11   one of these barbeque pits, what kind of liability would Starr

12   County be exposed to at that point.

13          And you didn't talk about this different court case

14   eliminating speech outside of the Supreme Court.  There is a

15   difference here because at the Supreme Court they were trying

16   to -- trying to stop all speech.  There was no compelling

17   interest at that point.  Here we have the actual voting.  We

18   have voting that's taking place and the Courts have found that

19   that is a compelling interest to protect the elections

20   process.

21          And, in fact, there is a case by the Fifth Circuit,

22   it's *Schirmer versus Edwards* and it's cited in our response,

23   it's 2 F.3d 117, in which the Fifth Circuit Court found that a

24   600 foot buffer zone was constitutional during election.  In

25   fact, it cited one of the Hawaiian law where it said that

1    1,000 feet -- a 1,000 foot buffer zone was constitutional.

2           So whether there is this permitting process outside

3    of the 100 foot mark, I don't believe it's unconstitutional.

4    It's just a way for the County to regulate the use of its

5    property.

6           And I think that's -- that's how I can sum it up,

7    Judge.  Just looking at the compelling interest that the

8    County has in passing and having this policy there has been no

9    evidence that it's been applied differently to different

10   people.  It's content neutral and there hasn't been -- there

11   hasn't been harm.  And quite the contrary.  And the last

12   element for the TRO is whether or not there's a disservice to

13   the public.

14          And Starr County has passed this to preserve county

15   property which is taxpayer property.  And the taxpayers are

16   ultimately the ones that would suffer from granting this TRO.

17          THE COURT:  What was the motive for this

18   legislation?  Mr. Escobar testified that it was to basically

19   fill a gap.  There was no policy in the county to regulate,

20   you know, its property or to control the use of its property.

21          He mentioned two incidents.  One he had this

22   hypothetical about a trailer full of cattle parked in the

23   parking lot of the courthouse and the other was the incident

24   with the pavilion that a particular commissioner apparently

25   was controlling to his own benefit.  And that those were sort

1    of the reasons they decided to look to see whether there was

2    any kind of policy.  Realizing there was none, implemented

3    this particular policy.

4           But you seem to indicate that the motive for all of

5    this was the electioneering that was going on in the

6    courthouse parking lot and that was the primary motive.

7           MR. FONSECA:  What I'm trying to say is that what

8    the Plaintiff is focusing on is being able to continue that

9    activity.  It's just one out of many as Mr. Escobar testified

10   to.  The misuse by the potential or alleged misuse of property

11   by a government official; being able to park a trailer with

12   cattle at the county courthouse.

13          Starr County has grown and the courthouse may have

14   at some point not needed this type of policy, use policy for

15   the parking lot and the courthouse.  But now that there is

16   increased traffic, now that there are issues on how they're

17   being used, the liability issues on whether competing

18   campaigns are -- they're all kicking at each other, those are

19   things that the County can consider and they should consider.

20   They should look at whether or not what is happening on their

21   property, not just because of the potential liability concerns

22   for the County but also for the safety of its citizens.

23          If I'm going -- if I'm going to vote I want to make

24   sure that I can park, that there is sufficient parking; that I

25   don't have to rely on having to go park at the Knights of

1    Columbus Building a block away because all these tents and all

2    these barbeque pits are being set up outside in the parking

3    lot.  But I can just easily park there and walk to the polling

4    station.

5          I could think of a woman with her children; I could

6    think of my wife having to carry a baby and having to carry

7    the stroller, having to walk 100 feet versus having to walk a

8    couple of blocks.  It makes a difference.

9          That is in the interest of the County to make sure

10   that the election process makes it a big easier for people to

11   vote, not necessarily to hinder it by allowing this type of

12   electioneering on the property.

13         THE COURT:  But this also, you would agree,

14   prohibits political protests by citizens at a county park

15   without a permit, sort of the rawest form of political speech

16   if people decided to get together, assemble and protest some

17   political activity of its government at a city park.  This

18   would prohibit it without a permit, you would agree?

19         MR. FONSECA:  It would, Your Honor.

20         THE COURT:  And so if -- I mean, how do you ensure

21   that people learn on a Friday afternoon of a shooting in a

22   Florida school who want to get together on a Saturday, or a

23   Sunday, or a Monday at a park and protest or advocate for gun

24   control?  In Starr County they would not be able to do that

25   because of the permitting process.

