United States District Court
Southern District of Texas
**ENTERED**
October 08, 2019
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| HILDA GONZALEZ GARZA, *et al*, | § | |
| | § | |
| Plaintiffs, | § | |
| VS. | § | CIVIL ACTION NO. 7:18-CV-46 |
| | § | |
| ELOY VERA, *et al*, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING IN PART AND DENYING IN PART PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

## I.      Factual and Procedural Background

Now before the Court are the parties' Cross-Motions for Summary Judgment on Plaintiffs' federal and state-law challenges to the electioneering and property use policies adopted by Starr County, Texas.  (Dkt. Nos. 92, 93).  Two of the current Plaintiffs, politically active County residents Hilda Gonzalez Garza and Rosbell Barrera, filed suit in this Court on February 21, 2018, challenging the County's newly enacted "Policy for Prohibition of Electioneering in or on Property Owned or under the Care, Custody and Control of the County" as an unlawful restriction on their right to engage in electioneering, a form of political speech protected under the First Amendment to the U.S. Constitution and the Texas Election Code, and seeking corresponding declaratory and injunctive relief.  (Dkt. No. 1; *see* Dkt. No. 4, Exh. A). Plaintiffs applied for a temporary restraining order ("TRO") to enjoin implementation and enforcement of this policy, but the Court found that a subsequently adopted "Building and Property Use Policy" ("Use Policy") controlled, and construed Plaintiffs' application as a request

for a TRO against the Use Policy.  *E.g.*, (Dkt. No. 18 at p. 2).[1]  The Court held an evidentiary

hearing on Plaintiffs' application, which featured testimony supporting the County's regulation

of electioneering in parking zones due to concerns regarding the availability of parking for

County business, the risk of voters being "mobbed" by electioneers as soon as they park, the

confluence of pedestrians and traffic, and most colorfully, an incident during the May 2016

mayoral election in which an argument over a barbecue pit—an instrument of the County

electioneering practice dubbed by defense counsel as "tacos for votes"—resulted in chicken

being flung across the Courthouse parking lot.  (*Id.* at pp. 4, 8).  The Court determined that

Defendants were substantially likely to prevail on their argument that Section 11 of the Use

Policy regulating parking zones constituted a reasonable restriction on electioneering[2] in light of

the purpose served by the fora—to enable access to County properties—and that no TRO should

issue against this section.  (*Id.* at pp. 5-6).  Plaintiffs did, however, meet the test for obtaining the

requested TRO against Section 13 of the Policy, which appeared to regulate even passive

political speech in common areas, to include public fora traditionally reserved for speech

activities, outside the Texas Election Code's 100-foot "buffer zone"[3]  applicable to polling

places.  (*Id.* at pp. 6-9).

     The County has since amended its policies, and Plaintiffs have made corresponding

---

[1]  The County's Commissioners adopted the initial policy on January 8, 2018, and the Use Policy on February 18, 2018.  (Dkt. No. 4, Exhs. A, B).

[2]  Although the Use Policy did not define "electioneering," the Court relied on the Texas Election Code's definition of the term as "the posting, use, or distribution of political signs or literature," and also the indication in Texas cases that the term further encompasses verbal political advocacy.  (Dkt. No. 18 at p. 3) (quoting TEX. ELEC. CODE 61.003(b)(1)).

[3]  The Texas Election Code contains the following provisions establishing this zone: § 61.003(a), which provides that "[a] person commits an offense if, during the voting period and within 100 feet of an outside door through which a voter may enter the building in which a polling place is located," the person "loiters" or "electioneers for or against any candidate, measure, or political party"; and (2) § 85.036(a), which states that "[d]uring the time an early voting polling place is open for the conduct of early voting, a person may not electioneer for or against any candidate, measure, or political party in or within 100 feet of an outside door through which a voter may enter the building or structure in which the early voting polling place is located."  TEX. ELEC. CODE §§ 61.003(a), 85.036(a).

attempts to amend their pleading, culminating in the County's "Electioneering Regulations" and revised Use Policy adopted on June 25, 2018, and the Fifth Amended Complaint filed by original Plaintiffs Gonzalez Garza and Barrera and additional Plaintiff Mario Mascorro, Jr., another politically active County resident.  *See* (Dkt. Nos. 29, 56, 63; Dkt. No. 36, Exhs. A-1, A-8; Dkt. No. 92, Exhs. 1-A, 1-B).[4]  Plaintiffs' Fifth Amended Complaint, brought against the County and various County officials responsible for drafting, enacting, and enforcing the challenged policies,[5] seeks declaratory and injunctive relief, as well as attorney's fees, on the basis of their claims that the Electioneering Regulations and Use Policy: (1) violate Plaintiffs' rights to free speech, assembly, and equal protection as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution; (2) violate § 61.003 of the Texas Election Code, since they do not constitute "reasonable regulations concerning the time, place and manner of electioneering" beyond the 100-foot buffer zone; and (3) constitute *ultra vires* activity by the Defendant County Commissioners, who lacked legal authority under § 61.003 to adopt them.  (Dkt. No. 63 at ¶¶ 113-41, Prayer).[6]  Now, both sides move for summary judgment on these claims.  (Dkt. Nos. 92, 93).[7]  Upon consideration of the Motions and the parties' responsive briefing and summary judgment evidence, in light of the relevant law, the Court finds that Plaintiffs are entitled to

---

[4]  Plaintiffs added Mascorro to make a Fourteenth Amendment equal protection challenge to the revised Use Policy's provision prohibiting persons under the age of 21 from applying for a permit to use certain County properties.  *See* (Dkt. No. 63 at ¶¶ 4, 131).

[5]  Those officials are: Omar Escobar in his official capacity as District Attorney for the 229th Judicial District; Victor Canales, Jr. in his official capacity as County Attorney; Eloy Vera in his official capacity as County Judge; Jaime Alvarez in his official capacity as County Commissioner for Precinct 1;  Raul Pena in his official capacity as County Commissioner for Precinct 2; Eloy Garza in his official capacity as County Commissioner for Precinct 3; Ruben D. Saenz in his official capacity as County Commissioner for Precinct 4; and Rene "Orta" Fuentes in his official capacity as County Sheriff.  (Dkt. No. 63 at ¶¶ 11-19).

[6]  The Court has jurisdiction over the federal claims under 28 U.S.C. §§ 1331 and 1343 and 42 U.S.C. § 1983, and supplemental jurisdiction over the state-law claims pursuant to 28 U.S.C. § 1367(a).  (Dkt. No. 63 at ¶¶ 5, 6).

[7]  The Motions are not "Cross-Motions" in only one respect: Defendants move for summary judgment on Plaintiffs' *ultra vires* claims, but Plaintiffs do not.

summary judgment on their challenges to the driver distraction provision of the Electioneering Regulations and the permitting process, age restriction, and criminal penalty provisions of the Use Policy, that Defendants are entitled to summary judgment on Plaintiffs' remaining challenges to the Use Policy, and that in all other respects, both Motions must be denied.

## II.      Standard of Review

A district court must grant summary judgment when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(a).  A fact is material if it might affect the outcome of the lawsuit under the governing law, and is genuinely in dispute only if a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A party moving for summary judgment has the initial responsibility of informing the court of the basis for its motion and identifying those portions of the pleadings and materials in the record, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); FED. R. CIV. P. 56(a), (c).  Where a movant bears the burden of proof on a claim, it must establish "beyond peradventure *all* of the essential elements of the claim…to warrant judgment in [its] favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis in original).  Once the moving party carries its burden, the burden shifts to the nonmovant to go beyond the pleadings and provide specific facts showing the existence of a genuine issue for trial.  *Celotex*, 477 U.S. at 324; FED. R. CIV. P. 56(c).  In conducting its review of the summary judgment record, the court "may not make credibility determinations or weigh the evidence" and must resolve doubts and reasonable inferences regarding the facts in favor of the nonmoving party.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 255; *Dean v. City of Shreveport*, 438 F.3d 448, 454 (5th Cir. 2006).

However, the nonmovant cannot satisfy its burden with "conclusory allegations, speculation, and unsubstantiated assertions which are either entirely unsupported, or supported by a mere scintilla of evidence." *Chaney v. Dreyfus Serv. Corp.*, 595 F.3d 219, 229 (5th Cir. 2010); *see also Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003) ("Unsubstantiated assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment.").

## III.    Overview of Plaintiffs' Claims

Whereas Plaintiffs' application for a TRO against the original Use Policy required the Court's consideration of two discrete sections of that policy, Plaintiffs' Fifth Amended Complaint and Motion for Summary Judgment take aim at two separate policies and a wider swath of provisions, and for an expanded set of reasons.  Through their Motion, Plaintiffs assert that no genuine issue of material fact exists to prevent summary judgment in their favor, on the grounds that the record establishes the following: (1) the Electioneering Regulations violate the First Amendment, in that they are content-based restrictions of protected political speech that were not adopted to further a compelling County interest, and are facially underbroad, overbroad and vague; (2) the Use Policy also violates the First Amendment, as it is not narrowly tailored to serve a significant interest of the County, and is facially overbroad, a prior restraint on speech and assembly that encourages viewpoint discrimination, and vague; (3) the Use Policy's restriction on speech and assembly by persons under the age of 21 violates the Equal Protection Clause of the Fourteenth Amendment; and (4) both policies violate the Texas Election Code because they prohibit electioneering outside the 100-foot buffer zone and are not reasonable time, place and manner restrictions on speech and assembly.  (Dkt. No. 92 at pp. 19-39).

Plaintiffs support these arguments with specific objections to various provisions in both

policies.  *See* (*id.*).  The targeted provisions of the Electioneering Regulations consist of the following: (1) those provisions that implicate the geographic scope of where Plaintiffs may lawfully electioneer, which allegedly exhibit the Regulations' overbreadth; (2) § 4(f), to the extent that this subsection makes it "unlawful for any person to loiter and electioneer on sidewalks and interfere with citizen access to polling locations unless the sidewalks are a specifically Designated Area for Electioneering," on the grounds that this language is underbroad, overbroad, and vague; and (3) § 4(l), the subsection making it "unlawful for electioneering activities to distract the attention or obstruct the vision of drivers, and increase the probability of traffic congestion on or surrounding County-owned or -controlled property," which Plaintiffs also challenge as underbroad, overbroad, and vague.  (*Id.* at pp. 19-28; Exh. 1-A at §§ 4(f), (l)).  Plaintiffs take issue with the following provisions of the Use Policy: (1) § 3(e), which provides that those County facilities identified in Attachment A (the County Courthouse, County Fairgrounds, El Cenizo Park Community Center, La Rosita Library, County Annex Conference Room, and Zarate Park Community Center) "are not available for reservation and permitting on County holidays," on the asserted basis that this subsection is overbroad; (2) §§ 3(a) and (b), in that they allow the use, with a permit, of only those six properties and prohibit the private use of non-Attachment A properties "unless otherwise allowed under [the] Policy," thereby demonstrating the permit requirement's underbreadth; (3) §§ 6 and 8, which set forth the process for obtaining a permit for the use of the six Attachment A properties, on the grounds that the permitting process is overbroad and an unconstitutional prior restraint on speech; (4) § 6(d), the subsection that sets a threshold age requirement of 21 for permit applicants, which Plaintiffs challenge on equal protection grounds; and (5) § 9(a), the provision stating that the County "has the right…to prosecute any and all violators [of the Policy] to the fullest extent of the law," by

reason of its alleged vagueness.  (*Id.* at pp. 28-37; Exh. 1-B at §§ 3(a), (b), (e), 6, 8, 6(d), 9(a), Attach. A).  Plaintiffs make an additional vagueness challenge that does not target any specific provision, arguing that "[b]ecause the Policy only prescribes that a permit is required to use the six county properties listed in Attachment A…, Plaintiffs are left to guess what conduct is permitted or prohibited in all other structures and facilities the County owns." (*Id.* at p. 35).

## IV.  Parties

## A.  Standing

## 1.  Overview of Applicable Law

The Court begins its analysis with the acknowledgment that "a lawsuit is not a general license for a federal court to examine all provisions of a municipal ordinance and decide if any are flawed." *SEIU, Local 5 v. City of Houston*, 595 F.3d 588, 597 (5th Cir. 2010).  Even though the parties fail to raise the issue, the Court must first examine whether Article III of the U.S. Constitution gives Plaintiffs standing to challenge the targeted provisions of the Electioneering Regulations and Use Policy.  *See id.* (constitutional standing is "no more subject to being waived in First Amendment cases than in any other"); *Justice v. Hosemann*, 771 F.3d 285, 291 (5th Cir. 2014) (even where defendant did not dispute plaintiffs' standing to bring First Amendment challenges to state's disclosure requirements for ballot initiatives, court was obligated to ensure its jurisdiction).