1          MR. FONSECA:  Your Honor --

2          THE COURT:  At a county -- on county property.

3          MR. FONSECA:  Right.

4          THE COURT:  They couldn't go to a park and hold up a

5     sign that says, "We need gun control."

6          MR. FONSECA:  Two things, Your Honor.  One, the

7     permitting process allows for quick permits to be granted by a

8     county judge.

9          THE COURT:  But over a weekend the courthouse isn't

10    open, county judges aren't available.

11         MR. FONSECA:  Granted.  However, the properties that

12    Starr County owns and which we've shown you the pictures of,

13    these aren't typically places where people congregate.  These

14    are not in the middle of town.

15         South of the courthouse you have a promenade of a

16    big park.  That's not county property.  We're not prohibiting

17    people from gathering there.  People are not prohibited from

18    being around the courthouse.  The courthouse is a pretty small

19    block.  It takes up a lot of space.

20         And if you look at the -- just by looking at the

21    map, these aren't the typical parks that are available for

22    anybody to use.  These are either remote locations or they're

23    being used for -- as a firehouse, as a library, for vehicles

24    for Starr County, a La Placita, for example.

25         So it's -- I don't see it being prohibitively -- it

1    being prohibitive of being able to -- for assistance to

2    express their views on property.

3              THE COURT:  All right.  I mean, I'm not familiar

4    with all the parks and gathering places in Starr County.

5    There's a fairgrounds listed.  I don't know if that's a place

6    where people might assemble to protest or advocate for a

7    particular political position or there's also something listed

8    as Zarate Park.  I couldn't really tell.

9              MR. FONSECA:  That's the same as La Victoria

10   Community Center.

11             THE COURT:  Okay.  And I couldn't really tell how

12   much property was there, that was on a place where somebody

13   might want to go and advocate on behalf of a political cause.

14   But this would certainly prohibit that without a permit.

15   Nobody would be able to go and stand in the park or even out

16   in front of the fire station there in business, that high

17   traffic area, stand up against the street there on county

18   property with a sign that says, you know, "More gun control,"

19   for example.  They would need a permit to do that.

20             MR. FONSECA:  And, Your Honor, to that, the courts

21   have upheld permits for parades.  If people are going to

22   congregate to voice their opinion, if I were in Washington DC

23   trying to fight for something and I didn't apply for a parade

24   permit, I'm sure I would find some -- be penalized in some way

25   or form.

1          And looking at this particular case and what the

2     Plaintiffs are trying to do, Your Honor, in restricting the

3     application of this policy during the election season at

4     polling locations, I would focus on that fact that stopping

5     the enforcement of this policy would go against the interest

6     of the County of protecting property and safety of its

7     citizens.

8               THE COURT:  All right.  Thank you very much.

9               MS. LEEDS:  Less than five minutes of rebuttal, Your

10    Honor.

11              THE COURT:  You may.

12              MS. LEEDS:  Mr. Alvarez, did you want to say

13    something?

14              MR. ALVAREZ:  Judge, I would just like to just weigh

15    in a little on the gun control example that you were giving,

16    Judge.  The reason those permits are given, Judge, is so the

17    law enforcement community can get some security in there just

18    in case riots happen back and forth and so on.  Just giving

19    them heads up, I mean, be alert, be affirmative.  If somebody

20    -- and those -- I just wanted to weigh in to that extent,

21    Judge.  Nothing further.  I kind of agree with Mr. Fonseca.

22              THE COURT:  All right.  No coincidence there.  All

23    right.  You want to respond to some of those arguments

24    Mr. Fonseca made?

25              MS. PERALES:  Yes, Your Honor, specifically in

1     response.

2            First, the County, through the District Attorney,

3     has stated that the County will subject Ms. Garza's speech to

4     a permitting process.  Although the Court correctly observes

5     that some political speech can be subject to a permit and fee,

6     this permitting process is unconstitutionally over broad.  So

7     within the context that permits may be okay, for example, in

8     parade cases where there was a concern about security or

9     trash.  But a permitting policy that applies all the way to

10    sweep in Ms. Garza's political conduct which includes passive

11    speech as well as perhaps handing out a sample ballot for the

12    Democratic primary, is unconstitutionally over broad.

13           Mr. Fonseca has said fees are, quote, enough to

14    preserve the property of the county.  And he also said that he

15    did not, in his opinion, think that the fees would be a

16    financial burden on campaigns or groups.