Article III limits a federal court's jurisdiction to the resolution of "cases" and "controversies," and confers standing only upon a showing that the plaintiff: (1) has suffered, or imminently will suffer, a concrete and particularized injury-in-fact; (2) the injury is fairly traceable to the defendant's conduct; and (3) a favorable judgment is likely to redress the injury. *E.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559-61 (1992); *SEIU, Local 5*, 595 F.3d at 597

(quoting *Houston Chronicle Publ'g Co. v. City of League City, Tex.*, 488 F.3d 613, 617 (5th Cir. 2007)).  Relevant to this case, "chilling a plaintiff's speech is a constitutional harm adequate to satisfy the injury-in-fact requirement."  *Justice*, 771 F.3d at 291 (quoting *Houston Chronicle Publ'g. Co. v. City of League City, Tex.*, 488 F.3d 613, 618 (5th Cir. 2007)).  "As the Supreme Court has explained, 'it is not necessary that [a plaintiff] first expose himself to actual arrest or prosecution to be entitled to challenge a [law] that he claims deters the exercise of his constitutional rights.'"  *Id.* (quoting *Steffel v. Thompson*, 415 U.S. 452, 459 (1974)).  "Instead, once a plaintiff has shown more than a 'subjective chill'—that is, that he 'is seriously interested in disobeying, and the defendant seriously intent on enforcing, the challenged measure'—the case presents a viable 'case or controversy' under Article III."  *Id.* (quoting *Int'l Soc'y for Krishna Consciousness of Atlanta v. Eaves*, 601 F.2d 809, 815 (5th Cir. 1979)).

Beyond the minimum requirements for constitutional standing, court-created prudential requirements exist, among them that "litigants must assert their own legal rights and not those of others."  *SEIU, Local 5*, 595 F.3d at 597-98.  However, this bar to asserting the rights of third parties is relaxed in cases in which a plaintiff challenges a law as overbroad or vague on its face, in violation of the First Amendment; so long as the plaintiff demonstrates that he is validly restricted by a challenged provision of the law—that is, that an Article III case or controversy exists as to that provision—he has standing to attack the provision as unconstitutionally overbroad or vague in order to prevent it from chilling the speech of other parties not before the court.  *See id.*; *Doe I v. Landry*, 909 F.3d 99, 114 (5th Cir. 2018).[8]  Conversely, "[i]f [the

---

[8]   A different rationale exists for allowing a plaintiff to challenge a law as facially underbroad, *i.e.*, underinclusive of the speech of third parties.  To the extent that an underbreadth challenge calls the redressability prong of Article III standing into question, disallowing standing "would effectively insulate underinclusive [laws] from constitutional challenge, a proposition [the Supreme Court has] soundly rejected."  *Arkansas Writers' Project, Inc. v. Ragland*, 481 U.S. 221, 227 (1987) (citing *Orr v. Orr*, 440 U.S. 268, 272 (1979)).

plaintiff] is limited by one provision of [a law] and makes a facial challenge due to the overbreadth [or vagueness] of a different provision," he lacks constitutional standing to proceed. *SEIU, Local 5*, 595 F.3d at 598.

"Importantly, having Article III standing at the *outset* of litigation is not enough"; a case or controversy must exist at all stages of a case. *Yarls v. Bunton*, 905 F.3d 905, 909 (5th Cir. 2018) (emphasis in original). A case becomes moot, and therefore no longer a case or controversy within the meaning of Article III, "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Id.* (quoting *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013)) (some internal quotation marks omitted); *see also Moore v. Hosemann*, 591 F.3d 741, 744 (5th Cir. 2009) (identifying mootness as "the doctrine of standing in a time frame") (quoting *U.S. Parole Comm'n v. Geraghty*, 445 U.S. 388 (1980)). "An important exception to the mootness doctrine, however, is attacks on practices that no longer directly affect the attacking party but are 'capable of repetition' while 'evading review.'" *Moore*, 591 F.3d at 744 (quoting *Alvarez v. Smith*, 558 U.S. 87 (2009)) (some internal quotation marks omitted). "To invoke that exception, a party must show that '(1) the challenged action is in its duration too short to be fully litigated prior to cessation or expiration, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.'" *Id.* (quoting *Fed. Election Comm'n v. Wis. Right to Life, Inc.*, 551 U.S. 449, 462 (2007)). "Election controversies are paradigmatic examples" of cases that satisfy the first prong, and in such cases the Fifth Circuit has applied the second prong "somewhat loosely"; "even if it [is] doubtful that the plaintiff would again be affected by the allegedly offending election [law]," the case is not moot if "other individuals certainly would be[.]" *Id.* (quoting *Ctr. For Individual Freedom v. Carmouche*, 449 F.3d 655, 662 (5th Cir. 2006)) (internal quotation marks omitted).

2.      **Electioneering Regulations**

Original Plaintiffs Gonzalez Garza and Barrera, both County residents and registered voters, are members of opposing political parties—Gonzalez Garza is a County Democratic Party Precinct Chair,[9] and Barrera is the County Republican Party Chair—who attest to a long history of civic engagement through participation in various forms of speech and assembly on County properties.  (Dkt. No. 4, Exh. C at ¶¶ 1, 3, 7; Exh. D at ¶¶ 1, 2, 4, 5; Dkt. No. 36, Exh. A at ¶¶ 2, 20-24; Dkt. No. 92, Exh. 2 at ¶¶ 1, 4; Exh. 5 at ¶¶ 1, 2).   Relevant to Plaintiffs' challenges to the County's policies as they apply to electioneering, the record is undisputed that Gonzalez Garza and Barrera regularly engage in passive and active electioneering activities (such as wearing t-shirts, holding signs, handing out materials, and speaking to voters on behalf of a candidate, ballot measure, or political party) outside the 100-foot buffer zone at County-owned polling places.  (Dkt. No. 4, Exh. C at ¶¶ 3, 5, 7, 21; Exh. D at ¶¶ 4, 5; Dkt. No. 36, Exh. A at ¶ 20).[10]  Prior to the February 20 through March 2, 2018 early voting period, when the original Use Policy was in place, both Plaintiffs wrote letters to District Attorney ("DA") Escobar inquiring whether their intended electioneering activities would be allowed,[11] received no response, and attested that they feared arrest if they engaged in these activities.  (Dkt. No. 4,

---

[9]   Gonzalez Garza is also a licensed attorney and former Starr County Assistant District Attorney and Assistant County Attorney.  (Dkt. No. 4, Exh. C at ¶ 2).

[10]   As a candidate for Precinct Chair in the March 2018 primary election, Gonzalez Garza did so on her own behalf.  (Dkt. No. 4, Exh. C at ¶ 4).

[11]   Garza Gonzalez stated in her letter that she intended to stand in the County Courthouse parking lot and distribute "The Constitution of the United States" pocket booklets, Democratic Party sample ballots, and bumper stickers, to post a Democratic Party sign in the parking lot, and to speak to voters about the Democratic Party while outside the 100-foot electioneering marker "but still on County property."  (Dkt. No. 4, Exh. C at Exh. C-2).  Barrera stated that he intended "to hand out material and put up signs in support of various Republican candidates running for statewide office in the parking lot of the Starr County Courthouse," also outside the 100-foot marker.  (*Id.*, Exh. D at Exh. D-1).

Exh. C at ¶¶ 7-9, 14, 15, 24, Exh. C-2; Exh. D at ¶¶ 6-9, Exh. D-1).[12]  Gonzalez Garza was "particularly concerned" that, at a County Commissioners Court meeting, County Attorney Canales had stated that the Sheriff's Office would enforce the electioneering policy then in place. (*Id.*, Exh. C at ¶ 16).  Gonzalez Garza later testified that during the early voting period, two Sheriff's deputies approached her while she was standing on the northwest corner of the Courthouse perimeter sidewalk and pointed at the campaign t-shirt she was wearing.  *E.g.*, (Dkt. No. 18 at p. 7).  Fearing arrest if she remained there, she left.  (*Id.*).  In a supplemental sworn declaration, she attested that during the March 2018 primary elections, she observed County officials enforce the policy then in place on the lawns of the Courthouse, and that a Sheriff's Office deputy temporarily prohibited electioneering on grassy areas and sidewalks at the El Cenizo polling location.  (Dkt. No. 36, Exh. A at ¶ 26).  Gonzalez Garza nonetheless returned to the Courthouse lawns during the May 2018 Democratic run-off elections, but "limited [her] electioneering activities to avoid getting in trouble with the County"; on one particular day, after standing outside the 100-foot marker on the Courthouse lawn, holding a sign in support of the Democratic Party, she noticed Sheriff's deputies inside the Courthouse and left to avoid a potential fine or arrest.  (*Id.* at ¶ 27).

The County's restrictions on electioneering have since been replaced by the policies adopted on June 25, 2018.   However, both Plaintiffs' concerns that their customary electioneering activities would subject them to arrest survive the County's amendments, and in varying degrees, demonstrate the continued existence of the type of case or controversy necessary to proceed with their First Amendment facial challenges to the Electioneering Regulations.  As discussed more fully *infra*, the Regulations continue to restrict electioneering

---

[12]   The only clarification Plaintiffs received was a social media post by DA Escobar on his official Facebook page, stating that electioneering would be prohibited in parking areas and parking zones.  (Dkt. No. 4, Exh. C at ¶ 20, Exh. C-5; Exh. D at ¶¶ 11, Exh. D-3).

outside the 100-foot buffer zone at County polling places, and to make the violation of the Regulations' provisions a criminal offense. *See* (Dkt. No. 92, Exh. 1-A at § 5(a)) ("Any person who violates any provision or section of these Regulations shall be deemed guilty of a Class C Misdemeanor."). To the extent that Gonzalez Garza and Barrera challenge the Regulations' geographic limitations on where they may lawfully electioneer, the Court is satisfied that such limitations continue to impose more than a subjective chill on these Plaintiffs' typical electioneering activities. With respect to the Regulations' challenged "sidewalk" provision, § 4(f), Gonzalez Garza has shown that she is seriously interested in standing and electioneering on sidewalks at polling places—specifically, the Courthouse sidewalks—and the Regulations manifest the County's interest in preventing her from doing so, at least on certain sidewalks not designated for electioneering. Barrera has made no similar showing—he describes his customary electioneering activities outside the 100-foot buffer zone in more general terms, and in his letter to DA Escobar, confined his intended activities to the Courthouse parking lot. However, he and Gonzalez Garza have made the necessary showing with respect to the "driver distraction" provision, § 4(l); for the reasons explained *infra*, the County's designated witness, County Judge Vera, testified that this provision potentially encompasses any "outside the norm" political sign that "attract[s] people to look"—an expansive reading of the provision—and since Gonzalez Garza and Barrera have both attested that they electioneer through the holding of signs, the Court is satisfied that § 4(l) constitutes more than a subjective chill on their speech.

Plaintiff Mascorro, a former independent candidate for County Commissioner, Precinct 2 in the November 2018 general election, at the age of 19—he lost in a close race with the incumbent, Defendant Pena—entered this lawsuit for the principal purpose of challenging the Use Policy's age restriction on obtaining permits to use certain County properties, for

electioneering or otherwise.  (*Id.*, Exh. 4 at ¶¶ 3, 9; *see* ¶¶ 4-6).  His sworn declaration evinces this purpose, and although Mascorro also complains of the "restrictive" Electioneering Regulations and Use Policy, and that his "campaign staff and…supporters could have engaged in additional electioneering activities and reached out to more voters" in the absence of these policies, his complaints are too generalized to discern the extent to which the challenged geographic limitations on electioneering, sidewalk provision, and driver distraction provision chilled his own ability to promote his candidacy outside the 100-foot buffer zone, and the extent to which they continue to chill his speech.  In any event, the Court finds that with respect to all of the challenged provisions of the Regulations, at least one Plaintiff has demonstrated a concrete injury-in-fact—the chilling of his/her constitutionally protected right to engage in electioneering—and that this injury is both traceable to the County's adoption of the current Electioneering Regulations, and redressable through a judgment declaring the Regulations (or as discussed more fully *infra*, the severable portions of them) unconstitutional and enjoining their enforcement.  Gonzalez Garza has Article III standing to proceed on all of Plaintiffs' facial challenges to the Regulations, and Barrera may join her challenges to the Regulations' geographic restrictions and driver distraction provision.

**3.     Use Policy**

**a.     Holiday Ban**

Plaintiffs' standing to challenge the Use Policy is more easily addressed by looking to the targeted provisions in succession.  The first—the "holiday ban"—consists of a single provision under which "County facilities are not available for reservation and permitting on County holidays" or "[i]f the holiday falls on a Monday or Friday, the weekend preceding or the weekend following."  (*Id.*, Exh. 1-B at § 3(e)).  An identical provision in a prior version of the

Policy was the specific target of Plaintiff Barrera's supplemental declaration executed on May 20, 2018, in which he explained that as a retired Colonel of the U.S. Army and a lifetime member of the Veterans of Foreign Wars, he has served as "the main organizer of the commemorative events honoring veterans and their families that take place in Starr County"—in particular, at the County Cemetery—on Memorial Day and Veterans Day.  (Dkt. No. 36, Exh. B at ¶¶ 3-6, 12, 14, 17; *see* Exh. A-1 at § 3(d)).  Interpreting "County facilities" to include the Cemetery, Barrera sought a TRO against the holiday ban on his intended use of the Cemetery on Memorial Day, May 28, 2018, but the Court found it prudent to refrain from then addressing Barrera's interpretation of the Policy in place given the County's assurance that it would allow "public gatherings honoring veterans at any County cemetery, memorial or park."  *See, e.g.*, (*id.* at ¶¶ 10-12, 16, 17; Dkt. No. 43).  Standing alone, this assurance does not moot Barrera's challenge to the holiday ban, but the County's subsequent amendment to its policy does. Although "Defendant-induced mootness is viewed with caution," government officials are accorded a presumption of good faith; "[w]ithout evidence to the contrary, [courts] assume that formally announced changes to official governmental policy are not mere litigation posturing," and accord such changes effect through the mootness doctrine.  *Yarls v. Bunton*, 905 F.3d 905, 910-11 (5th Cir. 2018) (quoting *Fontenot v. McCraw*, 777 F.3d 741, 747 (5th Cir. 2015); *Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 325 (5th Cir. 2009), *aff'd on other grounds sub nom. Sossamon v. Texas*, 563 U.S. 277 (2011)).  The amended version of the Use Policy now includes "Cemeteries and Memorials" within its definition of those "Public Spaces" not subject to the permitting process, and since the holiday ban manifestly applies to the six properties otherwise subject to that process, of which the Cemetery is *not* one, the Policy imposes no impediment to Barrera's use of the Cemetery for Memorial and Veterans Day events honoring

veterans.  *See* (Dkt. No. 92, Exh. 1-B at §§ 3(e), 12(a)).  Barrera's sworn declarations offer no other basis for challenging the holiday ban, nor does the declaration of Mascorro, who again mostly complains of the Use Policy's age restriction.  Still, the record reflects that County holidays also include Election Day, and for the reasons discussed more fully *infra*, that the holiday ban precludes non-passive electioneering in certain areas of the Attachment A properties that fall outside the definition of "Public Spaces"—areas described by Plaintiffs as "lawns and other grassy areas and open spaces," including areas at the Courthouse where Gonzalez Garza typically electioneers.  *See* (Dkt. No. 36, Exh. A at ¶ 5, Exh. A-3; Dkt. No. 93, Exh. I at p. 35).[13] Since the provision restricts Gonzalez Garza's speech in this manner, and the Policy makes any violation of its provisions a potential criminal offense, it imposes more than a subjective chill on her speech, and she has standing to challenge it as facially overbroad.  *See* (Dkt. No. 92, Exh. 1-B at § 9(a)).