17           But again, the permitting policy is over broad

18    because it also imposes a fee on Ms. Garza and any other

19    individual not supported by campaign funds or organizational

20    funds to have to go and secure a permit and pay some kind of

21    fee.  And as Mr. Olivares pointed out, of large digression on

22    the part of the County.

23           THE COURT:  Okay.  Well two things.  One is, there's

24    been no evidence that there's a fee for the permit.

25           And the second thing is the evidence was that there

1    was an after-hours fee of $25, some vagueness something about

2    the $50 deposit.  But a $50 deposit to me is something that it

3    -- generally what that means is you get it back.  It's a

4    deposit to secure either your attendance or that you return

5    the property in good condition.  I mean, I think that's

6    implicit in the word that it's a deposit, it's not a charge.

7           The third thing is as you pointed out the large

8    range of fee up to $1,000 dealt only with the county

9    courthouse and not any other county property.  There was a --

10   it was specific to the actual footage of the courthouse proper

11   and because that was the only historical structure that the

12   County owns.

13          MS. PERALES:  Your Honor, I would point the Court's

14   attention to page 2 which is the building and property use

15   policy.  At the bottom, at the very last line it says --

16          THE COURT:  Paragraph 5?

17          MS. PERALES:  This is paragraph 5(b) specifically

18   and the last sentence.  Applications are not valid until all

19   fees are paid.

20          Let's just assume for the moment that it is simply a

21   $50 deposit.  Conditioning Ms. Garza's political activities,

22   what she does specifically and testified to today, on a $50

23   deposit and going through the process of applying for a permit

24   and waiting for it to come, paying any necessary fees which

25   are required for application, is unconstitutionally broad in

1  Plaintiff's view.  It may not be as applied to an enormous

2  parade or some other type of political speech activity but it

3  is with respect to Ms Garza.

4       Second, I would like to turn to another comment of

5  Mr. Fonseca.  With respect to the property use policy at large

6  -- now, just moving away from the permitting process --

7  Mr. Fonseca said a T-shirt is not electioneering.  That is not

8  correct.  A T-shirt is electioneering and we would point the

9  Court's attention to two things.

10      First, the Texas election code --

11      THE COURT:  I think he said that that's -- maybe he

12  -- I understood that he said a T-shirt is electioneering and

13  that the deputies might've been confused, or she was too close

14  to the line.  There just wasn't enough evidence.  That she was

15  perhaps electioneering within the 100 foot line and that was

16  the basis for them asking her to leave.

17      Again, this is conjecture.  It could've just as

18  easily also have been they were asking her to leave because

19  she was on the property, on the common ground and didn't have

20  a permit, even though they were letting grandma and the

21  grandchild play in the grass adjacent to her.  So, it's

22  speculation.

23      But I think he conceded that she had a shirt on and

24  that might've been a motive -- a shirt that had a political

25  speech and that may have motivated the deputies.  But I

1    concede we're all speculating.

2              MS. PERALES:  And certainly the Texas election code

3    would not allow her to wear that within the 100 feet or inside

4    the polling place.

5              THE COURT:  Agreed.

6              MS. PERALES:  We know that.  And we also know

7    there's a case pending before the U.S. Supreme Court right now

8    regarding somebody who wore a political T-shirt inside a

9    polling place and there really is no question that it is

10   electioneering.  Perhaps Mr. Fonseca misspoke.

11             But again, the policy, the property use policy is

12   not narrowly tailored to the extent that it regulates

13   Ms. Garza's conduct in non-voting areas.

14             For example, the annex.  The District Attorney

15   mentioned that vote counting occurs at the annex on election

16   evening.  Of course, campaigns are allowed to send their

17   representatives to monitor that process.  And what we're

18   seeing here is that this property use policy would not allow a

19   representative of a campaign, with a campaign T-shirt, to be

20   present at the annex for vote counting for monitoring

21   purposes.  This bears little justification -- this bears

22   little relationship to the justification that's offered by the

23   County about interference with voters.

24             THE COURT:  Where -- I don't see that that's not

25   permitted?  You can wear -- I mean, as long as you're not

1    violating the state election code, this doesn't prohibit

2    somebody from wearing a badge and parking in an appropriate

3    parking spot and walking into the county annex with their

4    campaign buttons on their lapel or placards on their car, does

5    it?