**b.    Permitting Requirement and Process**

Gonzalez Garza attests that in addition to her electioneering activities at the Courthouse, she "[t]ypically use[s] the Courthouse grounds, including the lawns, sidewalks, and grassy areas, to express [her] views about issues…such as domestic violence, child abuse, and drug awareness," and "to gather with other Starr County residents to raise awareness about those issues."  (Dkt. No. 36, Exh. A at ¶ 21).  She also attests to participating in candlelight vigils and peaceful demonstrations at the Courthouse and "county community centers," and in religious activities "on county property"; in October 2017, she joined about 30 other people who assembled on the Courthouse premises before processing to a local Catholic church for the "Red Mass" celebration.  (*Id.* at ¶¶ 22, 23).  At some of these gatherings, she has been a featured

---

[13]  Although the Use Policy states that the "use" of property "excludes passive expressions of speech," it does not except other forms of electioneering in which Gonzalez Garza engages from the Policy's application.  *See* (Dkt. No. 92, Exh. 1-B at § 3(c)).

speaker. (*Id.* at ¶ 24). "For years, [she has] participated in [these] gatherings of public importance without a requirement to pay fees or apply for a permit," but under the current version of the Use Policy, she must comply with the "Application Process" in § 6 and the "Deposit and After-Hour Fees" requirements imposed by § 8 in order to obtain a permit for the non-passive use of certain areas of the Attachment A properties, which again include green and open spaces at the Courthouse where Gonzalez Garza typically engages in expressive activities. (*Id.* at ¶ 25; *see also* ¶ 6; *see* Dkt. No. 92, Exh. 1-B at §§ 3(a)-(c), 6, 8). Barrera and Mascorro make no similar showing—the latter is not required to obtain a permit, because he cannot obtain one at all—but at the very least, Gonzalez Garza has demonstrated her standing to proceed on Plaintiffs' facial challenges to the permitting requirement and process.

c.     **Age Restriction**

Mascorro plainly serves as the party with standing to challenge § 6(d), which prohibits anyone under the age of 21 from applying for a permit to use the six properties identified in Attachment A. In aid of this role, Mascorro attests to his "wish" to have been able to use County buildings to electioneer and communicate his platform to voters in 2018, and complains that in contrast to his challenger, Defendant Pena, Mascorro's age prevented him from applying for a permit to do so. (Dkt. No. 92, Exh. 4 at ¶¶ 4, 6). The Court is satisfied that Mascorro has demonstrated sufficient injury-in-fact—the inability to use certain buildings for his speech activities—both tied to the Use Policy's age restriction and redressable through a challenge to the restriction on equal protection grounds. Even though his candidacy has ended, the case or controversy has not; Mascorro's challenge to the age restriction during the 2018 election cycle belongs with the "paradigmatic examples" of cases "that cannot be fully litigated before the particular controversy expires," and where "the effects of the [age restriction] will persist."

*Moore*, 591 F.3d at 744-75.  He has Article III standing to proceed.

**d.    Criminal Penalty**

Of the two Plaintiffs who have demonstrated restrictions on the exercise of their First Amendment rights by the Use Policy, only one demonstrably has standing to challenge § 9(a), the provision threatening prosecution "to the fullest extent of the law" for the violation of those restrictions.  Again, Mascorro challenges his inability to apply for a permit to use certain County properties—not the permitting requirement itself—and it stretches the bounds of reason to read even such expansive language to subject Mascorro to prosecution if he attempts to apply for one. Rather, the party with standing to sue is Gonzalez Garza, who has gone so far as to test the reach of the Use Policy's restrictions on the permit-less use of the Courthouse grounds.  *See* (Dkt. No. 36, Exh. A at ¶ 27).  That the Use Policy allows for the open-ended prosecution of any violation of its provisions constitutes more than subjective chill on Gonzalez Garza's First Amendment rights, and she has standing to challenge the penalty provision on vagueness grounds.

**e.    Application to Non-Attachment A Properties**

The declarations of Gonzalez Garza and Mascorro both indicate their confusion regarding the extent to which County properties not listed in Attachment A are subject to the permitting requirement or other restrictions.  *See* (*id.*, Exh. A at ¶¶ 11; Dkt. No. 92, Exh. 4 at ¶ 6).  Since both of these Plaintiffs also attest to the use or desired use of such properties for speech activities, and their potential misapprehension of the Policy's restrictions on these properties raises the specter of criminal prosecution, they have standing to assert this particular vagueness challenge.  *See* (Dkt. No. 36, Exh. A at ¶¶ 22, 24, 25; Dkt. No. 92, Exh. 4 at ¶ 6).

**B.    Claims against Individual Defendants**

The record establishes the role of each of the individual Defendants in this dispute.  DA

Escobar and County Attorney Canales conceived of the policies at issue, Escobar drafted the policies, Escobar and Canales proposed them to the Defendant Commissioners, who adopted them, and Escobar, Canales, County Judge Vera, and Sheriff Fuentes are responsible for enforcing them. *See*, *e.g.*, (Dkt. No. 92, Exhs. 1-A & 1-B; Exh. 7, CANALES DEP. at pp. 44-45; Exh. 8, FUENTES DEP. at p. 10; Exh. 12, VERA DEP. at p. 89; Dkt. No. 93 at ¶¶ 1, 12, 16).[14] Defendants, through their Motion, assert that Escobar, Canales, and Fuentes should be dismissed because they "did not enact or enforce the complained of legislation," and although the Court acknowledges that the Electioneering Regulations and Use Policy were officially "enacted" by the Commissioners, it finds that the challenged Defendants are proper parties to Plaintiffs' request for an injunction against the enforcement of the current policies. (Dkt. No. 93 at ¶ 16; *see* Dkt. No. 95 at pp. 34-35); *see also Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 736 (1980) ("enforcement officers," such as prosecutors "who are threatening to enforce and who are enforcing the [challenged] law," are proper defendants in a § 1983 suit for declaratory and injunctive relief); *James v. Harris Cty.*, 577 F.3d 612, 617 (5th Cir. 2009) ("Under Texas law, sheriffs are 'final policymakers' in the area of law enforcement for the purposes of holding a county liable under § 1983.").

---

[14]   Defendants submit that Escobar does not occupy an enforcement role by pointing out that he lacks jurisdiction over misdemeanor crimes, but in allowing for prosecution of any violation of the Use Policy "to the fullest extent of the law," the Policy itself gives him the authority to enforce it. (Dkt. No. 92, Exh. 1-B at § 9(a); Dkt. No. 97 at ¶ 17, Exh. O at p. 24; *see* Dkt. No. 98, Exh. A at pp. 6-7).

**V.**     **Plaintiffs' Motion for Summary Judgment**[15]

**A.**     **First Amendment Challenges to Electioneering Regulations**

**1.**     **Nexus between Regulations and Compelling County Interest**

**a.**     **Overview**

Plaintiffs contend, Defendants do not attempt to dispute, and the given title and substance of the Electioneering Regulations make clear that they are "content-based" restrictions on a particular form of constitutionally protected political speech—electioneering, defined by the Regulations as "the posting, use, or distribution of political signs, literature, or material" on County property used as polling locations during a voting period.  (Dkt. No. 92 at p. 19, Exh. 1-A at  §§ 1(b), 2(c)); *see Burson v. Freeman*, 504 U.S. 191, 197 (1992) (restrictions on political campaign-related speech near polling places were content-based); *Wiggins v. Lowndes Cty., Miss.*, 363 F.3d 387, 390 (5th Cir. 2004) ("Political speech regarding a public election lies at the core of matters of public concern protected by the First Amendment.").   Therefore, the Electioneering Regulations must survive "strict scrutiny," a test that requires the County to show that its Regulations are both "necessary to serve a compelling state interest and…narrowly [tailored] to achieve that end."  *SEIU, Local 5*, 595 F.3d at 596 (quoting *Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 45 (1983)).

The Electioneering Regulations set forth as their purpose:

(1)     To provide reasonable regulations for electioneering on County-owned or -controlled public property when such property is used as a polling place location during a voting period.

(2)     To establish an electioneering-free zone within one hundred feet (100) of any outside door through which a voter may enter a County building containing a polling place during any voting period.

(3)     To prevent damage to public property and to ensure that a polling place location is sufficiently available during a voting period for those who use the facilities other

---

[15] Even where only a single Plaintiff has standing to bring a particular challenge to either policy, for ease of reference, the Court will herein refer to "Plaintiffs" collectively when addressing all such challenges.

than for election purposes.

(4)    To protect the public health, safety, and welfare of the County.

(5)    To protect the voter and the integrity of the election process.

(Dkt. No. 92, Exh. 1-A at § 1(c)).  Plaintiffs do not attempt to argue that this comprehensive

purpose is not a compelling one, and they are circumscribed by precedent from doing so.  *See*

*Burson*, 504 U.S. at 198-211 (100-foot buffer zone narrowly tailored to serve compelling state

interests of protecting voters from confusion and undue influence and preserving integrity of

election process); *SEIU, Local 5*, 595 F.3d at 596 (labeling as "foundational" to its analysis a

municipality's ability to "regulate expressive conduct in a public forum to protect public health,

safety, or welfare"); *Schirmer v. Edwards*, 2 F.3d 117, 121 (5th Cir. 1993) (state "undoubtedly

has a compelling interest to protect its citizens' right to vote").  Rather, Plaintiffs challenge the

Electioneering Regulations as "motivated by a desire to limit political activity during voting,"

and argue that "[a]s a result, Defendants cannot demonstrate a genuine nexus between the

Electioneering Regulations and a compelling interest."  (Dkt. No. 92 at p. 20).  They also argue

that the Regulations' underbreadth, overbreadth, and vagueness reveal that the Regulations are

not narrowly tailored to any such interest.  (*Id.* at pp. 20-21).

**b.    Motivation for Electioneering Regulations**

Plaintiffs emphasize the undisputed evidence that "[m]ost of the individual Defendants

are elected officials who have held their positions for many years or even decades," that "[p]rior

to 2018, the individual Defendants often ran in uncontested races" or "safely" won the

occasional contested election, and that the County adopted the Electioneering Regulations to

address the "unprecedented number of contested races in Starr County in 2018."  (*Id.* at pp. 10-

14, 19-20; *see* Exh. 1-C; Exh. 3 at ¶¶ 2-11; Exh. 6, GARZA DEP. at pp. 12; Exh. 7, CANALES DEP.

at pp. 12, 54-57; Exh. 8, FUENTES DEP. at pp. 4-5, 9; Exh. 9, ALVAREZ DEP. at pp. 9-10; Exh. 12,

VERA DEP. at p. 17; Exh. 13, ESCOBAR DEP. at pp. 5, 96-98).  Plaintiffs in part extrapolate from these facts the presumed motives for the Electioneering Regulations—"to limit political activity during voting"—but such facts also support the motives revealed by other testimony and indicated by the stated purpose of the Regulations themselves—to maintain order[16] and access to the polls[17] in the new climate of contested races.  (*Id.* at p. 20; Dkt. No. 94 at ¶ 2(A); *see* Exh. K, CANALES DEP. at p. 55; Exh. G, ESCOBAR DEP. at p. 94).  Plaintiffs offer other evidence in support of the presumed motives, but in light of testimony reflecting an intent to serve the compelling interests set forth in the Regulations themselves, Plaintiffs cannot establish these motives as the "real" ones.  *See* (Dkt. No. 92 at pp. 10-14, 20; Dkt. No. 96 at pp. 10-11).

c.      **Underbreadth**

In an effort to demonstrate that, regardless of the motivation behind them, the Electioneering Regulations are not narrowly tailored to serve any compelling interest of the County, Plaintiffs first argue that the Regulations' "underbreadth"—that they regulate only political speech for the ostensible purpose of, for example, maintaining public safety in parking lots, while allowing "a high school marching band to perform in the Starr County Courthouse parking lots during the voting period (as long as the band does not perform in support of a candidate or ballot measure)"—"means that they do not serve [that] compelling interest" and

---

[16]  Plaintiffs' reply argues that "'keeping order' is not a compelling interest," but the Court finds that it falls within the umbrella of the comprehensive, compelling purpose of the Regulations.  (Dkt. No. 96 at p. 9).