6            MS. PERALES:  Well, as to the car, Your Honor, in

7    the parking lot we think that now that the Court has found

8    Section 12 of the property use policy to be surplusage and

9    without a fact, there is another paragraph that says you can

10   have a bumper sticker on your car and park in the parking lot.

11   But the property use policy does prohibit the wearing of a

12   political T-shirt on county property, fully if it's in the

13   parking area, and then in common areas without a permit.

14           THE COURT:  Where does it prohibit it for people

15   that are appropriately parked and --

16           MS. PERALES:  And the person is wearing the T-shirt

17   and enters onto county property.

18           THE COURT: -- wearing a T-shirt, right.

19           MS. PERALES:  I believe that is -- it is part of

20   this dispute, Your Honor, that somebody who is electioneering,

21   which is wearing that T-shirt --

22           THE COURT:  Right.

23           MS. PERALES:  -- cannot do so on county property

24   without a permit.

25           THE COURT:  Well, we were just told that the Justice

1  of the Peace who is running for election that works there at

2  the very courthouse parks his truck there with his sign in the

3  window each day since February 20th.

4  　　　　MS. PERALES:  Yes, Your Honor.  With respect to

5  parking we now understand that the property use policy to

6  allow parking with a bumper sticker because of the Court's

7  ruling regarding surplusage.  Now just with respect to the T-

8  shirt --

9  　　　　THE COURT:  Okay.  Let's talk about that.

10  　　　　MS. PERALES:  -- or holding a small handbill or a

11  palm card, these are electioneering acts.

12  　　　　THE COURT:  Okay.

13  　　　　MS. PERALES:  They are not permitted on county

14  property without a permit.  Electioneering, as well as other

15  types of political and nonpolitical speech, are not allowed.

16  　　　　THE COURT:  Now where is the T-shirt prohibited?

17  Where do you read that wearing a T-shirt -- I'm going to use

18  the JP Martinez as an example.

19  　　　　Having -- being a voter and having gone to the

20  polls, it's very typical that the candidate wears a shirt with

21  embroidery of their campaign on the breast.  And I only saw

22  the back of Mr. Martinez but typically he had the kind of

23  shirt on that's done that way.

24  　　　　So let's just assume for this hypothetical that he

25  did.  Are you suggesting that he could not park his car,

1    wearing his shirt with his name and whatever, what he's

2    running for on the breast of the shirt, then walk into the

3    county offices without being in violation of the use policy?

4         MS. PERALES:  He can park his car, Your Honor, yes.

5    But with that T-shirt on, and as the District Attorney

6    explained with respect to Ms. Garza's activities, he cannot

7    park his car and stand in the parking lot and talk with a

8    voter.

9         THE COURT:  Right.

10        MS. PERALES:  He cannot go to the grassy area next

11   to the county and stand there with his T-shirt, right?  That

12   would be subject to a permitting process, he cannot do it

13   without a permit.  And he cannot be elsewhere on county

14   property with that T-shirt without getting permission from the

15   County.  Because otherwise that act, that use of county

16   property is not approved.

17        THE COURT:  Where is it prohibited?  I'm not

18   following you.

19        Now, you gave a couple of examples that were not

20   similar, they were rather dissimilar examples.  Approaching

21   people in the parking lot, talking to them about your campaign

22   and attempting to hand them push cards, that's different than

23   parking in a parking lot with your T-shirt on and walking into

24   the building to conduct county business or visit a county

25   office or apply for a permit.  So point that out to me because

1    it's something that I may have missed.

2          MS. PERALES:  This information, Your honor, is

3    contained in Plaintiff's Exhibit 2 as well as the testimony of

4    the District Attorney.

5          THE COURT:  All right.  So show me in Plaintiff's

6    Exhibit 2 and then we'll get to the testimony.

7          MS. PERALES:  Okay.  There are provisions here in

8    Plaintiff's Exhibit 2 that talk about use of county property.

9    And use of county property is either entirely prohibited --

10   and that would be with respect to parking lots -- or it would

11   be subject to a permitting process.  And that is how the

12   property-use policy operates through all of its terms.

13         You cannot use county property without a permit.

14   And there are other areas of county property you cannot use at

15   all, which is the parking lot.  And that is the testimony of

16   the District Attorney as well when he talked about the need to

17   have a policy that regulates use of the county.