[17]  Plaintiffs also submit that Defendants' "goal in enacting the Electioneering Regulations was to limit the ability of candidates and their supporters to communicate with voters entering the polling place," relying on the testimony of DA Escobar that "the whole crux of this is that you're not going to be standing there electioneering, trying to engage the voters who are trying to get in and out of the polling location."  (Dkt. No. 92 at p. 21; Exh. 13, ESCOBAR DEP. at p. 199).  The Court reads this testimony in its context as Escobar's attempt to explain that he did not think passive forms of political speech on sidewalks—for example, a voter wearing a campaign t-shirt and on his way to vote—"should be a problem," but that "when you're on the sidewalk trying to engage people, then you've got an issue because that's not what a sidewalk is for."  (Dkt. No. 92, Exh. 13, ESCOBAR DEP. at pp. 198-200; *see* Dkt. No. 94 at ¶ 2(B)).  In other words, Escobar's testimony also supports the purpose of maintaining voter access to the polls.

cannot survive strict scrutiny.  (Dkt. No. 92 at p. 21) (citing *F.C.C. v. League of Women Voters of Cal.*, 468 U.S. 364, 396 (1984) (observing that "overinclusiveness and underinclusiveness" of statutory ban undermined likelihood of substantial governmental interest); *Dep't of Tex., Veterans of Foreign Wars of U.S. v. Texas Lottery Comm'n*, 760 F.3d 427, 440 (5th Cir. 2014) (underinclusiveness of statute "undermines any argument that [the State] is truly interested in regulating [for that purpose]")).   However, as Defendants point out in their response, the Regulations state that their provisions "shall not be construed in violation of County policy," which includes the Use Policy and its provision reserving parking lots "strictly for public and government automobile parking purposes and to effect the business of the Government buildings which they serve."  (*Id.*, Exh. 1-A at § 1(d); Exh. 1-B at § 11; Dkt. No. 94 at ¶ 2(C)).  Plaintiffs' "parking lot" example does not reflect the Regulations' asserted underbreadth.

Plaintiffs' reply counters with other examples of underbreadth: that the provision making it unlawful to "distract" drivers prohibits only electioneering activities, such as holding a distracting political sign, while allowing persons to similarly distract drivers with religious signs; and that the restriction on certain electioneering activities on certain sidewalks—that is, those activities that "interfere with citizen access to polling locations unless the sidewalks are a specifically Designated Area for Electioneering"—does not similarly prohibit "singing by the high school glee club, a prayer meeting for peace, an assembly to read the U.S. constitution, soliciting donations for a charity, and the handing out of restaurant coupons."  (Dkt. No. 96 at pp. 2-5) (citing Exh. 1-A at §§ 4(f), (l); Exh. 6, Garza Dep. at pp. 35-37; Exh. 7, Canales Dep. at pp. 95-98; Exh. 9, Alvarez Dep. at pp. 51-53; Exh. 10, Saenz Dep. at pp. 23-24; Exh. 12, Vera Dep. at pp. 48-50, 80-82; Exh. 13, Escobar Dep. at pp. 112-14, 145-46).  The challenged provisions, which are found in § 4, entitled "Prohibited Activities and Conduct," provide in full:

(f)     It shall be unlawful for any person to loiter or electioneer on sidewalks and interfere with citizen access to polling locations unless the sidewalks are a specifically Designated Area for Electioneering.  This prohibition does not apply to passive expressions of speech such as wearing clothing, hats, or pins which may be considered electioneering.

(l)     It shall be unlawful for electioneering activities to distract the attention or obstruct the vision of drivers, and increase the probability of traffic congestion on or surrounding County-owned or -controlled property.

(Dkt. No. 92, Exh. 1-A at §§ 4(f), (l)).  The County has not pointed to any language in the Regulations or Use Policy, or to any other County policy, that would proscribe non-electioneering activities that "distract the attention or obstruct the vision of drivers, and increase the probability of traffic congestion," whether at polling locations or otherwise.  However, since Plaintiffs otherwise admit and even emphasize that electioneering is an activity in which County citizens regularly engage, and the Court may reasonably infer that this form of speech predominates at polling locations during voting periods, that § 4(f) restricts only electioneering activities in service of protecting public safety at polling locations during voting periods does not patently exhibit unconstitutional underbreadth.  With respect to the sidewalk provision, the Court notes that it also prohibits "loitering"—a term that Plaintiffs challenge elsewhere in their Motion as overbroad and vague, based in part on their reading of § 4(f) to prohibit loitering or electioneering on non-designated sidewalks, and separately to prohibit interfering with pedestrian access to polling locations on those sidewalks.  (Dkt. No. 92 at pp. 27-28; Dkt. No. 96 at p. 13).[18]  If Plaintiffs' construction were the correct one, their examples of non-electioneering activities on sidewalks would fall within the latter prohibition if they block access to the polls, such that § 4(f) would not be underinclusive of such activities.  Given the Regulations' stated goals and limited application to polling places during voting periods, and that loitering is

---

[18]  Plaintiffs support their construction of § 4(f) with the testimony of DA Escobar, but the record contains only the first cited page of his deposition, and that page offers no such support.  *See* (Dkt. No. 96 at p. 13; Exh. 13, ESCOBAR DEP. at p. 202).

generally understood to be criminally sanctionable only when paired with an improper purpose, a more reasonable construction of this provision is that it prohibits electioneering or loitering that "interfere[s] with citizen access to polling locations" on non-designated sidewalks. *See City of Chicago v. Morales*, 527 U.S. 41, 57-58 (1999) (noting "the precedent set by a number of state courts that have upheld ordinances that criminalize loitering combined with some other overt act or evidence of criminal intent," and that "state courts have uniformly invalidated laws that do not join the term 'loitering' with a second specific element of crime"). Even under this construction, Plaintiffs' given examples could potentially be considered loitering if they impede citizen access to the polls,[19] and do not establish § 4(f) as constitutionally underbroad.

d.    **Overbreadth**

Plaintiffs also make the argument that the Electioneering Regulations are overbroad, and therefore not narrowly tailored to serve any compelling governmental interest. (Dkt. No. 92 at pp. 21-22). In support of this argument, Plaintiffs incorporate the ensuing section of their Motion in which they challenge the Regulations as "substantially" overbroad. *See* (*id.* at pp. 21-28). As Plaintiffs observe in that section, one test for determining whether a law exhibits "overbreadth" in violation of the First Amendment is "if the impermissible applications of the law are substantial when 'judged in relation to [its] plainly legitimate sweep.'" (*Id.* at p. 22); *e.g.*, *Morales*, 527 U.S. at 52 (quoting *Broadrick v. Oklahoma*, 413 U.S. 601, 612-15 (1973)). However, "'[o]verbreadth' has also been used to describe a challenge to a [law] that in all its applications directly restricts protected First Amendment activity and does not employ means narrowly tailored to serve a compelling governmental interest." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 965 n.13 (1984) (citing cases). Since the Electioneering

---

[19]   In other words, § 4(f) arguably encompasses any act of remaining on a sidewalk if it impedes voter access to the polls, regardless of whether a secondary purpose for remaining there exists. At the very least, Plaintiffs have not established otherwise.

Regulations are directed at restricting a particular form of protected political speech, albeit for stated interests that are compelling, the Court determines this application of Plaintiffs' "overbreadth" challenge by looking to whether the Regulations employ means narrowly tailored to serve any such interest.

Plaintiffs take the position that the Electioneering Regulations "prohibit electioneering in a substantial amount of public fora" at County-owned polling locations, in that they permit electioneering only in the County's "Designated Areas for Electioneering" ("DAE") highlighted in green on maps attached to the Regulations, and only to the extent that the DAE encompass property not otherwise excluded—in sum, only "the east and west sidewalks of the Courthouse and a small strip of the parking lot at La Rosita"; therefore, the Regulations exclude County-owned parks, sidewalks, and grassy areas, and two polling places entirely, from those areas in which Plaintiffs may lawfully electioneer.  (Dkt. No. 92 at pp. 23-24).  This argument hinges on Plaintiffs' interpretation of County Judge Vera's testimony, given simultaneously on his own behalf and as the County's designated representative,[20] that he agreed with County Attorney Canales's explanation at a Commissioners Court meeting that electioneering "is prohibited everywhere you do not see the green"—that is, everywhere outside the DAE.  (*Id.* at pp. 9, 24; Dkt. No. 96 at pp. 5-8) (citing Dkt. No. 92, Exh. 12, VERA DEP. at pp. 68-70, 72-73).  However, as Defendants note, Canales made this statement in the course of explaining where persons could, and could not, "hand out voting cards [or] sample ballots" on sidewalks, not to explain the sweep of the Regulations as a whole.  *See* (Dkt. No. 94 at ¶ 2(E); Dkt. No. 92, Exh. 12, VERA DEP. at p. 69; Dkt. No. 92, Exh. 1-A at § 4(f) (making it "unlawful for any person to…electioneer on sidewalks and interfere with citizen access to polling locations *unless the*

---

[20]  *See* (Dkt. No. 92, Exh. 12, VERA DEP. at p. 11); FED. R. CIV. P. 30(b)(6) (entity noticed for deposition must designate person to testify on its behalf).

*sidewalks are specifically [DAE]*") (emphasis added)).  Moreover, consistent with the sidewalk provision, the Electioneering Regulations define the DAE as "those areas shown on Exhibit A [the attached maps] as areas specifically designated for electioneering *which would otherwise be prohibited under the County's [Use Policy] or other sections in these Regulations*."  (Dkt. No. 92, Exh. 1-A at § 2(c)) (emphasis added).  In other words, the DAE carve out areas for electioneering where the Electioneering Regulations and Use Policy otherwise disallow it, such as on sidewalks (Regulations) or in parking lots (Policy);[21] they do not identify the only areas in which Plaintiffs may lawfully electioneer.  *See* (*id.* at § 4(f); Exh. 1-B at § 2(D); Dkt. No. 94 at ¶¶ 2(D), (F)).  Since neither the Electioneering Regulations nor Use Policy proscribes all electioneering in parks, on sidewalks, and in grassy areas owned by the County, or at the Salineno and Abel Gonzalez polling locations, the exclusion of these areas and properties from the DAE does not somehow prohibit electioneering there.

Plaintiffs next contend that the Electioneering Regulations are overbroad because they "prohibit Plaintiffs from electioneering on some county properties even when they are not used as polling locations," offering the examples of the La Victoria and El Cenizo Community Centers which are identified as polling places with DAE in the maps attached to the Regulations, but were not used as polling places during the May 2018 voting period (La Victoria and El Cenizo) and other voting periods in 2018 (La Victoria).  (Dkt. No. 92 at p. 25) (citing Dkt. No. 92, Exh. 1-A at § 1(b), Exh. A; Exh. 2-B; Exh. 9, ALVAREZ DEP. at pp. 59-60; Dkt. No. 36, Exh.

---

[21]  Also for this reason, the fact that "a small grassy area at La Rosita" included within the DAE for that property "sits next to the fire department" does not, as Plaintiffs argue in a footnote, trigger operation of the prohibition on electioneering "within fifteen (15) feet from the curb on any County fire station driveway"; rather, the DAE excepts that property from the fire station provision.  (Dkt. No. 92 at pp. 23-24 n.4; Exh. 1-A at § 4(i)).  Plaintiffs' other footnoted argument, if credited—that the El Cenizo DAE encompasses property not owned by the County—does not mean that electioneering is somehow excluded on that property.  (Dkt. No. 92 at p. 24 n.4).

A-9).[22]   However, since the Electioneering Regulations "apply only to County property used as polling locations," the fact that La Victoria and El Cenizo are identified as "County properties used as polling locations" in the attached maps does not somehow render them electioneering-free zones when the County opts not to use them for that purpose.  (Dkt. No. 92, Exh. 1-A at § 1(b); *see* Dkt. No. 94 at ¶ 2(G)).  The only support for Plaintiffs' position lies in Commissioner Alvarez's testimony—notably, after suggesting that counsel was "making fun of [him]" with the question, since "if there's no election why would somebody stand there [to electioneer?]"—that "[t]he regulation would be enforceable" at La Victoria even if it was not being used as a polling place.  (Dkt. No. 92, Exh. 9, ALVAREZ DEP. at pp. 59-60).  Alvarez's misapprehension of the plain language of the Regulations falls far short of establishing Plaintiffs' construction as the correct one.

Plaintiffs next target as overbroad the driver distraction provision also challenged as underbroad, arguing that the absence of a definition for or workable standard for determining "what constitutes a distracting electioneering activity" potentially sweeps within this prohibition a large of amount of protected speech.  (Dkt. No. 92 at pp. 25-27; *see* Exh. 1-A at § 4(l)).  Plaintiffs support this argument by citing to the following testimony: County Attorney Canales's admission that "holding up a sign that says, Honk if you voted for Victor, and then people are honking," would possibly fall within this prohibition, subject to the discretion of the responding officer; Sheriff Fuentes's agreement that the prohibition would encompass "holding up a sign that says honk if you voted for Sheriff Fuentes," and also suggesting that "someone holding…big political signs" would constitute distracting activity—again, subject to the independent judgment of law enforcement; County Judge Vera's belief that "outside the norm" signs that "attract people to look, but…[may] cause traffic accidents" would be considered distracting; and DA

---

[22]  Plaintiffs also cite to "Dkt. 4-4 (Ex. A-3)," which is not in the record.  (Dkt. No. 92 at p. 25).