18         If the Court determines that wearing a political T-

19   shirt and standing near a grandmother whose child is -- whose

20   grandchild is playing in the grass, is not use of county

21   property, then we wouldn't have this dispute.  Then none of

22   these terms would apply to the political speech of Ms. Garza.

23   But if Ms. Garza's activity falls under this policy as the

24   District Attorney has made absolutely clear, then we have

25   constitutional over-breadth problems.

1          THE COURT:  So again, regardless of what motivated

2     Defendant, the deputies on this Saturday in the incident with

3     Ms. Garza, this policy does prohibit her from engaging in

4     electioneering on a common area of the courthouse.

5          MS. PERALES:  And we would assert that a lobby is a

6     common area and the areas where -- in the waiting rooms

7     outside of courtrooms.  These are all common areas.  The grass

8     outside.  Not the parking area because that is subject to

9     different regulation.  But --

10          THE COURT:  Well, it's -- I mean, I --

11          MS. PERALES:  -- if Ms. Garza cannot --

12          THE COURT:  -- so you're defining common areas as

13     areas that can be locked down at night?  I mean, the fact that

14     the public can enter during the day and go up to a counter in

15     the Clerk's Office through a hallway that's open to the

16     public, I don't read this as applying to that.  I read this as

17     applying to facilities that are open to the public all day,

18     all night, again like a -- what's outside of a locked

19     building.  You know, the county can lock its offices at night

20     and prohibit anybody from coming in.

21          MS. PERALES:  So if -- there is nothing in the -- we

22     don't believe that there is anything inside this property use

23     policy that distinguishes between use of county property, for

24     example, to go to the annex and participate in monitoring the

25     vote counting, versus standing in the grassy area beyond the

1    100 foot perimeter outside the county courthouse.  And thus

2    one can see the concern that we have.

3           But even if we just go to the grass, let's pick

4    another spot of grass, a county park.  A county park, grassy

5    area, common use.  An individual cannot solicit signatures for

6    a petition.  So this is another example of the

7    unconstitutional over-breadth issue with the property use

8    policy, is that somebody cannot, like Ms. Garza, wear her T-

9    shirt, hand out campaign material.  Somebody cannot gather

10   petition signatures.  All of those things cannot happen in the

11   common area of a park.

12          And the policy could be narrowly tailored, Your

13   Honor.  It could distinguish between active and passive

14   speech.  Wearing a T-shirt versus approaching a voter.

15          The policy could distinguish between tents and

16   barbeque pits that take up more than a certain amount of

17   square footage versus the activity of Ms. Garza wearing a T-

18   shirt, handing out sample ballots and political materials but

19   it does not.

20          The policy should be based on specific findings and

21   it should be narrowly tailored if it's going to sweep in

22   Ms. Garza's political conduct.  Because it does not and

23   because it subjects her conduct to either a permitting process

24   or an outright prohibition, it is unconstitutionally over

25   broad.

1           THE COURT:  Okay.

2           MS. PERALES:  Thank you.

3           THE COURT:  All right.  So, Mr. Fonseca, I do have a

4    question that just occurred to me in a hypothetical.  So what

5    does the county require of somebody who wants to go watch

6    their kid play baseball on the county baseball park?  So they

7    are going to go use a bench on -- the bleachers to sit and

8    watch their child play on the county baseball field.

9           MR. FONSECA:  Well, they're certainly not required

10   to have a permit.

11          THE COURT:  Why not?  They're using the common area

12   of a county property.

13          MR. FONSECA:  But the use has already been

14   designated as a spectator sport.

15          THE COURT:  Well, where does -- this doesn't say

16   that.  This says -- you have two properties here.  You have

17   parking lots and everything -- and common areas, basically

18   everything else.  And if someone wanted to go have a picnic at

19   La Placita Park on a nice spring day with their spouse and

20   child, would they need a permit to go do that?

21          MR. FONSECA:  (No audible response.)

22          THE COURT:  Because they are going to now use that

23   property, the common area of that property would they need a

24   permit?

25          MR. FONSECA:  It's my understanding that there are

1    -- at times these parks and community centers are open to the

2    public for their use as -- to be used outdoors, either to have

3    games or to have access to just having a picnic.  There are

4    times when that happens and that's designated by the actual

5    community center that we're talking about.

6         Here we have not -- it's La Victoria and San Nicia

7    Park (phonetic).  Those are the two with the biggest green

8    common areas.  And the community centers which are charged

9    with putting on events or holding any activities, the county

10   opens that up.  At that point if the county is inviting people

11   to take on any of those activities or whether or not it allows

12   baseball teams to put on a game, then at that point it's

13   already been permitted.