Escobar's explanation that what is distracting is a matter of, "I know it when I see it."  (*Id.*, Exh. 7, CANALES DEP. at pp. 101-02; Exh. 8, FUENTES DEP. at pp. 53-54; Exh. 12, VERA DEP. at p. 79; Exh. 13, ESCOBAR DEP. at p. 147).  Defendants respond by arguing that the term "distracting" is "a common term that does not have to be defined in the County's Regulations, especially in the context of driving," but a commonly understood term can still encompass an excess of protected speech, and Defendants make no effort to dispute the potential, expansive reach of that term, as acknowledged by the County's designated representative and multiple Defendants.  In *Guyot v. Pierce*, 372 F.2d 658 (5th Cir. 1967), cited by Plaintiffs, the Fifth Circuit found unconstitutional a city parade ordinance that prescribed "no definitions or standards as to what constitutes 'distracting activity,'" observing that this (and other) "unlimited language" in the ordinance were "wide open to…interpretation on the part of enforcement officials."  (Dkt. No. 96 at p. 3); *Guyot*, 372 F.2d at 662.  Defendants' testimony concedes as much in this case, even going so far as to intimate that what is "distracting" to a driver may depend upon the viewpoint expressed by the speaker, *i.e.*, whether a message on a political sign is "outside the norm."  That the stated goal of the provision is to prohibit distracting activities that "increase the *probability* of traffic congestion" does little to temper the "wide open" discretion otherwise afforded; the provision is too sweeping, and too untethered from the Regulations' compelling goals of ensuring public access and safety at polling locations, to survive strict scrutiny.

Plaintiffs next resurrect their challenge to § 4(f)—in particular, its prohibition of loitering on sidewalks not designated for electioneering—claiming that this prohibition sweeps in a large amount of constitutionally protected conduct.  (Dkt. No. 92 at pp. 27-28).  Plaintiffs first point to County Judge Vera's testimony, on behalf of the County, that "loitering…would be someone that is handing out stuff, selling stuff," including campaign literature, and also to DA Escobar's

testimony that loitering includes standing on a sidewalk while wearing a political t-shirt, and complain that § 4(f) therefore prohibits "peaceful leafletting and wearing campaign t-shirts." (*Id.*, Exh. 12, VERA DEP. at p. 78; Exh. 13, ESCOBAR DEP. at pp. 201-02).  This argument again rests on Plaintiffs' misreading of § 4(f) to prohibit loitering on non-designated sidewalks, without the additional "qualifier" that loitering must "interfere with citizen access to polling locations" to constitute a violation, and no Defendant provided testimony—at least, in the record cited and provided to the Court—that this section prohibits "peaceful leafletting and wearing campaign t-shirts" even if these activities do not obstruct access to the polls.  For the same reasons, Plaintiffs' citation to *Morales*, *supra*, for its observation that "the freedom to loiter for innocent purposes" is a constitutionally protected liberty interest, is not implicated here; § 4(f) prohibits loitering for a purpose that itself affects citizens' protected right to vote, not an "innocent" one.  *See Morales*, 427 U.S. at 43.  As Defendants point out, the Texas Election Code prohibits loitering "during the voting period and within 100 feet of an outside door through which a voter may enter the building in which a polling place is located," and although Plaintiffs correctly respond that they do not challenge the constitutionality of this provision, they also offer the curious retort that "the Electioneering Regulations are [therefore] preempted by state law, since they prohibit loitering…in areas of county property inside the 100-foot buffer zone where the Election Code already prohibits loitering[.]"  (Dkt. No. 94 at ¶ 2(I); Dkt. No. 96 at p. 12); TEX. ELEC. CODE § 61.003(a).  To the extent that § 4(f) and the Election Code overlap, the former's use of the qualifier—that loitering must impede citizen access to the polls to constitute a violation—appears to provide greater clarity than the Code, and even if this were not the case, Plaintiffs' preemption argument does nothing to demonstrate that § 4(f) itself sweeps in too much protected conduct to survive strict scrutiny.  As Defendants observe, and consistent with §

4(f)'s qualifier and the Regulations' stated goals, the prohibition on loitering "is restricted to sidewalks leading up to polling locations," creating exceptions on other sidewalks for the expressive activities that Plaintiffs claim are encompassed by it.  (Dkt. No. 94 at ¶ 2(I)).  The qualifier and exceptions carved into the provision, in an apparent effort to strike a balance between the constitutional interests at play, undermine Plaintiffs' attempt to establish that the provision sweeps too broadly, and prevent them from establishing that § 4(f) is unconstitutionally overbroad.

## 2.    Substantial Overbreadth

As the Court observed *supra*, Plaintiffs also invoke a "substantial overbreadth" challenge to the Electioneering Regulations, on the basis of the arguments already addressed.  Since the Court has determined that the Regulations' "impermissible applications" are isolated to one subsection, Plaintiffs cannot establish that such applications are "substantial" when judged in relation to the Regulations' other provisions.  Plaintiffs' second iteration of its overbreadth challenge is unavailing.

## 3.    Vagueness

Finally, Plaintiffs challenge the Electioneering Regulations as unconstitutionally vague. "Vagueness doctrine is an outgrowth not of the First Amendment, but of the Due Process Clause of the Fifth Amendment," *United States v. Williams*, 553 U.S. 285, 304 (2008), although a vague law that regulates expression "raises special First Amendment concerns because of its obvious chilling effect on free speech," *Brown v. Entm't Merchants Ass'n*, 564 U.S. 786, 807 (2011) (quoting *Reno v. Am. Civil Liberties Union*, 521 U.S. 844, 871-72 (1997)); *see also id.* (explaining that "[v]ague laws force potential speakers to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked") (quoting *Baggett v. Bullitt*,

377 U.S. 360, 372 (1964)) (internal quotation marks omitted).  Where, as here, the challenged

law imposes a criminal penalty, the law is void for vagueness if it: (1) "fail[s] to provide the kind

of notice that will enable ordinary people to understand what conduct it prohibits"; or (2) "may

authorize and even encourage arbitrary and discriminatory enforcement."  *Morales*, 527 U.S. at

56.  Although "perfect clarity and precise guidance" are not required, "even of regulations that

restrict expressive activity," in such context the vagueness doctrine "demands a greater degree of

specificity."  *Brown*, 564 U.S. at 807 (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 794

(1989)); *Smith v. Goguen*, 415 U.S. 566, 573 (1974).

Against this backdrop, the Electioneering Regulations' driver distraction provision

subjected to a trifecta of constitutional challenges—underbreadth, overbreadth, and vagueness—

fails the final test.  *See* (Dkt. No. 92 at pp. 25-27).  Again, Defendants' uncontested testimony

and the Fifth Circuit's decision in *Guyot* determine the outcome; since what "distract[s] the

attention of drivers, and increase[s] the probability of traffic congestion" may include any

"outside the norm" political sign that "attract[s] people to look," thereby granting wide discretion

to law enforcement and posing the danger of viewpoint discrimination, the absence of more

specific guidelines for what constitutes "distracting" electioneering activities renders this

provision void for vagueness.  *See* (*id.*, Exh. 12, VERA DEP. at p. 79); *Guyot*, 372 F.2d at 662-63

(absence of "standards and considerations" for what constituted distracting activities also

rendered city parade ordinance unconstitutionally vague).

Plaintiffs also repeat their challenge to the Regulations' prohibition on loitering on non-

designated sidewalks, albeit for reasons adjusted to the vagueness analysis; they argue that this

prohibition fails to provide "sufficient parameters to the public or to law enforcement."  (Dkt.

No. 92 at p. 28).  Specifically, Plaintiffs point to the Regulations' failure to define the word

"loiter," County Attorney Canales's and Sheriff Fuentes's admissions that what constitutes loitering is subjective, and Fuentes's additional concession that his office has no guidelines for how to enforce the Regulations as a whole.  *See* (*id.*, Exh. 7, CANALES DEP. at p. 104; Exh. 8, FUENTES DEP. at pp. 52, 57).   However, even accepting that the term "loiter" is open to interpretation, the additional qualifier in § 4(f)—that loitering must "interfere with citizen access to polling locations" to constitute a violation, provides sufficient notice to the ordinary citizen and guidance to law enforcement on what is prohibited.  *Cf. Morales*, 527 U.S. at 57-64 (vagueness of ordinance turned on failure to distinguish between innocent loitering and loitering for prohibited purpose); *see* (Dkt. No. 94 at ¶ 2(J)).   Moreover, § 4(f) demonstrates a cohesiveness and clarity of purpose, and therefore the requisite specificity, by prohibiting loitering for this reason on those sidewalks that serve as means of ingress and egress to and from polling places; it imposes no similar restriction on sidewalks designated as areas for electioneering at polling locations.   In the Court's view, it does not raise the type of First Amendment concerns that would render it unconstitutionally vague.

**4.     Conclusion**

Plaintiffs have established that one subsection of the Electioneering Regulations—the driver distraction provision of § 4(l)—is unconstitutionally overbroad and vague.   In all other respects, Plaintiffs' request for summary judgment on their constitutional challenge to the Regulations must be denied.

**B.     Equal Protection Challenge to Use Policy**

In challenging the Use Policy, Plaintiffs first target a single subsection of the permitting process: § 6(d), which prohibits individuals under the age of 21 from applying for a permit to use the six properties identified in Attachment A, and therefore prohibits them from using the

Attachment A properties for speech or assembly of any kind. *See* (Dkt. No. 92 at pp. 28-29; Exh. 1-B at § 6(d) ("Applicants [for a permit] must be at least 21 years of age.")). Plaintiffs challenge this provision as a violation of the Fourteenth Amendment's Equal Protection Clause, which "is essentially a direction that all persons similarly situated should be treated alike," and which requires strict scrutiny of an age classification that "impermissibly interferes with the exercise of a fundamental right," such as the right to speak or assemble. (*Id.* at pp. 28-29); *see City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985); *Massachusetts Bd. of Ret. v. Murgia*, 427 U.S. 307, 312 (1976) (citing *Williams v. Rhodes*, 393 U.S. 23, 30 (1968), to identify First Amendment rights as fundamental)). Plaintiffs argue that "Defendants unequivocally testified that there is no justification, let alone a compelling interest," to support the age restriction contained within the permitting process, pointing to DA Escobar's admission that the provision's singling out of persons under 21 was "arbitrary," and to his and other Defendants' inability to explain the inclusion of the age restriction or identify any problem or incident associated with the use of County property by persons under the age of 21. (Dkt. No. 92 at p. 29) (citing Exh. 7, Canales Dep. at p. 18; Exh. 8, Fuentes Dep. at pp. 77-78; Exh. 9, Alvarez Dep. at p. 82; Exh. 10, Saenz Dep. at p. 53; Exh. 11, Pena Dep. at p. 103; Exh. 12, Vera Dep. at p. 104; Exh. 13, Escobar Dep. at pp. 181-82). The Policy itself offers no further explanation, nor does Defendants' response, and Defendants' Motion offers only the unsubstantiated argument of counsel that the provision satisfies rational basis review (rather than strict scrutiny) because "the County has determined that only applicants of a mature age can be responsible for losses to property." (Dkt. No. 93 at ¶¶ 35, 36; *see* Dkt. No. 96 at pp. 27-29). In the absence of any evidence to controvert Plaintiffs' citations to the record, and given the heightened standard of review that applies when an age classification implicates protected

speech, the Court must find that Plaintiffs are entitled to summary judgment on the claim that the age restriction violates equal protection.

## C.    First Amendment Challenges to Use Policy

### 1.    Overview

Plaintiffs assert that the Use Policy impermissibly regulates speech and assembly, in violation of the First Amendment, for the following reasons: (1) the Policy prohibits all persons from speaking or assembling on County holidays, which includes Election Day, at the six Attachment A properties, (Dkt. No. 92, Exh. A-2 at § 3(e));[23] (2) on non-holidays, it requires persons desiring to speak or assemble to undergo a "burdensome" permit application process only with respect to these properties, and subjects the process to the "unfettered" discretion of County Judge Vera, (*id.* at §§ 6, 8);[24]; (3) it criminalizes violations of the Policy but fails to prescribe a specific criminal penalty, (*id.* at § 9(a)); and (4) it does not inform what conduct is prohibited on non-Attachment A properties.  (Dkt. No. 92 at pp. 14-16, 30-37).