14        THE COURT:  So does it -- is there a permit required

15   now to have a baseball game at the park?

16        MR. FONSECA:  The policy, yes, Your Honor.

17        THE COURT:  Is that park locked down?  I don't know

18   that you would know that answer?

19        MR. ALVAREZ:  Judge, just to weigh in again.  Most

20   of those events, Judge, the -- like Little League, they ask

21   permission to hold baseball games between this day and this

22   day, you know.  And they ask for that and so it's the

23   understanding of everybody that you can go and be a spectator

24   to watch your kid play there because the league has asked

25   permission of the county to use their park.

1          THE COURT:  So sort of on your behalf they've gotten

2     the permit?

3          MR. ALVAREZ:  Right.  And the league has asked for

4     that.  So I would take it that that's okay.  I mean, I don't

5     see a problem with that.

6          THE COURT:  Well, I'm just trying to, you know, to

7     read this literally.  I just want to see how far it goes.  I

8     mean, it seems to me that -- I mean, are there any parks that

9     are open, you can just pull up, they're not locked down during

10    the day where somebody can just go and park and whatever?

11         MR. FONSECA:  Most of them are locked down, Judge.

12    I mean, the ones that I know are locked down.  You can't just

13    go in there whenever you want and get out whenever you want.

14         THE COURT:  And for some that -- it sounds like

15    there may be one or two that aren't -- I guess the Sheriff

16    Deputy could say:  Hey, no picnics?  Have you got a permit to

17    have your picnic here?

18         I mean, you could also see where it gets out of

19    hand.  You know, maybe a husband, wife and a child having a

20    picnic is not a big deal.  But then if the picnic is, you

21    know, 500 people, you know, then it's a problem.  And I can

22    see why the county may want to permit everyone and leave it up

23    to the officer's discretion, I guess, on what --

24         MR. ALVAREZ:  Some of the parks can be used like for

25    a concert or a little band or something like that.  They have

1     to ask permission at that point, a permit from the city or the

2     county.  I mean, that's how it is.  But, I mean, because it's

3     not a sporting event; it's something else beyond what it's

4     designated for in that area, Judge.

5              THE COURT:  Oh, okay.  And so the County would agree

6     that this policy does prohibit -- again, I'm going to keep

7     using Martinez as our an example -- him from parking his -- I

8     mean, he would be permitted to park his truck in the parking

9     lot with his political banner.  But as he walked into the

10    courthouse where his office is he would not be able to

11    approach people with a push card, for example, or ask people

12    to vote for him on his way up to the 100 foot point.

13             MR. FONSECA:  That's correct, Your Honor.  It's a

14    parking lot, it's a parking zone, and that's what it's being

15    used for.  And that prohibition applies not just to him but

16    for anybody.

17             If a church group wanted to pass out any leaflets in

18    the parking lot it would apply to them, too.  And that goes

19    back to the content neutral aspect of this policy and why

20    intermediate scrutiny applies.

21             And you can see that on page 4 of the policy where

22    depositing or posting handbills or flyers is prohibited.  And

23    so is alms and contributions.  These are specifically

24    enumerated under Section 8 of the policy.  You'll see it on

25    page 4.

1          THE COURT:  So there -- I'm just looking back at the

2     courthouse.  There is a sidewalk around the perimeter of the

3     courthouse along the public streets.  I'm going to say on

4     three sides of the courthouse.  I mean, why isn't that

5     sidewalk the same protected public fora as in the case, the

6     site of which I don't have here, but involving the protest at

7     the U.S. Supreme Court?

8          MR. FONSECA:  The interest is different Your Honor.

9     When the Supreme Court is considering a case it's hearing

10    argument it's different than when the courthouse is a polling

11    place and when its people are trying to get to the courthouse

12    to vote.  There's a distinction there.

13         THE COURT:  But there is no distinction -- but still

14    this would prohibit somebody from protesting along the front

15    of the courthouse, let's say, protest something that the

16    County Commissioners had just approved, or was set to approve,

17    or to vote on and they wanted to act to protest it or advocate

18    for it.  Why would they not be able to use -- I mean, why

19    couldn't -- why wouldn't it be constitutional for them to use

20    that front sidewalk and yet that's prohibited?