### 2.    Type of Fora Implicated by Provisions Challenged under First Amendment

Since it is a distinction with a marked difference, in terms of the level of "scrutiny" to employ, the Court first turns to the parties' dispute regarding the type of fora implicated by the Policy, and in particular, the challenged provisions.   In contrast to the content-based Electioneering Regulations which target a particular form of political speech at the County's polling locations, the Use Policy sets forth broader guidelines and criteria for the use of County-owned property; to the extent the Policy regulates activity protected by the First Amendment, it is content-neutral.  *See*, *e.g.*, (*id.*, Exh. 1-B at § 2(a)).  As Plaintiffs observe, even content-neutral regulations of "time, place, and manner of expression" in "traditional public fora"—that is, those

---

[23]  *See also* (Dkt. No. 92, Exh. 1-B at § 3(b), Attach. A; Dkt. No. 36-2, Exh A-3).
[24]  *See also* (Dkt. No. 92, Exh. 1-B at § 3(b); Exh. 2-A).

fora "historically associated with the free exercise of expressive activities, such as sidewalks, streets, and parks," *United States v. Grace*, 461 U.S. 171, 177 (1983)—must be "narrowly tailored to serve a significant government interest, and leave open ample alternative channels of communication."  (Dkt. No. 92 at p. 30); *Perry Educ. Ass'n*, 460 U.S. 37, 45 (1983); *SEIU, Local 5*, 595 F.3d at 596 (explaining that use of this test "to judge the constitutionality of a regulation is an application of 'intermediate scrutiny'").[25]

The Court's TRO was primarily concerned with the original Use Policy's prohibition of even passive electioneering on County Courthouse sidewalks analogous to those deemed traditional public fora in *Grace*, *supra*, and the current version of the Policy evinces efforts to address this concern; it excepts from the otherwise challenged holiday ban and permitting requirement/process (and therefore age restriction)[26] the use of "Public Spaces" defined as "[s]idewalks on County property and County Parks, Cemeteries and Memorials," and also excludes from the term "use" "passive expressions of speech."  *See* (Dkt. No. 18 at pp. 6-9; Dkt. No. 92, Exh. 1-B at §§ 3(c), 12(a), (d)).   In fact, the current version specifically allows "[p]eaceful picketing and leafletting in Public Spaces" by any individual "during specified hours of operation throughout the year, including County holidays."  (Dkt. No. 92, Exh. 1-B at § 12(c), (d)).  Nonetheless, Plaintiffs claim that the challenged portions of the Policy implicate traditional public fora because they regulate speech and assembly in "lawns and other grassy areas and open spaces" not otherwise included in the definition of Public Spaces.  (Dkt. No. 92 at p. 31).  As Plaintiffs observe, the Policy defines County-owned "buildings" and "facilities" to "include structures *and surrounding property* belonging to Starr County," requires a permit to use the

---

[25]   The same test applies to regulations of designated public fora, i.e., public property opened or designated by the government for public expressive activity.  *See Perry*, 460 U.S. at 45-46.

[26]   Since "Public Spaces" are excepted from the permitting process, an individual need not meet the permitting age threshold to use these spaces.

buildings and facilities of the six properties identified in Attachment A, and specifies that the buildings and facilities excluded from the permitting requirement "are not available for use by private citizens unless otherwise allowed under this Policy."  (*Id.* at pp. 15, 31; Exh. 1-B at §§ 3(a) (emphasis added), (b)).  Further, Attachment B addressing the use of the Courthouse specifically, requires a permit to use "the courthouse *or grounds*."  (*Id.* at pp. 15, 31; Exh. 1-B at Attach. B § (xii) (emphasis added)).[27]  In other words, to the extent that "surrounding property" or "grounds" encompass "lawns and other grassy areas and open spaces" that fall outside the definition of Public Spaces, "such as the County Courthouse steps," such areas are subject to the holiday ban, permitting requirement/process, and age restriction for the six properties identified in Attachment A, and speech and assembly are prohibited in these areas at all other County-owned properties.  (*Id.* at pp. 15, 31).

Although Plaintiffs read the Policy correctly, their invocation of intermediate scrutiny is also premised on the assumption, unsupported by argument or evidence, that any green or open space not included in the definition of Public Spaces constitutes traditional public fora.  "The mere physical characteristics of the property cannot dictate forum analysis"; in general terms, "[t]he dispositive question is not what the forum is *called*, but what *purpose* it serves, either by tradition or specific designation."  *United States v. Kokinda*, 497 U.S. 720, 727-30 (1990) (distinguishing U.S. Supreme Court perimeter sidewalks in *Grace* from sidewalk leading from parking area to front door of post office, "constructed solely to provide for the passage of individuals engaged in postal business," and which constituted a nonpublic or at the very least,

---

[27]  Although, as Defendants note, Attachment B also states that "Courthouse greens are available at all times for public use to the extent that there is no threat to the security of the Courthouse and the safety of County employees," the ensuing provision requiring a permit for the use of Courthouse "grounds" indicates that Courthouse greens are "available" only upon securing a permit.  *See* (Dkt. No. 92, Exh. 1-B at Attach. B §§ (i)(d), (xii); Exh. 12, VERA. DEP. at pp. 102-03, 122 (testifying on behalf of County that grassy areas at Courthouse are part of its "grounds," and that Policy requires permit to use Courthouse grounds); Dkt. No. 94 at ¶ 2(K); Dkt. No. 96 at pp. 13-14).

limited public forum subject to reasonableness test); *Boardley v. U.S. Dep't of Interior*, 615 F.3d 508, 515 (D.C. Cir. 2010) (emphasis in original).  "What makes [an area] a traditional public forum is not its grass and trees, but the fact that it has 'immemorially been held in trust for the use of the public and, time out of mind, ha[s] been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.'"  *Boardley*, 615 F.3d at 515 (quoting *Perry*, 460 U.S. at 45).  As in *Boardley*, the record before this Court is inadequate to determine the forum status of the multitude of green and open spaces governed by the Policy.  *See id.*  However, the County's implicit (and reasonable) concession that, at the very least, the Courthouse steps constitute traditional public fora, offers a basis for considering Plaintiffs' argument that the challenged provisions fail intermediate scrutiny.  *See* (Dkt. No. 94 at ¶ 2(K); Dkt. No. 94, Exh. G, VERA DEP. at p. 180 (admitting that Courthouse steps, although not defined as such in the Policy, "are what we would traditionally consider a public space"); *Forsyth Cty., Ga. v. Nationalist Movement*, 505 U.S. 123, 126, 129-30 (1992) (treating courthouse steps as public forum); *id.* at 515-16 (government's concession that certain areas within national parks were designated public forums gave basis for resolving First Amendment challenge to regulations that applied to those areas, without deciding forum status of all national parks).  All of these provisions constitute time, place, and/or manner restrictions on the use of County property, to include non-passive speech or assembly on the Courthouse steps, and are therefore constitutionally permissible only if narrowly tailored to serve a significant government interest, and then only if they leave open ample alternative channels of communication.

**3.      Intermediate Scrutiny**

**a.      Holiday Ban**

Again, the holiday ban consists of a single provision under which the six Attachment A

properties "are not available for reservation and permitting on County holidays" or "[i]f the holiday falls on a Monday or Friday, the weekend preceding or the weekend following."  (Dkt. No. 92, Exh. A-2 at § 3(e)).  Also relevant to Plaintiffs' ensuing First Amendment challenges to the Use Policy, Plaintiffs claim that "[t]he County adopted the Policy to address [DA] Escobar's purported concerns about parked cattle trailers at the County Courthouse parking lot and variations in leasing practices of County Commissioners," then assert that the Policy is not narrowly tailored to serve these interests.  (Dkt. No. 92 at p. 30).  In a related argument, Plaintiffs also suggest that, because certain Defendants admitted that certain of their concerns could be addressed by regulating only the Courthouse parking lot, the Policy is not narrowly tailored.  (*Id.* at pp. 33-34) (citing Exh. 6, GARZA DEP. at p. 53; Exh. 9, ALVAREZ DEP. at p. 32; Exh. 10, SAENZ DEP. at p. 44).[28]  However, Plaintiffs cannot limit the interests served by the current Policy to the non-exclusive concerns of individual Commissioners, or to what the cited evidence reveals as starting points for the original use Policy: Escobar's realization, in a discussion with County Attorney Canales, that "nothing" would prevent a person from parking a cattle trailer at the Courthouse, and also the shared concern that County property was being leased by individual County officials.  (*Id.*, Exh. 12, VERA DEP. at p. 93; Exh. 13, ESCOBAR DEP. at pp. 162-63; *see also* Exh. 9, ALVAREZ DEP. at p. 76; Dkt. No. 94 at ¶ 2(L)).  As Escobar explained,

> [t]he county acts as a governing body, not an individual, at least that's the way it's supposed to be.  But there [were] zero regulations.  There was nothing.  It was completely arbitrary. ….  *So that began this process of how do we begin to define* how public property is to be used, because we didn't have anything.

(*Id.*, Exh. 13, ESCOBAR DEP. at pp. 163-64) (emphasis added).  That the County may have started the process for adopting the Use Policy with these interests in mind, does not mean that the

---

[28]  County Attorney Canales's cited testimony does not directly support this argument; he merely acknowledged that the County could "theoretically" adopt a rule that prescribes a maximum amount of time that people can park at Courthouse.  *See* (Dkt. No. 92, Exh. 7, CANALES DEP. at p. 79).

current version of the Use Policy serves only those interests, on the County Courthouse steps or

otherwise.  Rather, the Court must also consider the interests reflected in the current Policy itself:

> <u>General Purpose.</u>  The purpose of this policy is to establish the guidelines and criteria under which Starr County can develop, maintain, and control its Facilities in order to support county operations, public service, and historical values.  The Commissioners' Court recognizes that facilities are sometimes used for other public purposes, for which adequate parking and safe access must be maintained; blight, distraction, and nuisance must be mitigated in service to the whole community; and, the County must preserve the general health and welfare of the citizens of Starr County.

(*Id.*, Exh. 1-B at § 2(a)).  Further, with respect to the Policy's restrictions on the use of the six

properties identified in Attachment A, including the Courthouse (and its steps), the Policy

reflects the County's interest in ensuring that these properties are "primarily used for official

county functions and their intended purposes," and otherwise "made available to other users on a

limited fee basis for events that support a public purpose, benefit, service, training or interest to

Starr County residents that otherwise would not occur without the facility being available."  (*Id.*

at § 3(a)).  The holiday ban, in eliminating the limited fee basis option entirely on certain days of

the year, further reflects the County's intent "that [the six properties] be used to the fullest extent

for [their] primary purposes."  (*Id.*).  The record also supports the tethering of this provision to

the broader, general purpose of the Policy as a means to maintain and control County property,

and to protect the public; as several Defendants explained, property maintenance and supervision

are more difficult on days when facilities are closed and regular employees are not present.  *See*

(*Id.*, Exh. 12, VERA DEP. at p. 111; Dkt. No. 94 at ¶ 2(P); Exh. 1, ESCOBAR DEP. at pp. 179-80;

Dkt. No. 93, Exh. H, PENA DEP. at p. 97).  This is, of course, true with respect to other County

properties at which no regular employees are present on holidays, but the fact that the Policy

nonetheless allows for the holiday use, without a permit, of all Public Spaces during specified

hours of operation (or if no specified hours are posted there, at all times)[29] reflects a narrow

tailoring in service of significant County interests, as well as the existence of ample alternative

channels for speech and assembly.  The required nexus between the holiday ban and the interests

it serves remains intact at the Courthouse, where the County has an additional, significant

interest in the "historical preservation" of this property, yet allows for the use of Courthouse

sidewalks on holidays.   *See* (Dkt. No. 92, Exh. 1-B at Attach. B).[30]   Plaintiffs have not

established their entitlement to summary judgment on the asserted basis that the holiday ban fails

intermediate scrutiny.[31]

### b.      Permitting Requirement and Process

### i.      Requirement

Plaintiffs next challenge the permit provisions of the Use Policy, in part because "the

County chose only to require a permit for the use of six county properties"—again, to include the

Courthouse and its steps—while excepting others, such as the Salineno Community Center and

Abel Gonzalez Community Center, from its "list of facilities available for reservation and for

which a permit is required."  (Dkt. No. 92 at p. 31; *see* Exh. 1-B at § 3(b) ("Buildings and

facilities that are excluded from Attachment A are not available for use by private citizens unless

---

[29]   The Policy provides that "to the extent practicable, hours of operation [for Public Spaces] will be posted at the main entrance of each location," and "[a]ny Public Space lacking a notice of the hours of operation shall be considered to be open at all times—24 hours a day, 7 days a week, throughout the year." (Dkt. No. 92, Exh. 1-B at § 12(d)).

[30]   On Election Day, when the Courthouse is used as a polling place, the Electioneering Regulations provide that sidewalks designated as areas for electioneering are available for this purpose, and other sidewalks are available for non-electioneering activities so long as those activities do not obstruct access to the polls. *See* (Dkt. No. 92, Exh. 1-A at § 4(f)).

[31]   That it does not survive the scrutiny of Defendant Alvarez, who as a veteran proclaimed his willingness to disobey a holiday ban on "a gathering to honor veterans on Memorial Day" on the steps of a County facility, does not alter this determination.  (Dkt. No. 92 at p. 33; Exh. 9, ALVAREZ DEP. at pp. 87-88).  However, given other indications in the record that Defendants are amenable to designating the Courthouse steps and greens as "Public Spaces" excluded from the holiday ban and permitting requirement, the Court emphasizes that they are free to do so; this Order should not be interpreted as an impediment to any such change.

otherwise allowed under this Policy."); Exh. 1-E (Starr County property list)).   To use the
excluded facilities, County Judge Vera explained, a citizen would know from "prior practice" to
ask the relevant Precinct's Commissioner for permission.   (*Id.* at p. 33; Exh. 12, VERA DEP. at
pp. 100-01).   Plaintiffs also cite to testimony that one of the Attachment A properties, the Starr
County Fairgrounds, is not actually owned by the County, and to Commissioner Garza's
accusation that one Commissioner's precinct was "targeted" by the inclusion of the Zarate and El
Cenizo properties in Attachment A, and submit that the permit requirement is both
underinclusive and unsupported by a genuine governmental interest in regulating the use of
County property.   (*Id.* at pp. 32-33; *see* Exh. 6, GARZA DEP. at pp. 67-69; Exh. 12, VERA. DEP. at
p. 95).