21         MR. FONSECA:  And that's correct, Your Honor.  I was

22    focusing on this case itself and what the complaint is and the

23    request for the temporary restraining order.  But they have --

24    the permit process is available to use in any area of the

25    property.  If they know that there is a -- if the County

1    Commissioners are meeting, you know when they're meeting.

2         THE COURT:  But the Supreme Court didn't require a

3    permit.  I mean, that's what they're saying, is you can't

4    restrict that; it's public fora.  I mean, we can't restrict

5    who protests here on the front sidewalk of this building; it's

6    public fora.  And yet this particular policy I believe

7    encompasses that sidewalk.  I mean, it's kind of hard because

8    I only circled in red the parking lot of the courthouse.

9         Yeah.  Well, it would be -- I mean, they would -- I

10   assume that's still common areas?  I don't know.  Maybe that's

11   not defined as common area.  Common area excludes the

12   perimeter of parking lots?  I mean, excuse me.  Common area

13   would exclude the perimeter of sidewalks of a public building?

14   And yet that really wouldn't guard against it.  Yeah, that's

15   the -- I have a little bit different diagram.  I was looking

16   at the one that the Plaintiff's provided as part of their

17   Exhibit 2.

18        UNIDENTIFIED SPEAKER:  That is Defendant's

19   Exhibit 8.

20        THE COURT:  8, right.  You can just see there's a

21   sidewalk perimeter against the public streets on three sides

22   of that courthouse.

23        MR. FONSECA:  I'm sorry, the courthouse

24   (indiscernible).

25        THE COURT:  Yeah.  Well, I mean, I'm just concerned

1        that that this policy incorporates the sidewalk and that it

2        bans all speech without a permit -- political, religious,

3        commercial, et cetera -- people along that sidewalk and that

4        that Supreme Court case -- again, I mean, if you go read it,

5        it's -- but it may be -- but that ban may be in conflict with

6        what that Supreme Court case said.  I'm just concerned about

7        that.  We need to look at that.

8                All right.  Well, no good answer.  I guess the Court

9        just needs to look up the law a little bit.  All right.

10               So, you know, I need a little bit of time to

11       continue to do some briefing here on some of these issues and

12       get them resolved.  I'm not going to have a decision today, I

13       don't believe, given it's already 2:00 o'clock, almost 2:00

14       o'clock.

15               You do have my preliminary rulings on the January

16       8th order.  That's not really an order.  I mean, it's -- I've

17       declared it unconstitutionally vague.  It's not something

18       that's enforceable but it doesn't appear to be something that

19       was intended to be enforced; it's something that talks about

20       what the desires are of the County and subsequently the

21       following month they actually entered a or adopted a policy

22       that's somewhat in conformance with some of the desires but

23       not completely.

24               So the Court will issue an order hopefully within

25       the next day or so regarding this.  It doesn't appear that

1   there are any significant problems occurring.  The County has

2   been advised that this January 8th document isn't something

3   they can enforce although they've told me here today they

4   weren't enforcing it and that the incident that happened on

5   February 20th was a misunderstanding by an election judge who

6   was quickly corrected and the only other incident relating to

7   anything like this happened this weekend with Ms. Garza.

8           And the Court is still kind of unsure exactly what

9   happened there beyond the deputies asking her to leave.  So

10  the Court doesn't know why they asked her to leave; whether it

11  was some attempted enforcement of this policy or some other

12  reason.  She did mention they pointed to her shirt which had a

13  campaign slogan on it so likely it had something to do with

14  that.  But again we don't know without hearing from these

15  deputies, which the Court heard no evidence from.

16          All right.  Then there being nothing further we'll

17  be in recess and we'll try to get you an order here quickly.

18          COURTROOM CLERK:  All rise.

19      (Proceedings concluded at 1:53 p.m.)

20                          * * * * *

        I certify that the foregoing is a correct transcript
to the best of my ability produced from the electronic sound
recording of the proceedings in the above-entitled matter, and
this is an accurate a transcript, as best as is possible, due
to conditions of the recording.
    /S/  MARY D. HENRY
CERTIFIED BY THE AMERICAN ASSOCIATION OF
ELECTRONIC REPORTERS AND TRANSCRIBERS, CET**337
JUDICIAL TRANSCRIBERS OF TEXAS, LLC
JTT TRANSCRIPT #58291              DATE FILED:  MARCH 9, 2018