Defendants respond that the County has no obligation to make the Salineno and Abel
Gonzalez Community Centers available for private use, explaining that "the County uses these
spaces for senior citizens on most days, and the County has the right to reserve their use for such
public purpose."  (Dkt. No. 94 at ¶ 2(N)).   As Plaintiffs note, Defendants fail to cite to evidence
that these buildings are mostly used for senior citizens.  (Dkt. No. 96 at p. 15).   However, the
Policy itself states that "Starr County buildings and facilities are to be primarily used for official
county functions and their intended purpose," a significant County interest that is served by
prohibiting the private use of the Salineno and Abel Gonzalez (and other) properties regardless
of the specific County function served.  (Dkt. No. 92, Exh. 1-B at § 3(a)).   Also, that the County
relaxed the prohibition on private use with respect to the Attachment A properties, which may be
used with a permit, belies Plaintiffs' accusations of underbreadth; in doing so, the County
expanded the areas in which the otherwise legitimate goal of reserving County properties for
their official/intended purpose may give way to private use, whether for expressive activities or

otherwise.  Defendants also observe that, consistent with Vera's testimony, the Policy allows for the Commissioners' Court to consider a citizen's request to use a non-Attachment A property, pointing to the provision enabling the Commissioners' Court to waive or modify Policy requirements when:

> (i)   It is necessary in order to serve the public interest;
>
> (ii)  It will allow use which will continue to meet the intent of this Policy; and
>
> (iii) It will not violate any applicable statutory requirements.

(Dkt. No. 94 at ¶ 2(O); *id.* at § 2(c)).  Although this provision allows for waiver or modification by the Commissioners as a body (rather than as individuals, as Vera's testimony indicated), it similarly expands the scope of properties available for private use, within parameters that otherwise accord with significant interests of the County.

Defendants also dispute Commissioner Garza's "targeting" accusation with the uncontested observations that the Salineno and Abel Gonzalez Community Centers are located in Precincts 2 and 4, respectively, and that the Commissioners for those Precincts voted to adopt the Use Policy.  (Dkt. No. 94 at ¶ 2(N); *see* Dkt. No. 92, Exh. 1-B at p. 8 of 15).  Plaintiffs nonetheless claim that "Defendants continue to fail to explain why the Commissioners' Court excluded properties such as these if the County's aim was truly to ensure that the County leased buildings in a uniform fashion, as Defendants claim."  (Dkt. No. 96 at p. 15).  This was not, however, the County's singular aim; the stated purposes served by prohibiting the use of certain County properties and creating exceptions for others are various, in part to account for the very interests Plaintiffs seek to vindicate in this case: their rights to speak and assemble.  Finally, that the Fairgrounds are not actually owned by the County means, if anything, that the Policy does not regulate this property; it does not somehow unfasten the permitting requirement from the

County's significant interest in making the Attachment A properties "available to other users on a limited fee basis for events that support a public purpose, benefit, service training or interest to Starr County residents that otherwise would not occur without the facility being available." (Dkt. No. 92, Exh. 1-B at § 3(a)).  Since Public Spaces remain available, without a permit, for expressive activities, Plaintiffs have not demonstrated that ample, alternative channels for communication do not exist, and are not entitled to summary judgment on their facial challenge to the permitting requirement.

ii.    **Process**

Regardless of the constitutionality of the requirement to obtain a permit, Plaintiffs also challenge its "burdensome application process with one-size-fits all requirements that are applicable to all activities" in the Attachment A properties, complaining that to speak or assemble at any of these properties, Plaintiffs must: (1) pay a $50.00 deposit (or in the case of the Courthouse, a deposit of up to $1,000.00) that the County may or may not refund; (2) state the purpose for which the property will be used; (3) sign a release of liability; (4) have the signature to the release notarized by a Texas notary public; and (5) submit the application to County Judge Vera no less than 30 days before the intended use.  (Dkt. No. 92 at pp. 31-32; *see* Exh. 1-B at ¶¶ 6(b), (c), 8(b); Exh. 2-A ("Request Form for Use of Starr County Facilities")).  Plaintiffs single out the deposit and 30-day advance application criteria as the most onerous, claiming that these requirements are "significant and burdensome for the average Starr County resident and have a chilling effect on speech."  (*Id.* at p. 32) (citing Exh. 12, VERA DEP. at pp. 17-18 (testifying that "[m]ost of the people in Starr County are very humble people, low to moderate income, not highly educated"); Exh. 1-D (showing Starr County median household income as $27,133)).  "Yet the County imposes these burdens regardless of the scope or nature of the regulated

activity; for example, the requirements apply with equal force to a family wishing to rent a county building for a large quincenera and to a single individual wishing to stand on the lawns of the County Courthouse…to hand out literature on preventing teen suicide." (*Id.* at p. 32).

If, to modify the latter example, this individual were to stand on the Courthouse steps, the Court agrees that the permitting process—specifically, its requirements to pay a potentially non-refundable deposit of at least $50, provide a signed and notarized release of liability, and apply 30 days in advance for permission to hand out teen suicide prevention materials—are patently overbroad and not narrowly tailored to achieve any significant interest of the County, as stated in the Policy or otherwise provided by the record.  Defendants submit that "safety concerns would prohibit individuals from congregating in the area used for ingress and egress," but a single individual standing on the Courthouse steps does not pose a demonstrable threat to ingress or egress, much less public safety.  (Dkt. No. 94 at ¶ 2(K); *see* Dkt. No. 96 at pp. 14-15).  More importantly, the record provides no indication that requiring a possibly non-refundable $50 deposit, signed and notarized release of liability, and 30 days' advance notice would allay these concerns.  Also, the Court shares Plaintiffs' concern that, even if an individual meets the minimum requirements for submitting a permit application, the Policy still places the deposit amount and that individual's ability to use the Courthouse steps entirely within the discretion of County Judge Vera.  *See* (Dkt. No. 92 at pp. 36-37; Exh. 1-B at §§ 6(a), (c), 8(b), (e)).  Although the permitting requirement itself is supported by significant County interests, among them to make these properties available for "events that support a public purpose, benefit, service, training or interest to Starr County residents that otherwise would not occur without the facility being available," the absence of any stated guidance on what types of activities fall within these interests, in combination with the wide discretion given to County Judge Vera to make this and

other determinations relating to permit fees, establish the permitting process as an overbroad, prior restraint on speech that enables viewpoint discrimination, and therefore fails intermediate scrutiny. *See* (*id.*, Exh. 1-B at § 3(a)); *SEIU, Local 5*, 595 F.3d at 596 (observing that "[r]egulations that require speakers to obtain permits before speaking—prior restraints—are disfavored," and if they "grant the licensing authority broad discretion," are subject to "heavy presumption" of constitutional invalidity); *Int'l Women's Day March Planning Comm. v. City of San Antonio*, 619 F.3d 346, 354 (5th Cir. 2010) ("Given [the] aversion to content discrimination, permit schemes may not vest government officials with overly broad discretion in assessing fees, because 'government regulation that allows arbitrary application…has the potential for becoming a means of suppressing a particular point of view.'") (quoting *Forsyth County, Ga. v. Nationalist Movement*, 505 U.S. 123, 130 (1992)) (some internal quotation marks omitted)).  Plaintiffs are entitled to summary judgment on their facial challenge to the permitting process, and in particular, to §§ 6(a)-(c) and 8(b) and (e) of that process.

**c.**   **Criminal Penalty**

Plaintiffs argue that because § 9(d) of the Use Policy "potentially criminalizes a wide range of conduct," while failing to "create or refer to a specific offense for the conduct it prohibits," the Policy is therefore void for vagueness.  (Dkt. No. 92 at p. 34).  Again, a challenged law that imposes a criminal penalty is void for vagueness if it authorizes arbitrary or discriminatory enforcement, and is scrutinized even more carefully when First Amendment interests are at play.   Since the challenged provision gives the County the right to "prosecute…any and all" violations of the Policy—such as, for example, engaging in non-passive speech on the Courthouse steps on a holiday, or without a permit—and since it allows prosecution "to the fullest extent of the law," it poses the danger of arbitrary, viewpoint-based

enforcement, and raises the specter of unconstitutional vagueness.  Defendants dispute vagueness for two reasons: the Use Policy is not a criminal statute, and also "there is no need for a criminal penalty" because individuals who fail to comply with the Policy "can simply be denied access to County property."  (Dkt. No. 94 at ¶ 2(R)).  Neither argument is availing; regardless of its title and overall purpose, an enactment that imposes a criminal penalty is subject to the above-described vagueness standard, and by providing that the County "has the right to have persons violating any provisions removed from the premises *and* to prosecute any and all violators to the fullest extent of the law," the Policy itself contradicts Defendants' disavowal of the County's "need" for a criminal sanction.  *See* (Dkt. No. 96 at pp. 16-17); *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 47 (1991) (due process protection "is not to be avoided by the simple label a State chooses to fasten upon its…statute," such that "[a] State Act whether labeled 'penal' or not must meet the challenge that it is unconstitutionally vague") (quoting *Giaccio v. State of Pa.*, 382 U.S. 399, 402 (1966)); *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 498-99 (1982) (vagueness standard to apply turns on whether enactment imposes "civil rather than criminal penalties").  Consistent with the language of § 9(d), the two Defendants with discretionary authority to prosecute offenses on behalf of the County, DA Escobar and County Attorney Canales, admitted that the Policy "does not define an individual offense" and/or could be interpreted to create the offense of trespass.  (Dkt. No. 92 at pp. 34-35; Dkt. No. 96 at pp. 16-17; Exh. 7, CANALES DEP. at p. 45, 104; Exh. 13, ESCOBAR DEP. at pp. 185 (also admitting that Policy "does not define an individual offense").  Defendants' testimony confirms the potential for arbitrary or discriminatory enforcement of this section, and that Plaintiffs are entitled to summary judgment on their facial vagueness challenge to the criminal penalty imposed by the Policy.

### 4.   Reasonableness Standard

To the extent that the challenged provisions of the Use Policy restrict speech and assembly in fora not traditionally reserved or designated for expressive activity, they are governed by a different standard; "[i]n addition to time, place, and manner regulations, the [government] may reserve [such fora] for [their] intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view." *Perry*, 460 U.S. at 46.  Put another way, "[c]ontrol over access to a nonpublic forum can be based on subject matter and speaker identity so long as the distinctions drawn are reasonable in light of the purpose served by the forum and are viewpoint neutral." *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985).  Since the Court has already found that the holiday ban and permit requirement meet intermediate scrutiny, these provisions also meet the reasonableness standard.  Of course, the permitting process and criminal penalty imposed by the Policy can fail intermediate scrutiny and still be "reasonable," but since these provisions grant unchecked discretion to County officials to determine the deposit amount for a permit to engage in any form of speech or assembly on the six Attachment A properties, whether such a permit should issue, and the penalty to be imposed in the event of any violation of the Policy, they pose a real danger of viewpoint-based discrimination, and also fail this standard.  *See id.* at 811 ("The existence of reasonable grounds for limiting access to a nonpublic forum…will not save a regulation that is in reality a facade for viewpoint-based discrimination.").

### 5.   Application to Non-Attachment A Properties

Regardless of the type of fora implicated, Plaintiffs argue that the Policy is void for vagueness because it leaves citizens "guessing" as to what conduct is prohibited in non-

Attachment A properties and encourages arbitrary enforcement.  (Dkt. No. 92 at pp. 35-36).  In support of the lack-of-notice element of their vagueness challenge, Plaintiffs point to testimony by the County's designated representative, County Judge Vera, in which he agreed that a private citizen cannot discern from the Policy whether a permit would be needed to use such properties. (*Id.* at p. 35; *see* Exh. 12, VERA DEP. at pp. 100-01).  They also argue that, by testifying that a citizen would nonetheless know to ask the relevant Precinct Commissioner for permission to use the Property, Vera effectively conceded that the Policy encourages arbitrary enforcement.  (*Id.*). Defendants dispute this particular vagueness challenge with the argument that the Use Policy "clearly states that 'all persons in and on County property must observe and follow the Regulations for Use of Space in Section 9.'"  (Dkt. No. 94 at ¶ 2(S) (quoting Dkt. No. 92, Exh. 1-B at § 3(c)).  Plaintiffs respond that §§ 3(c) and 9 "reference[ ] only the regulations for property use on the six listed properties," but § 9 sets forth regulations for the use of County property by "citizens and permit-holders and their guests"—that is, for the use of all County properties, with or without a permit.  Vera's misapprehension of the Policy's language does not establish Plaintiffs' entitlement to summary judgment on their final vagueness challenge to the Policy.

## 6.    Conclusion

Plaintiffs have established their entitlement to summary judgment on their equal protection challenge to § 6(d) of the Use Policy's permitting process, and to their claims that §§ 6(a)-(c) and 8(b) and (e) of that process constitute an overbroad, prior restraint on speech in violation of the First Amendment, and that the criminal penalty imposed by § 9(d) is unconstitutionally vague.  Otherwise, Plaintiffs' request for summary judgment on their facial challenges to the Policy must be denied.

**D.      Texas Election Code Challenges to Electioneering Regulations and Use Policy**

Plaintiffs also move for summary judgment on their claims that the Electioneering Regulations and Use Policy violates § 61.003 of the Texas Election Code, which provides that "[t]he entity that owns or controls a public building being used as a polling place may not, at any time during the voting period, prohibit electioneering on the building's premises outside [the 100-foot buffer zone], but may enact reasonable regulations concerning the time, place, and manner of electioneering." (Dkt. No. 92 at p. 37); Tex. Elec. Code § 61.003(a-1). In support of their claim that the Regulations violate § 61.003(a-1), Plaintiffs cite to the "Election Advisory No. 2017-14" of the Texas Secretary of State's Office, which contains the following, pertinent language:

**Regulating Electioneering Outside 100-Foot Marker**

….

Only a court of law can determine what is reasonable in terms of time, place and manner. However, an example of a reasonable regulation may include prohibiting electioneering on sideways or driveways to keep them clear for pedestrians and traffic. Finally, we recommend that all regulations be content neutral. ….

(Dkt. No. 92, Exh. 1-F). Plaintiffs extrapolate from this language to assert that time, place, and manner restrictions outside the 100-foot zone "(1) should be content neutral and (2) must not be blanket prohibitions," and argue that since the Electioneering Regulations are content-based prohibitions of speech, they are not reasonable. (Dkt. No. 92 at p. 37). With regard to the first asserted criterion, the Court notes that any time, place, and manner regulation of "electioneering," such as the very example given by the Secretary of State, targets a specific form of political speech and can never be content-neutral; the Court does not, therefore, read the Secretary's "recommendation" to render the Electioneering Regulations unlawful simply because they are content-based. They are also not a "blanket" prohibition; although Plaintiffs repeat their

argument that the Regulations "fully prohibit" electioneering at those polling locations where the County has no DAE, again, the DAE identify areas for electioneering where the Regulations and Use Policy otherwise disallow it, such as on sidewalks or in parking lots. *See* (*id.*). That the Election Advisory suggests that prohibitions on electioneering are permissible in those very areas where the DAE *allow* it, undermines Plaintiffs' argument that the Regulations violate § 61.003(a-1). However, with respect to the single provision found facially unconstitutional—the driver distraction provision—Plaintiffs are entitled to summary judgment on their Texas Election Code claim; since the provision is unconstitutionally overbroad and vague, it is not a reasonable restriction on electioneering. The same is true with respect to the Use Policy provisions found unconstitutional, to the extent that they regulate electioneering. Otherwise, Plaintiffs' request for summary judgment on their Texas Election Code claims must be denied.

## E.      Remedy

Although Plaintiffs have demonstrated the unlawfulness of § 4(l) of the Electioneering Regulations, §§ 6(a)-(d), 8(b) and (e), and a portion of § 9(d) of the Use Policy, and that they are entitled to a declaration of the same, it does not follow that Plaintiffs are entitled to an injunction against the whole of the Regulations and Policy. "Generally speaking, when confronting a constitutional flaw in a statute, [courts] try to limit the solution to the problem" by, for example, severing the "problematic portions" of the law "while leaving the remainder intact." *Ayotte v. Planned Parenthood of N. New England*, 546 U.S. 320, 328-29 (2006) (internal citations omitted). Among the guideposts for determining whether to follow this general rule in a given case is legislative intent—more specifically, whether the enacting body "[w]ould have preferred what is left of its statute to no statute at all," with special consideration given to the presence of a severability clause. *Id.* at 329-31; *Veasey v. Abbott*, 830 F.3d 216, 269 (5th Cir. 2016) (citing

*Ayotte*, 546 U.S. at 330-31) ("When a statute contains a severability clause, courts must take special care to attempt to honor a legislature's policy choice to leave the statute intact.").  In fact, the Regulations and Policy contain an identical clause stating that "[a]ny word, phrase, paragraph, or section of [the policy] is severable and should any part be declared unconstitutional, illegal or invalid by any court of competent jurisdiction, such declaration shall not affect any remaining word, phrase, paragraph or section."  (Dkt. No. 92, Exh. 1-A at § 1(d); Exh. 1-B at § 14).  To the extent possible, this clause must be honored.

Since Plaintiffs have established the existence of only one unconstitutional subsection of the Electioneering Regulations, and the absence of the "problematic" driver distraction provision would not significantly undermine the accomplishment of the Electioneering Regulations' comprehensive purpose, Plaintiffs' remedy is an injunction against the enforcement of this singular provision.  However, if the Court were to sever and invalidate the unlawful permitting provisions and penalty provision as a whole, and leave the remainder of the Use Policy intact, the County would be left with a permitting requirement and Policy that have no stated means of enforcement, leading to even more significant concerns regarding the "unfettered" discretion given to County officials to enforce the permit requirement and other Policy provisions.  Therefore, with respect to the Use Policy, the Court finds that the remedy that best balances the interests of the parties is: (1) an injunction against only that portion of § 9(d) that allows the County "to prosecute any and all violators to the fullest extent of the law," leaving the County with the ability to "have persons violating any provisions removed from the premises"; and (2) an injunction against the permitting requirement pending amendment by the County of the objectionable process, and leaving the County with the ability to enforce the otherwise unobjectionable portions of § 9 as to the use of the Attachment A properties.

**VI.     Defendants' Motion for Summary Judgment**

**A.     Electioneering Regulations**

Since the Court has granted Plaintiffs' request for summary judgment on their claims that § 4(l) of the Electioneering Regulations is unconstitutionally overbroad and vague and violates the Texas Election Code, Defendants are not entitled to summary judgment on these claims. What remains is the Motion's defense of what Defendants interpret as the additional provisions challenged by Plaintiffs' Complaint, but the chief focus of Plaintiffs' response and the parties' ensuing briefing is the motivation behind the enactment of the Electioneering Regulations as a whole; as discussed *supra*, whereas Defendants assert (and provide some evidence) that the Regulations were enacted with the goal maintaining order and access to the polls in the new climate of contested races, Plaintiffs assert (and also provide some evidence) that the motive was to limit political activity so as to favor incumbents.  In setting forth arguments and evidence for why their asserted motive was the real one and the opposing side's was not, the parties highlight the presence of a genuine factual dispute on this issue, and more importantly, the issue of whether the Regulations can survive strict scrutiny.  *See* (Dkt. No. 93 at ¶¶ 9-15; Dkt. No. 95 at pp. 6-8, 10-23; Dkt. No. 97 at ¶¶ 6-12; Dkt. No. 98, Exh. A at pp. 2-6).  As Defendants also note, "[i]t is a familiar principle of constitutional law that [courts] will not strike down an otherwise constitutional statute on the basis of an alleged illicit legislative motive," and the Court acknowledges that whether Defendants, individually or collectively, harbored an unconstitutional or constitutional motive (or a mixture of the two) in enacting restrictions on electioneering is not the dispositive question.  (Dkt. No. 93 at ¶ 9); *United States v. O'Brien*, 391 U.S. 367, 383 (1968).  However, the Court is also satisfied that the record reflects a genuine dispute as to whether electioneering activities had created or threatened to create what the Motion

characterizes as a "circus" at County polling locations, or whether, as Plaintiffs claim, "peaceful political speech" has thus far predominated at the polls in Starr County.  Therefore, Defendants have not established as a matter of law that the Regulations' restrictions on electioneering—a form of political speech already regulated by the Texas Election Code—are *necessary* to serve even the indisputably compelling interests of ensuring public access to and safety at polling locations during voting periods, and consequently, Defendants also have not demonstrated that the Regulations are reasonable restrictions on electioneering within the meaning of the Code.  On this basis alone, the Court must deny Defendants' Motion for Summary Judgment on Plaintiffs' challenges to the lawfulness of the Electioneering Regulations, and to the Commissioners' adoption of them.

**B.**    **Use Policy**

The standard of review governing the content-neutral Use Policy, even to the extent that it restricts the use of public fora for expressive activities, is not as stringent; at the most, the Policy's provisions must be narrowly tailored to serve a significant government interest and leave open ample alternative channels of communication, and at the very least, must satisfy the reasonableness standard.  The Court has already determined that the age restriction, permitting process, and criminal penalty fail these tests, and therefore must deny Defendants' request for summary judgment to the contrary.  With respect to the remaining provisions of the Policy, the Court is again left with the parties' dispute over the motive behind the Policy, with Plaintiffs claiming that the County adopted the Policy "for the limited purposes of ensuring adequate parking space at the Courthouse parking lot and creating uniformity in leasing practices of County Commissioners," and that the Policy is not narrowly tailored to serve these interests. (Dkt. No. 95 at p. 30).  However, for the reasons set forth *supra*, the record reflects these

purposes as the starting points for the Policy, and the Court has no grounds to dispute the necessity of a policy to govern the use of the County's property, for the stated, significant interests of: supporting county operations, public service, and historical values; maintaining adequate parking and safe access; mitigating blight, distraction, and nuisance; and preserving the general health and welfare of County citizens. *See* (Dkt. No. 92, Exh. 1-B at § 2(a)).  Apart from arguments made in support of their Motion, and accepted by the Court, *see* (Dkt. No. 95 at pp. 31-32), Plaintiffs' briefing in response to Defendants' Motion attempts to demonstrate the absence of the requisite link between the Policy and a significant interest of the County by arguing that § 9(e), which prohibits the posting of signs on all County property at any time, is "unprecedented and unconstitutional," (*id.* at p. 32).  Defendants' Motion justifies this provision by asserting that "the County has an interest in maintaining sidewalks clear for the safety of pedestrians and in making sure that lawns and greens are always available for active citizen use and not exclusively for the speech of the first to 'claim' an area as his own for as long as a sign remains," and also in "protect[ing] the lawns and vegetation from destruction," and although Plaintiffs complain of the absence of evidence to support these interests as specifically articulated, each derives from the stated, significant interests of the Policy itself.  (Dkt. No. 93 at ¶ 33; *see* Dkt. No. 95 at p. 32).  Plaintiffs nonetheless complain that § 9(e) is not narrowly tailored to serve any such interest, since the Policy permits "standing and holding signs in the same areas," thereby revealing that "the County is not genuinely interested in eliminating visual clutter or preserving green areas," and has not crafted the Policy to address these concerns "in a uniform fashion."  (Dkt. No. 95 at p. 33).[32]  However, the Court finds no inconsistency in a

---

[32]  Plaintiffs also assert, without reference to supporting language in the Policy, that the Policy permits "the placing of chairs, tables, tents, and grills" in the same areas, but § 9(p) generally disallows the use of "BBQ pits," tents, and "other similar items" on County property.  (Dkt. No. 92, Exh. 1-B at § 9(p); Dkt. No. 95 at p. 33).

Policy that simultaneously prohibits the affixing of signs to property while allowing the same signs to be held there; the prohibition serves the stated interests, and the permissive provision constitutes a lesser encroachment on those interests and provides an alternative means for speech via signs.[33]  Plaintiffs have not placed in genuine dispute whether this, or any other restriction on speech or assembly imposed by any other Policy provision not already addressed, fails intermediate scrutiny, much less the reasonableness standard.  Therefore, the Court will grant Defendants' Motion for Summary Judgment on Plaintiffs' remaining constitutional, Texas Election Code, and *ultra vires* claims relating to the Use Policy.

## VII.   Conclusion

For the foregoing reasons, the Court hereby **ORDERS** that Plaintiffs' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, and that Defendants' Motion for Summary Judgment is **GRANTED IN PART** and **DENIED IN PART**, as follows:

Plaintiffs' Motion is **GRANTED**, and they are entitled to summary judgment, on their claims that § 4(l) of the Electioneering Regulations is overbroad and vague, in violation of the First and Fourteenth Amendments, and does not constitute a reasonable restriction on electioneering, in violation of the Texas Election Code; that the age restriction imposed by § 6(d) of the permitting process of the Use Policy violates equal protection; that  §§ 6(a)-(c) and 8(b) and (e) of that process constitute an overbroad, prior restraint on speech in violation of the First Amendment; that the criminal penalty imposed by § 9(d) of the Policy violates the First and Fourteenth Amendments and is void for vagueness; and that all of the unconstitutional provisions of the Policy, to the extent that they regulate electioneering, also violate the Texas Election Code.  Accordingly, the Court further **ORDERS** that Plaintiffs are entitled to a declaration of the

---

[33]  The Court also observes that the Electioneering Regulations allow for the posting of political signs, under certain conditions, during voting periods.  (Dkt. No. 92, Exh. 1-A at §§ 2(e), (f), 4(a), (c), (g), (m)).

same, and to an injunction against enforcement of the unlawful provisions of the Electioneering Regulations and Use Policy and the permitting requirement of the Policy pending amendment by the County of the objectionable process, leaving the County with the ability to "have persons violating any [remaining] provisions removed from the premises" under § 9(d), and to enforce the unobjectionable portions of § 9 as to the use of the Attachment A properties.  In all other respects, Plaintiffs' Motion is **DENIED**.

Defendants' Motion is **GRANTED**, and they are entitled to summary judgment, on Plaintiffs' constitutional, Texas Election Code, and *ultra vires* claims challenging all other provisions of the Use Policy.  In all other respects, Defendants' Motion is **DENIED**.

SO ORDERED this 7th day of October, 2019, at McAllen, Texas.

Randy Crane
United States District Judge